# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Marko Busic and Adil Sheikh, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:21-CV-03640-GSF |
| Plaintiff, | <u>AMENDED CLASS ACTION COMPLAINT</u> |
| v. | HONORABLE GARY S. FEINERMAN |
| Orphazyme A/S, Christophe Bourdon, Anders Vadsholt, Kim Stratton, Thomas Blaettler, Molly Painter, Georges Gemayel, Bo Jesper Hansen, Martin Bonde, Rémi Droller, Sten Verland, Martijn Kleijwegt, Anders Hedegaard, Catherine Moukheibir and Carrolee Barlow, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Lead Plaintiff Marko Busic ("Lead Plaintiff") and additional Plaintiff Adil Sheikh ("Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint (hereafter the "Complaint" or the "Amended Complaint") against Defendants Orphazyme A/S ("Orphazyme" or the "Company"), Christophe Bourdon ("Bourdon"), Anders Vadsholt ("Vadsholt"), Kim Stratton ("Stratton"), Thomas Blaettler ("Blaettler"), Molly Painter ("Painter"), Georges Gemayel ("Gemayel"), Bo Jesper Hansen ("Hansen"), Martin Bonde ("Bonde"), Rémi Droller ("Droller"), Sten Verland ("Verland"), Martijn Kleijwegt ("Kleijwegt"), Anders Hedegaard ("Hedegaard"), Catherine Moukheibir ("Moukheibir") and Carrolee Barlow ("Barlow") (collectively the "Defendants"), allege the following based upon personal knowledge as to their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, interviews with former employees of the Company or the Confidential Witnesses ("CWs") and other information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a Class Action on behalf of all persons or entities, who: (1) purchased or otherwise acquired Orphazyme's American Depository Shares ("ADS") pursuant and/or traceable to Orphazyme's Registration Statement issued in connection with its September 29, 2020 Initial Public Offering ("IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); and/or (2) purchased or otherwise acquired Orphazyme's ADS between September 29, 2020 and November 4, 2021, both dates inclusive (hereafter the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2. Orphazyme is a biopharmaceutical company that focuses on the development of drugs to treat neurodegenerative diseases. Before the Class Period, the Company sponsored a Phase 2/3 clinical trial for arimoclomol, its sole drug candidate, to treat Niemann-Pick Disease Type C ("NPC"), a rare, genetic condition that impairs the body's ability to recycle cholesterol

2

and other lipids, and causes damage to tissues, including the brain. There are no approved drugs for this condition, and larger companies with greater resources recently abandoned similar clinical trials because of the time and expense required to conduct a robust clinical study that could support regulatory approval. Defendants did not have the time or the resources to conduct a well-controlled, robust clinical trial that collected data for several years due to the Company's exclusive reliance on raising funds from investors and lack of revenues from any approved products, so they chose to submit a New Drug Application ("NDA") to the United States Food and Drug Administration ("FDA") based on a Phase 2/3 clinical trial for arimoclomol to treat NPC that consisted of only 50 patients and lasted for barely two years. In January 2019, this clinical trial failed to meet both primary endpoints, failed to demonstrate statistical significance, and according to the FDA, among a litany of numerous problems, had "weak and contradictory results." Nevertheless, Defendants submitted the NDA for arimoclomol based on the "weak and contradictory" results of the clinical trial, painted a rosy picture of its results by excluding certain patients or otherwise manipulating the data to present better results and repeatedly assured analysts and investors throughout the Class Period that regulatory approval was imminent because the Company was in the "final stages of labeling talks" with the FDA and "absolutely launched already in the US."

3. Before the Class Period began, arimoclomol received a Breakthrough Therapy ("BT") designation from the FDA as well as Fast Track and Priority Review. A drug can be designated as a BT if preliminary clinical evidence indicates that it may show substantial improvement over existing therapies (there were no approved alternatives here) to treat life-threatening conditions, but the designation does not alter the standards for showing safety and efficacy, both of which must be demonstrated with well-controlled, robust clinical trials before a

3

drug can be marketed in the United States. What the BT designation and Fast Track and Priority Review did mean, however, was that Defendants were entitled to receive regular and intense feedback from the FDA both before the NDA was submitted and throughout the time that the NDA was pending. Pursuant to the FDA's customary norms and practices, deficiencies in the NDA or the clinical trials and endpoints used to support the NDA are regularly discussed with the sponsor both before and during the pendency of an application. Orphazyme has not disputed that such standard practices were followed here, providing, at least, Defendants Stratton, Bourdon, Vadsholt, Blaettler, Hansen and Painter with actual knowledge of the agency's serious criticisms and concerns. Unfortunately, Defendants were not equally candid with investors, concealing negative feedback from the FDA about their most important drug.

4. The Company went public in the United States pursuant to an IPO on September 29, 2020. Before the IPO was completed, Defendants received a letter from the FDA that raised concerns about the clinical trial's "weak and contradictory results," its failure to meet both primary endpoints, and its failure to demonstrate statistical significance. Defendants' knowledge of the FDA's concerns was confirmed by the handholding and intensive guidance from the FDA that BT designation affords as well as the fact that the trial was already complete long before the NDA was submitted.

5. In an amendment to the Registration Statement filed in late September 2020, Defendants obscured the FDA's concerns by using deliberately vague terms that rendered the description meaningless. For instance, Defendants stated that the FDA had raised concerns about "the meaningfulness of one metric utilized to evaluate patient progress" in the clinical trial, but never disclosed what the metric was or what the FDA's actual concerns were. The clinical trial had only two metrics utilized to observe the efficacy of arimoclomol, and both failed to

4

demonstrate statistical significance. This attempt to downplay the FDA's concerns rendered the Registration Statement that Defendants used to sell shares in the IPO materially misleading in two important respects: (1) it omitted to disclose that the FDA had serious concerns about the "weak and contradictory" results of the clinical trial and its lack of statistical significance, not just a "metric," and (2) it was compounded by describing the FDA's criticisms as potential risks, when actual, concrete criticisms about the clinical trial and its endpoints had already occurred and had a high risk of occurring again in the near future.

6.      After the Company went public, between March 2021 and October 2021, Defendants Orphazyme, Bourdon, Vadsholt, Blaettler and Hansen made misleading statements and omitted to disclose facts that progressively got worse. While these Defendants continued to tout the results of the clinical trial for arimoclomol to treat NPC and misled analysts and investors to believe that approval of arimoclomol was imminent, they omitted to disclose that the FDA raised concerns about the deficiencies in the NDA in regular communications based on the BT designation and, in particular, in a mid-cycle communication with the Company that occurred no later than December 2020.

7.      On June 18, 2021, the Company disclosed that it had received a Complete Response Letter ("CRL") from the FDA that requested additional qualitative and quantitative evidence concerning arimoclomal's risk-benefit profile. Pursuant to federal regulations, a CRL systematically describes all the specific deficiencies in the NDA and identifies all the corrective actions that a sponsor can take to rectify its mistakes. That is what the CRL did here, but Defendants repeatedly concealed its most damning conclusions for months after its receipt, including that the CRL criticized the lack of statistical significance, and the "weak and contradictory results" of the clinical trial. In October 2021, Defendants met with the FDA to again

discuss the NDA for arimoclomol and told investors that "good progress" had been made, but concealed that the FDA rejected their proposals regarding the previously-identified deficiencies in the NDA at this meeting and raised even more serious concerns about the clinical trial's results.

8. A strong inference that Defendants, at the very least, acted with severe recklessness is supported by the following facts: (1) a CW account from the former Director of Field Medical Affairs at Orphazyme's United States headquarters confirms that the FDA's serious criticisms and concerns that would require a new clinical study were known even before Defendants partially disclosed the CRL's contents, (2) communications with the FDA through in person meetings and through other channels that undoubtedly occurred both before the NDA was submitted and while it was pending, (3) Defendants' own admissions in a Prospectus Supplement filed in November 2021, which demonstrates that Defendants repeatedly and systematically omitted the most negative feedback received from the FDA from their Class Period statements in an effort to manage the decline in price of the Company's ADS and prepare the market for a soft landing, (4) Defendants' own statements showing that they understood the importance of listening to the FDA's feedback and the significance of its criticisms and concerns, and (5) the implausibility of any competing inference, given the obvious significance of the omitted material to the core operations of the Company, since arimoclomol is the Company's only product and a failure to gain regulatory approval and commercialize the drug would doom the Company's prospects.

9. The truth about Defendants' wrongful acts and omissions emerged through a series of partial disclosures throughout the Class Period, causing the price of the Company's ADS to dramatically decline from a high of $21 to less than $4 today (November 19, 2021) after several other trials for arimoclomol failed, after the Company partially disclosed the contents of the CRL, after it announced that it would reduce its workforce by two-thirds, after analysts concluded that

6

the Company's failures – a materialization of the concealed risks – posed an existential threat to Orphazyme, and after Defendants ultimately conceded at the end of the Class Period serious problems about the clinical trial to treat NPC and the FDA's severe criticisms that had been previously concealed from investors.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADS upon the partial disclosures and/or materializations of the concealed risks thereof, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v).

13. Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27(a) of the Exchange Act (15 U.S.C. §78aa(a)) and 28 U.S.C. §1391(b). Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. The Company conducted business through its wholly owned subsidiary, Orphazyme U.S., which is based in Chicago, IL and was situated within this District during the Class Period. This wholly-owned subsidiary was established to focus on regulatory review of the arimoclomol NDA and the Company's attempt to commercialize arimoclomol in the United States.

7

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

15.     Plaintiffs, as set forth in his previously filed declaration (ECF No. 13-4) for Marko Busic, and attached as Exhibits 1 and 2 to the Declaration of Brian P. O'Connell to this Complaint for additional Plaintiff Adil Sheikh, acquired the Company's ADS pursuant and/or traceable to the Offering Documents and/or otherwise acquired the Company's ADS at artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

16.     Defendant Orphazyme is incorporated under the laws of Denmark with its principal place of business located in Copenhagen.  The Company established a wholly owned subsidiary to focus on regulatory review of the arimoclomol NDA and the Company's attempt to commercialize arimoclomol in the United States.  The U.S. subsidiary is headquartered in Chicago. The Company's ADS trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ORPH."

17.     Defendant Stratton served as the CEO and was a member of the Board of Directors of Orphazyme from July 2019 to December 2020.  Stratton signed the misleading Registration Statement.

18.     Defendant Bourdon became the CEO of the Company in March 2021.  Bourdon made the materially misleading statements more fully described in Paragraphs 74 through 77 and Paragraphs 80 through 93.

19.     Defendant Vadsholt has served as the Company's CFO since May 2016.  He also served as the Company's interim CEO in early 2021.  Vadsholt signed the misleading Registration Statement and signed the materially misleading Annual Report filed with the SEC on March 2, 2021.  Vadsholt also made the materially misleading statements identified in Paragraphs 69 through 73.

20.     Defendant Blaettler served as the Chief Medical Officer of the Company from November 2016 to November 2021.  Blaettler made the materially misleading statements identified in Paragraph 82.

21.     Defendant Gemayel has served on the Board of Directors at Orphazyme since November 2012 and as Chairman of the Board of Directors since September 2014.  Gemayel signed the misleading Registration Statement.

22.     Defendant Hansen has served as the Deputy Chairman of the Board of Directors at Orphazyme since October 2017.  Hansen signed the misleading Registration Statement and made the materially misleading statement identified in Paragraph 78.

23.     Defendant Moukheibir has served as a member of the Board of Directors at Orphazyme since November 2017.  Moukheibir signed the misleading Registration Statement.

24.     Defendant Barlow has served as a member of the Board of Directors at Orphazyme since September 2020.  Barlow signed the misleading Registration Statement.

25.     Defendant Bonde has served as a member of the Board of Directors at Orphazyme since June 2010.  Bonde signed the misleading Registration Statement.

26.     Defendant Droller served as a member of the Board of Directors at Orphazyme at the time of the IPO.  Droller signed the misleading Registration Statement.

27. Defendant Verland served as a member of the Board of Directors at Orphazyme at the time of the IPO. Verland signed the misleading Registration Statement.

28. Defendant Kleijwegt served as a member of the Board of Directors at Orphazyme at the time of the IPO. Kleijwegt signed the misleading Registration Statement.

29. Defendant Hedegaard served as a member of the Board of Directors at Orphazyme at the time of the IPO. Hedegaard signed the misleading Registration Statement.

30. Defendant Painter served as the President of the Company's wholly owned subsidiary in the United States from January 2020 to September 2021. Painter signed the misleading Registration Statement as the duly authorized representative of the Company in the United States.

31. The Defendants referenced above in ¶¶ 17-30 are sometimes referred to herein collectively as the "Individual Defendants."

32. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and/or market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants are liable for the materially misleading statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

33. Orphazyme is a biopharmaceutical company that purports to harness Heat Shock Proteins ("HSP") to develop treatments for neurodegenerative diseases. The Company was founded in 2009, went public in Denmark in November 2017 and completed an IPO of ADS in the

United States in late 2020. The Company's corporate headquarters are in Copenhagen and, in 2020, the wholly owned U.S.-based subsidiary of the Company opened its Chicago, Illinois headquarters to facilitate seeking regulatory approval for and commercialization of arimoclomol, the Company's sole drug candidate.

34. HSPs are proteins produced by cells in response to stressful conditions. The production of HSPs in stressful conditions is known as the Heat Shock Response, which creates a defense mechanism to protect against the major characteristics of neurodegenerative diseases. Arimoclomol is an HSP amplifier that purports to treat neurodegenerative diseases. It is contained in a capsule that can be swallowed whole or delivered through a nasal gastric tube.

35. In January 2019, Orphazyme reported results from a Phase 2/3 clinical trial of arimoclomol to treat NPC, a rare, genetic disease that impairs the body's ability to recycle cholesterol and other lipids, and causes damage to tissues, including the brain. The disease impacts both children and adults, and its symptoms include difficulties in swallowing, loss of speech, cognition, motor coordination and ambulation. Aggressive symptoms can lead to death by the time a patient reaches early adulthood. There is currently no approved drug in the United States to treat NPC. The FDA declined to approve one other drug, Zavesca (miglustat), in 2010. However, Zavesca is sometimes prescribed as an off-label therapy.

36. Phase 3, and to a lesser extent, Phase 2 trials, are supposed to be large, well-controlled trials. Here, the Phase 2/3 trial of arimoclomol to treat NPC consisted of only 50 patients and reported data that was collected over a period of two years. One of the primary endpoints of the trial was disease severity as measured by the 5-domain NPC Clinical Severity Scale ("NPCCSS"). The five domains are swallowing, ambulation, cognition, fine motor skills and speech. The other co-primary endpoint was the Clinical Global Impression of Improvement

Scale ("CGI-I"), a widely used patient rating tool in psychiatry that the FDA specifically requested be included. On the 5-domain NPCCSS, the trial was not statistically significant, and the FDA repeatedly questioned the effectiveness of the swallowing domain. On the CGI-I, the trial similarly failed to show statistical significance because of a strong placebo response. These results were not surprising to Defendants given the nature of the disease, the small number of patients they chose to enroll in the trial and the extremely limited length of the trial. In January 2021, Mallinckrodt LLC ("Mallinckrodt") halted the development of adrabetadex, another drug candidate to treat NPC, because the risks associated with the drug outweighed any potential benefits. Dr. Steven Romano, Mallinckrodt's Executive Vice President and Chief Scientific Officer, was blunt about the reasons: he emphasized that a trial that collected data for, at least, three to five years would be required to demonstrate efficacy, but Mallinckrodt's clinical trial, like Orphazyme's, lasted for less than 3 years.

37. Despite understanding all of this adverse information, Defendants presented a rosy and misleading picture of Orphazyme's trial results to investors. They manipulated clinical data in a post-hoc fashion, and hid that the FDA viewed the clinical trial results as "weak and contradictory," raising serious concerns about the lack of statistical significance. Defendants used post hoc analysis to alter results by excluding patients with certain conditions or children under the age of 4, in order to manufacture statistical significance that did not exist as the trial was specified for the 5-domain NPCCSS endpoint. Defendants also claimed that the trial showed statistically significant results in an artificial subgroup of patients who were already being treated with the off-label use of miglustat. With respect to the CGI-I, Defendants claimed that only 10.7% of patients treated with arimoclomol "got much worse" or "very much worse" compared to 26.7%

in the placebo group, but conceded that 42 of the 50 patients in the trial were not even assessed based on this metric.

38.     NDAs are typically supported by two or more pivotal Phase 3 (or Phase 2/3) trials that consist of hundreds or thousands of patients and last longer than preclinical studies or Phase 1 or 2 trials.[1]  Nevertheless, Defendants submitted their NDA for arimoclomol for the treatment of NPC in a rolling submission, ending on July 20, 2020, based solely on the Phase 2/3 trial they already were told was problematic.  The FDA accepted the NDA on September 16, 2020 and immediately raised red flags about the clinical data used to support the application, as fully described in Paragraphs 57 through 61.

39.     During the Class Period, the Company also conducted Phase 2/3 trials to assess the safety and efficacy of arimoclomol in patients with Inclusion Body Myositis ("IBM"), a progressive muscle disorder, and Amyotrophic Lateral Sclerosis ("ALS"), a neurodegenerative disease that negatively impacts nerve cells in the brain and the spinal cord.  Clinical results from these trials showed that they both failed in March 2021 and May 2021, respectively.  The Company has now abandoned its drug development program for all indications except for NPC.

**Defendants Received Regular and Intensive Feedback From the FDA About the NDA Throughout the Class Period**

### Defendants Regularly Communicated with the FDA Throughout the Class Period Because of the BT Designation

40.     In 2012, Congress added the BT designation to the Federal Food, Drug and Cosmetic Act ("FD&C Act") to prioritize the review of drugs developed to treat serious, life-threatening diseases.  Under Section 902 of the FD&C Act, the FDA can designate a drug as a

---

[1] *See NEW DRUG APPROVAL: FDA's Consideration of Evidence from Certain Clinical Trials,* UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, Report No. GAO-10-798, at 10, https://www.gao.gov/assets/a308304.html.

"breakthrough therapy" when the drug is "intended . . . to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies . . . " *Codified as* 21 U.S.C. § 356(a)(1). Importantly, the BT designation does not change the standards for safety or efficacy or otherwise alter how the FDA assesses the risk/benefit profile of an NDA. Developmental drugs that receive a BT designation still must demonstrate safety and efficacy for their intended use before they are approved for marketing just like any other drug. *See* FDA's Guidance for Industry: Expedited Programs for Serious Conditions—Drugs and Biologics, at 10 (May 2014).

41. Nevertheless, the level of feedback and guidance that a sponsor receives from the FDA from the time that a sponsor meets with the FDA before submitting an NDA through the date that the agency makes a final determination informs sponsors exactly what information the FDA needs for approval, so that nearly every known drug application with BT designation (over 90%) receives approval on the first application, instead of a CRL.[2] This is so, in part, because the BT designation incorporates all features of Fast Track Review,[3] which include:

- "More frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval";
- "More frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers";
- "Eligibility for *Accelerated Approval and Priority Review, if relevant criteria are met"*; and
- "*Rolling Review*, which means that a drug company can submit completed sections of its Biologic License Application (BLA) or [NDA] for review by FDA, rather than waiting until every section of the NDA is completed before the entire application can be reviewed.

---

[2] *See* https://pink.pharmaintelligence.informa.com/PS144170/Half-Of-US-FDAs-Breakthrough-Therapy-Designations-Have-Resulted-In-Approval#:~:text=Half%20of%20the%20clinical%20programs,Sheet's%20US%20FDA%20Performance%20Tracker.

[3] *See* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

BLA or NDA review usually does not begin until the drug company has submitted the entire application to the FDA."[4]

(Emphasis original).

42.     According to the Center for Drug Evaluation and Research ("CDER") at the FDA, "[o]nce a drug is designated as a breakthrough therapy, the FDA commits to working particularly closely with the drug sponsor to ***devise the most efficient pathway for generating additional evidence needed about safety and efficacy***."  *See* R.E. Sherman, J. Li, S. Shapley, M. Robb, J. Woodcock, *Expediting drug development--the FDA's new "breakthrough therapy" designation*, N. ENGL. J. MED., 369(20):1877-80, (Nov. 14, 2013), https://www.nejm.org/doi/full/10.1056/NEJMp1311439 (Emphasis added).  Indeed, the Registration Statement itself concedes that arimoclomol's BT designation meant that "the FDA must take certain actions, such as holding timely meetings and providing advice, intended to expedite the development and review of an application for approval of a breakthrough therapy." *See* Orphazyme, September 29, 2020 Prospectus at 155.

43.     CDER's Policies and Procedures underscore the intense interaction between the sponsor of a BT designated drug and the FDA.  As soon as the drug receives BT designation, the CDER provides guidance on the drug development program, assigns a Cross-Disciplinary Project Lead ("CDPL") for the review team and involves senior management at the agency to foster cross-disciplinary review.  *See Good Review Practice: Management of Breakthrough Therapy-Designated Drugs and Biologics Manual of FDA Policies and Procedures No. 6025.6*, CENTER FOR DRUG EVALUATION AND RESEARCH—OFFICE OF NEW DRUGS, at 2. ("MAPP 6025.6").  The CDER's Policies and Procedures emphasize that "[t]he review team, led by the

---

[4] https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/fast-track.

CDPL, will meet frequently with the sponsor to provide **intensive guidance on efficient drug development**. CDER review staff and managers will follow the processes and procedures outlined in the guidance for industry *Formal Meetings Between the FDA and Sponsors or Applicants **when scheduling and conducting meetings*** for breakthrough therapy-designated drugs." *Id*. at 3 (Emphasis added, except the non-bolded italicized portion in original).

44.     Even before an NDA is submitted, drug sponsors with BT designation attend "critical [IND application] milestone meetings." *Id*. at 9. At the Pre-NDA meeting, the sponsor and the review team discuss "unresolved issues," and "identify trials to support quality, safety, and efficacy in the NDA." *See* Table II, *Good Review Practice: Good Review Management Principles and Practices for Effective IND Development and Review*—FDA Policies and Procedures No. 6030.9, CENTER FOR DRUG EVALUATION AND RESEARCH—OFFICE OF NEW DRUGS; *see also* 21 C.F.R. § 312.47 (Describing Investigational New Drug Application Meetings). "The primary purpose of this kind of exchange is to **uncover any major unresolved problems** . . . " 21 C.F.R. § 312.47(2) (Emphasis added).

45.     When a sponsor receives BT designation for a drug, the FDA holds a comprehensive multidisciplinary breakthrough therapy meeting with all relevant FDA disciplines to discuss the planned or completed clinical trials and their endpoints, plans for manufacturing the drug and any studies that would be required if the drug is approved. MAPP 2025.6 at 9. According to CDER's Policies and Procedures, this meeting also establishes a comprehensive communication plan with the sponsor to efficiently manage the interactions between the sponsor and the FDA throughout the time that the NDA is pending. *Id.* The communication plan includes expectations on the timing and format of interactions and information exchanges. *Id.* Although the Company continues to conceal the multidisciplinary meeting and comprehensive communication plan, the

fact that arimoclomol received BT designation before the Company went public means that this multidisciplinary breakthrough therapy meeting occurred before the IPO and the comprehensive communication plan was also established before the IPO.

46.     Because of the high level of interaction between the FDA and the sponsor of a BT designated drug, the FDA assigns several high-level managers to oversee the subject NDA.  For instance, the review team consists of a Regulatory Project Manager, who acts as the regulatory liaison with the drug sponsor, and collaborates with the CDPL to manage the day-to-day aspects of the drug application process.  The Regulatory Project Manager "[a]ddresses potential review process issues … and works with the review team and the sponsor to resolve these issues…".  *Id.* at 4.  The review team also includes a Discipline Primary Reviewer, who performs a scientific review of all incoming applications, and officially documents review findings.  *Id.* at 5.  The Discipline Primary Reviewer then communicates any issues to the Regulatory Project Manager, who acts as a liaison with the sponsor.  *Id.*  The review team further includes a Discipline Team Leader, who "***identifies roadblocks or issues in the review of incoming [applications]*** and works with the Discipline Primary Reviewer, CDPL, and the Regulatory Project Manager to resolve these issues."  *Id.*  (Emphasis added).  Most importantly, the CDPL "[a]cts as the scientific liaison between all members of the review team for coordinated internal interactions ***and communications with the sponsor*** through the [Regulatory Project Manager]."  *Id.* at 6.  (Emphasis added).

47.     In addition to regular meetings held with the sponsor while the NDA is pending, CDER's Policies and Procedures emphasize that "the review team should continue to meet with the sponsor throughout the IND [application] phase, outside of the critical IND [application] milestone meetings, to address important issues at different development phases.  The frequency

17

of these meetings should be determined by the communication plan established at the initial comprehensive multidisciplinary meeting." MAPP 6025.6 at 9.

### The FDA Communicated Serious Concerns Throughout the Class Period as Part of the Prioritized Review

48. The NDA for arimoclomol received a priority review designation before the IPO. The FDA typically makes a final determination for a drug application that receives priority review within six months, although in the case of Orphazyme, the FDA extended the review period by three additional months with a new target action date of June 17, 2021. *See* Orphazyme Prospectus Supplement, November 4, 2021, at S-7. However, Defendants were well-aware of the FDA's serious criticisms and concerns and the agency's negative views concerning the structural flaws of the Phase 2/3 clinical trial of arimoclomol to treat NPC many months before the target action date.

49. According to CDER's Desk Reference Guide for NDAs, the FDA holds a filing meeting within 30 days after an NDA is accepted with priority review designation. *See* FDA's CDER 21st Century Review Process: Desk Reference Guide, New Drug Application and Biologics License Application Reviews (NDA/BLA Review Process), at 18, *available at* https://www.fda.gov/media/78941/download. The FDA then issues a filing notification letter to the applicant within 60 days of acceptance, which identifies deficiencies in the application. *Id.* at 21. Defendants received this deficiency letter before the IPO. *See* Paragraphs 4 through 5 and Paragraphs 57 through 66.

50. During the review process, the review team communicates information requests to the applicant. *See* FDA's CDER 21st Century Review Process: Desk Reference Guide, New Drug Application and Biologics License Application Reviews (NDA/BLA Review Process) at 26. Several forms of communication take place with the applicant during the review process. They include, but are not limited to, communicating information requests to the applicant by letter or

email, holding meetings or teleconferences as well as providing specific status updates to the sponsor by telephone or email. *Id.* at 26-27.

51. The review team at the FDA holds an internal mid-cycle meeting within 90 days after an NDA is accepted. In this meeting, the review team identifies "***deficiencies that require significant additional work by the applicant and will be conveyed to the applicant in an appropriate action letter***." *Id*. at 30 (Emphasis added). "Additional information needed from the applicant and any feedback that can be relayed to the applicant are identified (i.e., ***safety issues identified, difficulty reproducing key analyses***, and additional information requests)." *Id*. at 30-31 (Emphasis added). Generally, "within 2 weeks of the mid-cycle meeting, the Regulatory Project Manager and other members of the review team will call the [s]ponsor to provide an update on the review status. This is known as the Mid-Cycle Communication." https://www.nuventra.com/resources/blog/submitting-your-fda-marketing-application; *see also* FDA's *PDUFA Reauthorization Performance Goals And Procedures Fiscal Years 2018 Through 2022*, at 10, https://www.fda.gov/media/99140/download.

52. Thus, at the latest, the mid-cycle meeting at the FDA occurred by the middle of December 2020, three months after the NDA was accepted for filing. Even assuming that the mid-cycle communication was delayed, it certainly occurred before some of the most misleading statements were made, in this case, in the summer and fall of 2021. Yet, instead of tempering their communications to investors, Defendants continued to omit that the FDA had already identified to Orphazyme major "***deficiencies that require significant additional work by the applicant and will be conveyed to the applicant in an appropriate action letter***." *See* CDER 21st Century Review Process: Desk Reference Guide, New Drug Application and Biologics License Application Reviews (NDA/BLA Review Process), at 30. (emphasis added).

53. Two months after the mid-cycle meeting, the FDA holds a late-cycle review meeting. This meeting is generally held shortly before the FDA acts on the application and no later than two months before the target action date. *See Id*. at 39, Appendix A; *see also FDA's PDUFA Reauthorization Performance Goals And Procedures Fiscal Years 2018 Through 2022* at 11. Before a late-cycle meeting is held, any review discipline within the FDA finding deficiencies conveys by letter to the applicant preliminary notice of issues and deficiencies identified. *Id.* at 38. The late-cycle meeting is "intended to share information, identify deficiencies . . . and plan the rest of the review." *Id.* at 40. The FDA then holds a wrap up meeting five weeks before the target action date. *Id*. at 41-42.

54. The late-cycle meeting and its associated communications also occurred long before the CRL was issued and they were yet again events where deficiencies in the NDA were discussed. Still, Defendants Bourdon, Vadsholt, Blaettler and Hansen continued to make misleading statements after the late-cycle meeting and pretended as if the severity of the problems were not apparent even after receipt of the CRL. *See* Paragraphs 78 through 93.

**The CRL Confirmed Deficiencies in the NDA and the Inadequacy of the Clinical Data**

55. A CRL from the FDA is intended to represent a complete response to an NDA. Pursuant to federal regulations, a CRL "describe[s] all of the specific deficiencies that the agency has identified in an application or abbreviated application except as stated in paragraph (a)(3) of this section." 21 CFR 314.110(a)(1). It "systematically document[s] deficiencies that FDA reviewers have identified and typically explain[s] corrective actions sponsors can take." *See* Lurie, P., *et al.*, *Comparison of content of FDA letters not approving applications for new drugs and associated public announcements from sponsors: cross sectional study (2015)*, *available at* https://www.bmj.com/content/350/bmj.h2758. Pursuant to 221 CFR 314.110(a)(3), the FDA can

issue a CRL without inspecting a manufacturing site or reviewing a proposed label if the data submitted for the application is inadequate for approval, as it was with the arimoclomol NDA. The clinical data used here to support the NDA was inadequate from the start, yet Defendant Vadsholt misled analysts and investors to believe that approval was imminent because the Company was in the final stages of labeling discussions with the FDA.

56.     On June 18, 2021, the Defendants admitted they had received a CRL for arimoclomol, but omitted from their communications with investors the most serious criticisms of the clinical data contained in the CRL as fully described in Paragraphs 78 through 87. Defendants' recent admissions now confirm that the FDA, in fact, had provided the information that Orphazyme omitted from its Class Period statements. *See* Prospectus Supplement filed with the SEC on November 4, 2021 (attempting to raise another $50 million from U.S. investors), as detailed herein at Paragraphs 93 and 112.

**Defendants Made Material Omissions in the Registration Statement to Sell ADS to Public Investors**

57.     On September 29, 2020, Orphazyme sold 3,966,146 ADS pursuant to the Registration Statement at $11 per share. The Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made. In particular, the Registration Statement contained the following deliberately vague and misleading description of the concerns that the FDA had raised about the NDA and the clinical data supporting it almost immediately after the NDA was accepted:

> **Recent Developments**
>
> In September 2020, the FDA accepted our NDA for arimoclomol for NPC with priority review. In the letter accepting the NDA, the FDA set a target action date of March 17, 2021 under the PDUFA for completion of its review of our NDA. On

September 24, 2020, we received a filing communication from the FDA in connection with our NDA for arimoclomol for the treatment of NPC in which the FDA summarized six potential review issues, *four of which we have previously discussed with the FDA*, including the FDA's continuing evaluation of the integrity of data from our Phase 2/3 trial for NPC; the effect of the high degree of concomitant miglustat use in our Phase 2/3 trial for NPC on its ability to determine the safety and efficacy of arimoclomol, which could have potential implications for labeling/recommended dosing and post-marketing studies; the proposed primary hypothetical treatment effect used in our Phase 2/3 trial for NPC to estimate the treatment benefit effect; *the meaningfulness of one metric utilized to evaluate patient progress in our Phase 2/3 trial of NPC*; the timing of submission of the QTc and other study reports to the FDA, including in light of evidence suggesting a potential QT safety signal; and differences among the formulations of arimoclomol used in our Phase 2/3 trial of NPC as compared to the formulation of arimoclomol to be marketed. The FDA has requested that we submit reports from the QTc clinical trial by October 1, 2020 and that, given the priority review timeline and both nonclinical and clinical evidence suggesting a potential QT safety signal, submission of these reports after that date may not allow the FDA sufficient time to review. In a preclinical study, we observed a potential QT signal in dogs at a level of arimoclomol exposure that is 28 times higher than the level of exposure in humans in our Phase 2/3 trial in NPC. To date, we are not aware of any clinical evidence of a potential QT signal related to arimoclomol. We do not anticipate being able to submit the reports by October 1, 2020, which may negatively impact our development timeline.

*The filing communication constitutes preliminary notice from the FDA of potential review issues as part of its ordinary course review of our NDA and is not necessarily indicative of deficiencies that may be identified during the review. We intend to discuss the filing communication with the FDA.* The receipt of the filing communication does not impact the FDA's acceptance of the NDA for arimoclomol, the target PDUFA date or the priority review determination. *However, we cannot assure you that such issues will not result in a delay of any potential approval of arimoclomol for the treatment of NPC by the FDA or a determination by the FDA not to approve the product candidate for marketing in the United States.*

(Emphasis added).

58.     The statements identified in Paragraph 57 were materially misleading when made because they omitted to disclose which metric was identified as a "potential review" issue and why the FDA questioned its "meaningfulness" to evaluate patient progress in the Phase 2/3 trial to treat NPC.  Given that the only primary endpoints of the clinical trial were disease severity measured

by the NPCCSS and the CGI-I, both of which failed to show statistical significance, the so-called

"metric" in Defendants' massaged description had to refer to one or both of them. Further, because

the Defendants now admit that the FDA viewed the overall results of the clinical trial as "weak

and contradictory," raised concerns about the lack of statistical significance, and required that

Defendants conduct a new study to demonstrate "performance based validity evidence," and

because the FDA was required by its procedures to communicate its concerns to the BT drug

sponsor, Plaintiffs are informed and believe that the agency expressly raised these concerns in the

pre-NDA meeting and in meetings after the NDA was accepted. The failure to disclose these facts

rendered the deliberately vague description of the FDA's concerns as described in Paragraph 57

materially misleading when made.

59. The Registration Statement also contained misleading descriptions couching

numerous risks as merely potential and draping them with boilerplate language that could apply to

any biopharmaceutical or drug development company seeking regulatory approval, but omitting

that the described risks had either already occurred or had a high risk of occurring in the near

future. In particular, the Registration Statement stated:

> ***Because we are developing arimoclomol for the treatment of diseases in which there is little clinical experience, the FDA or other regulatory authorities may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results.***
>
> There are currently either no or limited approved therapies in the orphan disease indications we are targeting and there may be no therapies approved to treat other diseases that we will target in the future. As a result, the design and conduct of clinical trials of arimoclomol or any future product candidate ***may*** take longer, be more costly or be less effective as a result of the novelty of development in these diseases. In some cases, ***we may use endpoints or methodologies that regulatory authorities may not consider to be clinically meaningful*** and that we may not continue to use in clinical trials or that we may determine after the initiation of the trial to no longer be an appropriate endpoint or methodology. ***Any such regulatory authority may require evaluation of additional or different clinical endpoints in our clinical trials or ultimately determine that these clinical endpoints do not***

*support marketing approval. In addition, if we are required to use additional or different clinical endpoints by regulatory authorities, arimoclomol may not achieve or meet such clinical endpoints in our clinical trials. Even if a regulatory authority finds our clinical trial success criteria to be sufficiently validated and clinically meaningful, we may not achieve the pre-specified endpoint to a degree of statistical significance in any pivotal or other clinical trials we may conduct for our product candidate. Further, even if we do achieve the pre-specified criteria, our trials may produce results that are unpredictable or inconsistent with the results of other efficacy endpoints in the trial.* Regulatory authorities also could give overriding weight to other efficacy endpoints over a primary endpoint even if we achieve statistically significant results on that primary endpoint, if we do not do so on our secondary efficacy endpoints. Regulatory authorities also weigh the benefits of a product against its risks and may view the efficacy results in the context of safety as not being supportive of approval.

(Emphasis added).

60.     The statements identified in Paragraph 59 were materially misleading when made for the same reasons identified in Paragraph 58.  In addition, the statements identified in Paragraph 59 were materially misleading when made because they omitted to disclose that: (a) the FDA had already raised concerns about the meaningfulness of methodologies and endpoints related to the Phase 2/3 trial of arimoclomol for the treatment of NPC, (b) the risk that the FDA would require additional or different clinical endpoints to be evaluated had already increased, and (c) the FDA had already, at the very least, raised serious concerns about the lack of statistical significance and the "weak and contradictory results" of the clinical trial.

61.     Orphazyme used this materially misleading Registration Statement to raise over $43 million of net proceeds from public investors in the United States, before deducting underwriting discounts and offering expenses payable by the Company.

**Defendants Failed to Disclose Known Trends and Uncertainties and Significant Risk Factors Pursuant to Items 303 and 503 of SEC Regulation S-K**

62.     SEC Regulation S-K required Defendants to describe, in the Registration Statement as well as all SEC filings and investor communications during the Class Period, "any known trends

or uncertainties that have had or that the registrant reasonably expects will have a material impact . . . on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") (2017). "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

63. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

64. Item 503 (now codified as Item 105) also required the Defendants to include in the Registration Statement a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2011). Item 503's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks and shield oneself from liability do not tell investors how the

25

specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

65.     Put simply, Item 503 required Defendants to disclose the most significant risks that *could* adversely affect Orphazyme's present or future business expectations and prohibited the Defendants from relying on generic risks that could apply to virtually any other drug development or biopharmaceutical company in the industry.

66.     Throughout the Class Period, Defendants omitted to disclose in the Registration Statement and other communications with investors that the FDA had raised serious concerns about the clinical data used to support the NDA for arimoclomol as soon as the NDA was submitted. Defendants' decision to describe the FDA's September 2020 letter in deliberately vague terms is the antithesis of "*giv[ing] the investor[s] an opportunity to look at the company through the eyes of management* . . ." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. (Emphasis added). Defendants failed to identify which metric was identified as a "potential review" issue and why the FDA questioned its "meaningfulness" to evaluate patient progress in the Phase 2/3 trial to treat NPC, rendering the description misleading. Item 303 affirmatively required the Defendants to disclose the contents of the "review letter" with a high degree of specificity to comply with Regulation S-K's rigorous disclosure requirements. Defendants also violated their affirmative disclosure duties imposed by Item 503 (now Item 105). Because the clinical trial for the treatment of NPC was already complete, problems associated with its results emerged before the Company went public and those problems, at the very least, *could* adversely affect the Company's present or future business expectations, and, in fact, had a negative impact on those expectations, yet Defendants failed to disclose these risks in the Registration Statement.

**Additional Allegations Applicable Only to the Exchange Act Claims**

67.     Plaintiffs make the additional allegations contained in Paragraphs 69 through 93 below with respect to their claims under Sections 10(b) and 20(a) of the Exchange Act only. Plaintiffs disclaim any reliance upon these allegations or incorporation of their allegations in their Securities Act claims (Counts I and II).

68.     Orphazyme, Stratton, Vadsholt, Hansen and Painter are makers of the statements contained in the Registration Statement because Orphazyme is the Issuer of the statements and each one of these Defendants signed his or her name to those statements, indicating that he or she was a maker thereof.  In addition, Orphazyme, Bourdon, Vadsholt, Blaettler and Hansen recklessly omitted material information after the IPO as particularized in Paragraphs 69 through 93 below.

**Additional Omissions Made by Orphazyme, Bourdon, Vadsholt, Blaettler and Hansen After the IPO and Between March 2021 and October 2021**

69.     On March 2, 2021, the Company filed with the SEC its Annual Report for the Fiscal Year 2020 on Form 20-F (hereafter the "2020 Annual Report").  Defendant Vadsholt signed the 2020 Annual Report in his capacity as both the CFO of the Company as well as its Interim CEO, and it contained his certifications pursuant to the Sarbanes Oxley Act of 2002.  The 2020 Annual Report contained the same materially misleading statements identified in Paragraphs 57 and 59 above.

70.     The statements identified in Paragraph 69 were materially misleading when made for the same reasons identified in Paragraphs 58 and 60.  In addition, the 2020 Annual Report was materially misleading because the FDA's serious criticisms and concerns about the lack of statistical evidence and the "weak and contradictory" results of the clinical trial to treat NPC were discussed before this statement was made in (a) a multidisciplinary breakthrough meeting about the clinical trial, its endpoints and any additional studies that would be required to seek approval,

27

(b) regular communications with the FDA, both in person and through other means of communication, pursuant to a comprehensive communication plan, (c) communications with FDA personnel concerning any "roadblocks or issues" that arose in the review process, and (d) a mid-cycle communication from the FDA that occurred no later than the end of December 2020 and which identified the "deficiencies" in the NDA that would require Defendants to do "significant additional work."

71. On March 3, 2021, Vadsholt participated in the Cowen Healthcare Conference where, according to analyst reports from Cowen and Company, Vadsholt stated that Orphazyme was "in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements," but omitted to disclose previously known, negative feedback from the FDA concerning the clinical trial results and the pending NDA. In numerous reports between March 2021 and June 2021, analysts, including from Cowen and Company, understood this misleading statement to mean that approval for the arimoclomol NDA was imminent. Plaintiffs reached out to the analysts from Cowen and Company, and those analysts confirmed that "management" presented this misleading picture of imminent approval in early 2021.

72. Vadsholt's statement identified in Paragraph 71 was materially misleading for the same reasons identified in Paragraph 70. In addition, Vadsholt's reference to the "final stages of labeling talks" and liver/renal monitoring requirements was particularly misleading, and affirmatively led analysts and investors in the wrong direction, because he omitted to disclose that the Company had learned about the FDA's serious criticisms and concerns about the clinical trial in a mid-cycle communication that occurred before this statement was made.

73. Because the FDA was required by BT procedures to communicate with Orphazyme deficiencies during the pendency of the NDA, and because Orphazyme received a mid-cycle

communication and additional formal letters and other informal communications described above in Paragraphs 40 through 56, and has now admitted in the November 2021 Prospectus Supplement that such concerns included fundamental criticisms of the "weak and contradictory results" of the clinical trial and its lack of statistical significance, Plaintiffs are informed and believe that Orphazyme (including Vadsholt, who held himself out as having knowledge of the status of Orphazyme's regulatory communications) had actual knowledge of the concealed information at the time the misleading statements were made.

74.    On April 29, 2021, Bourdon and Vadsholt attended the B. Riley Neurosciences Conference where Bourdon repeatedly told investors the Company was "NPC launch ready," "we are absolutely launched already in the US," and "with NPC alone, Orphazyme can make a difference for patient[s] and generate substantial, you know value for our shareholders and investors."

75.    The statements identified in Paragraph 74 were materially misleading when made for the same reasons identified in Paragraphs 72 and 73, and as a result, Bourdon knew but omitted to disclose that Orphazyme was not (a) "absolutely launched already in the US," or (b) even "launch ready" or (c) in a position to "make a difference for patient[s]," or (d) to "generate" any "value for our shareholders and investors."

76.    In addition, at the same B. Riley Neurosciences Conference held on April 29, 2021, Bourdon made the following materially misleading statements about the efficacy of arimoclomol to treat NPC and the clinical data submitted to support the NDA:

> If we go to the next slide. And this is where, for those who are a bit far away from the trial. ***So we have been able to show in the trial, sorry for the animation, that, you know, we are assessing the efficacy of arimoclomol in NPC through a 5-domain NPC score, and we have been able to show some meaningful treatment difference for patients. And if you were, so the reduction in disease product –***

29

*progression by 63%. And this reduction even increased by – to 77% if we were excluding the double functional null mutations patient population. If we were even zooming more into the patients above the age of 4, we were able to show an 80% relative reduction in disease progression. So, those are the data that have been, you know, published. And this is, you know, what gives us the confidence that you know, we would be able with Miplyffa to make a difference for patients in the US hopefully and in Europe as well.*

So in summary, you know, *I feel we are ready to launch.*

(Emphasis added).

77.    The statements identified in Paragraph 76 were materially misleading when made because Bourdon omitted to disclose that the FDA had already raised serious concerns about the (a) lack of statistical significance in the clinical trial's results, (b) "weak and contradictory results" of the clinical trial, (c) validity of the technique used to measure the swallowing domain of the NPCCSS as explained by CW1, and (d) need to conduct a completely new study to support any chance of FDA approval.

78.    On June 18, 2021, the Company announced in a press release that it had received a CRL from the FDA based on a review of the NDA for arimoclomol for the treatment of NPC.  The press release omitted material facts about the FDA's severe criticisms and contained the following misleading statement made by Defendant Hansen:

> The FDA issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain. *Further, the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single phase 2/3 clinical trial to support the benefit-risk assessment of the NDA.*
> \*\*\*\*\*
>
> Deputy Chairman of the Board of Directors, Bo Jesper Hansen, said: "*As representative for Orphazyme's shareholders and as a shareholder myself, I am extremely disappointed. I strongly believe there is a path forward for Orphazyme based on our pursuit of regulatory approval from the European Medicines Agency and continued dialogue with the FDA. Meeting these milestones in NPC*

***will take great sacrifice from everyone in the organization, while we as a Board assist the management team in protecting as much value as possible.***"

(Emphasis added).

79.     The statements identified in Paragraph 78 were materially misleading when made because they omitted to disclose that: (a) Defendants already knew that the FDA had raised major red flags about the swallowing domain of the NPCCSS before the Company received the CRL as confirmed by CW1, (b) the known red flags about the swallowing domain would require the Defendants to conduct a new clinical trial, and (c) the CRL criticized the clinical data used to support the NDA as "weak and contradictory," and raised serious concerns about the clinical trial's lack of statistical significance and problematic estimand.  As a result, the actual CRL statements which Hansen omitted to disclose undermined his claim to investors of a "path forward."

80.     On June 18, 2021, at 6:00 a.m. Greenwich Mean Time ("GMT"), Bourdon, Vadsholt and Blaettler held a conference call to discuss the CRL.  At this conference call, Bourdon made the following materially misleading statements:

> ***And while we are not able to share any details outside of what it is in the press release,*** we felt it was important to hold this call today to communicate our resiliency and dedication to NPC patients and our key stakeholders. We do remain committed to working with the regulators with the goal of delivering arimoclomol to families managing this challenging disease.
>
> The CRL stated that the FDA is unable to approve the NDA in its present form based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale, NPCCSS, and in particular the swallow domain. Our primary endpoint of the Phase II/III clinical trial was progression in disease severity as measured by the 5-domain NPCCSS. This is a disease-specific measure of disease progression consisting of the 5 clinically most relevant domains to patients with NPC, caregivers and physicians. ***Further, the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single Phase II/III clinical trial to support the benefit-risk assessment of the NDA.***

(Emphasis added).

81.     The statements identified in Paragraph 80 were materially misleading when made for the same reasons identified in Paragraph 79.  In addition, the statements identified in Paragraph 80 were materially misleading because (a) Bourdon was able to share even worse facts contained in the CRL, but chose to omit and conceal them instead and (b) failed to disclose that the FDA's serious criticisms and concerns would require the Company to conduct a new clinical trial, not just provide "additional data" to bolster "confirmatory evidence" as confirmed both by CW1's account and the actual contents of the CRL that were disclosed after these misleading statements were made.

82.     During the June 18, 2021 conference call held at 6:00 a.m. GMT, an analyst from Danske Bank A/S asked specific, pointed questions about the regulatory communications with the FDA, the swallow domain test, and whether the FDA would require a new clinical trial altogether. Bourdon and Blaettler made the following materially misleading statements in response:

**Thomas Schultz Bowers** - Danske Bank A/S, Research Division – Analyst

Yes. I'm very sorry and surprised about the FDA decision here. ***So you had a very close dialogue with the FDA when designing the trial and also the endpoints and then, you would say, maybe even over the last couple of years have had in the pre- and post-filing process and communications. So just help me understand what exactly difference from the communication now regarding the 5-domain scale.***

And just secondly on this, on the swallow domain, what difference did you see compared to placebo in this part? Because I -- as I remember, it was primarily on the cognitive domain that you only saw maybe at best a numerical difference compared to placebo***. So where are you exactly on this swallow domain? And why is the agency, well, potentially even highly focused on this specific domain?***

***And then just on the additional data, I know you can't say most likely, but do you have any feeling on whether the FDA actually thinks that they need a new confirmatory clinical trial? Or is there some sort of way to look at maybe existing data or confirmatory preclinical work or any additional biopsy work or something like that, that could be supportive for resubmission?***

32

And then just lastly on -- just on safety profile, is there anything also -- I know you submitted, for example, QTc data in December. So anything here that may have tilted the risk -- the benefit-risk assessment from the FDA?

**Christophe Bourdon** - Orphazyme A/S – CEO

Thanks so much. Christophe here. Thanks for your questions. *So I mean, clearly, I'm going to really focus on what's on the press release. At this stage, I won't be able to really disclose much more details.* I think the FDA has clearly stated that their CRL is really based at the moment on needing additional qualitative and quantitative evidence. We will really assess in the coming days how to further -- what's the path forward with the FDA. That's what the team will be focusing on. *On the -- again, on the additional evidence beyond clinical, there could be some kind of also like, for example, pharmacodynamic data. But at this stage, it's very important for us to ensure that we find the most constructive path forward with the FDA. And as soon as we have new information here, we're going to come back and revert and update you.*

**Thomas Schultz Bowers** - Danske Bank A/S, Research Division – Analyst

*Okay. But can you just remind me on the domain or the swallow domain where -- how did your data look for that domain alone, if you had that?*

**Thomas Blaettler** - Orphazyme A/S - Chief Medical Officer

Yes. Thank you for the question, Thomas. *So we had good effect on the swallow domain. It was 1 of 3 domains that mostly carried the effect.*

**Thomas Schultz Bowers** - Danske Bank A/S, Research Division – Analyst

Okay. So that should be supportive for your case if they focus more highly on the swallow domain, basically, so meaning that you have a p-value of less than 0.05, I guess.

**Thomas Blaettler** - Orphazyme A/S - Chief Medical Officer

I think what is still important to emphasize here, it is a composite outcome measure, where all 5 domain should be considered in totality*. But certainly, the swallow domain is one of the strong domains for arimoclomol and is associated with survival.*

(Emphasis added).

83.     The statements identified in Paragraph 82 were materially misleading when made for the same reasons identified in Paragraphs 79 and 81.  In addition, the statements identified in

33

Paragraph 82 were materially misleading when made because they omitted to disclose that (a) Bourdon knew of extremely negative and adverse facts that went beyond the press release and chose to omit and conceal "more details," (b) the issues identified in the CRL went well beyond pharmacodynamic data, and included severe criticisms concerning the lack of statistical evidence, the "weak and contradictory clinical results" and the problematic estimand, and (c) contrary to Blaettler's misleading statements, the swallowing domain was not a "strong domain" that "had good effect" and "carried the effect," but was severely criticized by the FDA for its lack of statistical significance and a failure to demonstrate a correlation with the fluoroscopic assessment, as recounted by CW1.

84. During the June 18, 2021 conference call held at 6:00 a.m. GMT, an analyst from Rx Securities Limited asked a very important and pointed question regarding whether the Company knew about the deficiencies identified in the CRL long before it was received, given the regular and intensive communication with the FDA while the NDA was pending. Bourdon's response omitted material information, rendering it misleading:

**Samir Devani** - Rx Securities Limited, Research Division - Research Analyst

Yes. ***I'm just quite interested in trying to understand how a drug with breakthrough designation, where you're supposed to obviously have intensive FDA interactions, how do you get to this point where the FDA is questioning the validity of the endpoints? Surely, this must have been part of the dialogue ahead of filing. Perhaps you can just explain how you got to this point.***

**Christophe Bourdon** - Orphazyme A/S – CEO

So Christophe here. ***So we're going to reassess clearly the detail of the CRL and look what's the path forward here. I think at this stage, as Thomas was saying, I think the decision of the FDA is based on totality of evidence. And we're going to revert back as soon as we know more and then address your specific issue here. But I'm not going to comment on how the FDA came to its conclusion.***

(Emphasis added).

85.     The statements identified in Paragraph 84 were materially misleading when made because Bourdon omitted to disclose that he already "knew more" about the FDA's decision through (a) regular communications afforded by the BT designation and Priority Review of the NDA, (b) the mid-cycle communication and the late-cycle meeting, and (c) serious red flags raised about the swallow domain that would require a new clinical study, and which were known before the CRL was sent. In addition, Bourdon's deliberately evasive responses and his complete failure to answer the specific questions posed by the analyst about how the Company could not know about the FDA's concerns given the BT designation is tantamount to an adoptive admission by silence that gives rise to a strong inference of scienter. *See In re Terayon Commc'ns Sys., Inc.*, No. C 00-01967 MHP, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002).

86.     On June 18, 2021, at 12:00 p.m. GMT, Bourdon and Vadsholt held another conference call to discuss the CRL. At this conference call, Bourdon made the same materially misleading statements identified in Paragraph 80. At this second conference call held on June 18, 2021, an analyst from Guggenheim Securities, LLC specifically asked whether the Company would need to conduct a new clinical trial, and Bourdon provided the following materially misleading response:

> **Yatin Suneja** - Guggenheim Securities, LLC, Research Division - MD & Senior Biotechnology Analyst
>
> Got it. Got it. Just then one more question. *So with regard to the U.S. regulatory discussion, I mean, it seems like there is some data or clinical data required. If you would have to run a study, would you be willing to do that? And what could be the time line? Again, I understand you are early in the discussion, but some ballpark time frame.*
>
> **Christophe Bourdon** - Orphazyme A/S – CEO
>
> *So we are, at the moment, reassessing the kind of data, not only like clinical data, but they could be also like pharmacodynamic data. So we are assessing this as we*

*speak and then we're going to revert when we have more clarity on the path forward.*

(Emphasis added).

87.     The statements identified in Paragraph 86 were materially misleading when made for the same reasons identified in Paragraphs 83 and 85.

88.     On August 31, 2021, the Company held a conference call to announce the financial results for the first half of 2021.  At this conference call, Bourdon made the following materially misleading statements concerning the efficacy of arimoclomol and the alleged statistical significance of the results of the clinical trial for the treatment of NPC:

> *Indeed, arimoclomol has demonstrated statistically significant and clinically meaningful effects on the disease progression in NPC, it has shown durable response* and has demonstrated a good safety profile up to 36 months in the open-label extension study.

(Emphasis added).

89.     The statements identified in Paragraph 88 were materially misleading when made because Bourdon omitted to disclose that the CRL, in fact, criticized the clinical trial results for a *lack of statistical significance* and for its "weak and contradictory results."

90.     On October 31, 2021 the Company announced the results of a Type A meeting held with the FDA in the month of October 2021 to discuss the path forward for the NDA for arimoclomol.  The October 31, 2021 press release contained the following materially misleading statements:

- *Progress made in understanding potential resolution of topics outlined in Complete Response Letter, including need for additional data to support NDA.*

- *FDA recommends the company provides supplemental information and analyses, and the FDA offers to have further interactions to identify a path to resubmission for arimoclomol in NPC.*

   The Type A meeting resulted in the following take-aways:

- The FDA recommended that the Company submit additional data, information, and analyses to address certain topics in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission.

- The FDA concurred with the Company's proposal to remove the cognition domain from the NPCCSS endpoint, with the result that the primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, subject to the submission of additional requested information which the Company intends to provide. To bolster the confirmatory evidence already submitted, the FDA affirmed that it would require additional in vivo or pharmacodynamic (PD)/pharmacokinetic (PK) data; the Company is considering the optimal path forward to address the FDA's requests.

"We are pleased to have gained a greater understanding from the FDA on the information that could address topics in the CRL. ***This is good progress.*** We are encouraged by the FDA's request to submit additional information and the invitation to further engage to discuss our approach and potential path forward. ***While we have not yet established a path to resubmission, our team will now work on putting a plan in place to discuss with the FDA during our next interactions and we will share more details about our strategy as and when appropriate"*** said Christophe Bourdon, Chief Executive Officer, Orphazyme A/S. He added, ***"We firmly believe in the establishment of a positive benefit-risk balance for arimoclomol and will continue to support the NPC community and our early access programs."***

(Emphasis added).

91. On this news, the Company's stock price rose by 7.5% to close at $4.18 per ADS on November 1, 2021 from its previous day closing price of $3.89 on October 29, 2021.

92. The statements identified in Paragraph 90 were materially misleading when made because they omitted to disclose that: (a) at this Type A meeting, the FDA rejected the additional rationale and reanalysis the Company presented at the meeting to address the deficiencies identified in the CRL, (b) the FDA also asked the Company to submit rudimentary in vivo or PD biomarker or PK data to demonstrate that treatment with arimoclomol led to a biomarker response, (c) the FDA required "performance-based validity evidence" for key domains of the NPCCSS, (d) the FDA rejected the Company's attempt to rescore the swallow domain because of a failure to provide "previously requested evidence, protocols and supporting materials," and as a result, (e)

contrary to the false impression created by the press release, the Company did not make "good progress" at the Type A meeting towards resolving the FDA's serious criticisms and concerns identified in the CRL.

93.     That the omitted regulatory communications and other material information identified in Paragraphs 69 through 92 of this section, should have been disclosed to ensure truthful and accurate disclosure can no longer be in doubt.  As Defendants admitted in a November 2021 Prospectus Supplement, which they released to try to raise yet another $50 million from U.S. investors, Defendants had received crucial adverse information about the FDA's severe and negative feedback on numerous occasions before multiple misleading statements were made after the IPO as alleged in this section, but did not fully or factually disclose such adverse information to investors at the time the statements were made.  Under Regulation S-K, the failure to disclose these specific facts after the IPO is actionable regardless of whether any affirmative misrepresentation was also made.

**CW Account Bolsters a Strong Inference of Scienter**

94.     CW1 was a Director of Field Medical Affairs at Orphazyme from July 2020 to July 2021.  CW1 has a Ph.D. in neuroscience and was responsible for leading the Company's field medical affairs group as well as a team of medical science liaisons in the United States.  The medical affairs group presented information to healthcare providers and insurers about the clinical data and trial results for the Phase 2/3 trial of arimoclomol to treat NPC.  CW1 reported to Daniel Gallo, the head of U.S. Medical Affairs, who reported to Defendant Painter.

95.     According to CW1, *in May 2021, Orphazyme's U.S. headquarters in Chicago received a question from the FDA that informed management at this office that the FDA had raised massive red flags about the clinical data used to support the NDA for arimoclomol*.  CW1

states that the FDA had raised serious questions about the validity of the technique used to measure the swallowing domain of the NPCCSS. CW1 explains that the FDA had already told Defendants before the CRL was sent that measuring the swallowing domain would require the use of a video fluoroscope exam where a patient swallows food made of or made with a radioisotope. CW1 explained further that during this exam, a video is made of the x-ray as the patient eats foods (of different consistencies), allowing the doctor to test the patient's ability to swallow effectively and safely. CW1 states that the FDA had already told Defendants before the CRL was issued that the Company needed to demonstrate a correlation between the swallowing domain and the fluoroscopic assessment. This shows that the FDA was not satisfied with Orphazyme's decision to use the 5-domain scale. A more intensive NPCCSS that consists of 17 domains requires such specific equipment and expertise, and that far more comprehensive scale is the preferred choice of over 74% of physicians who treat patients with NPC. *See* https://www.researchsquare.com/article/rs-240168/v1.

96. CW1 confirms that the Company understood the severity of the FDA's concerns regarding the swallowing domain and knew that an entirely new study would be required to address those concerns, assuring that the NDA would be denied before the Company acknowledged receipt of the CRL. CW1 further confirms that the FDA's concerns were not related to an insignificant issue because the highest risk of death in patients with NPC is from aspiration pneumonia, which can occur when patients breathe in food particles rather than swallow food. The deaths occur because bacteria from the food can infect the esophageal pathway and lead to deadly pulmonary infection and pneumonia. As a result, CW1 states that a patient's swallowing ability is key to assessing both the safety and efficacy of a drug candidate. In fact, Defendants themselves understood the importance of this issue. For example, on August 28, 2020, the Company held a

conference call to announce the financial results for the first half of 2020. At this conference call, Defendant Stratton admitted : "[a]nd *this is really important, a lot of our patients actually have difficulties with swallowing*, so being able to add the granules to food or to put down a naso-gastric tube is really important."

97. CW1 asserts that management in Copenhagen was well-aware of the FDA's concerns long before May 2021. CW1's basis for this belief is that the clinical and regulatory departments in Copenhagen had spearheaded communications with the FDA throughout the pendency of the NDA, and the fact that CW1's internal communications with higher level managers in the United States confirmed that management at the Copenhagen headquarters had previous knowledge of the FDA's serious criticisms and concerns even before that negative feedback was shared with personnel in Chicago.

**The Core Operations Inference Raises a Compelling Inference of Scienter**

98. Arimoclomol is the Company's only product, but it has never been approved for commercial use. As a result, the Company has never generated any revenue from its sales. Given that the Company was a one-trick pony throughout the Class Period, it would be absurd to infer that Defendants would not know critical, adverse facts about the clinical trials, problems with the clinical data used to support the NDA for arimoclomol, or the severe criticisms of the FDA that the agency began to raise to the Company even before it went public, including by letter identifying deficiencies in the clinical data.

99. The core operations inference is strengthened by the fact that Defendants could not conduct a large, robust, clinical trial as is typically required in Phase 3 without significant resources and time expended, which they did not have. As a result, they made a deliberate choice, consistent with their informed management of this core operation, to submit to the FDA weak and

contradictory clinical data that they knew lacked statistical evidence, and chose to omit this information from investors in order to pull off a vital capital raise. Defendants' desperate financial state is evidenced by the fact that Vadsholt told investors at the B. Riley Virtual Conference held on April 29, 2021 that the Company would run out of cash by the end of 2021 and would rely on revenues from the commercialization of arimoclomol to generate additional funds if approved. Thus, Defendants gambled that regulatory approval and commercialization of arimoclomol would allow the Company to remain viable.

100. Moreover, Defendants had actual knowledge of the deficiencies that the FDA repeatedly raised throughout the Class Period. The clinical trial for arimoclomol to treat NPC was already complete before the Company submitted the NDA. As described above, the FDA had several meetings and communications with Orphazyme designed to give them feedback about the FDA's concerns and trial issues. *See* Paragraphs 40 to 56. The regulatory records for other BT drugs and devices confirm that the FDA not only is required by its procedures to make such communications, but that it does so in practice. For instance, on October 27, 2020, multiple members from the FDA review team testified that serious structural flaws of a similarly completed clinical trial for a medical device that received a BT designation were repeatedly discussed with the device sponsor for several years, including in both pre-NDA and post-NDA meetings and other communications, but the sponsor, which was in a similarly perilous financial condition and lacked options, chose to disregard the FDA's concerns. *See e.g.*, Tr. of the Advisory Committee Meeting held on October 27, 2020 to discuss the risk-benefit profile of Neovasc Inc.'s Reducer device at 95:6-10, https://www.fda.gov/media/144239/download. In addition, Defendants were informed about the FDA's serious criticisms and concerns throughout the pendency of the NDA, including

when the mid-cycle communication occurred, no later than December 2020, yet continued to make materially misleading statements after that date.

101.    Defendants also understood the importance of the FDA's negative feedback and its implications.  For instance, at a February 28, 2020 conference call to discuss the Company's financial results for 2019, Defendant Stratton told investors that: "I think with it's really just when we are meeting with the FDA, *that we've done our homework, that we've got the right questions, that we're listening to their feedback, listening to their guidance*."  (Emphasis added). Defendants further understood that they had every opportunity to understand the FDA's concerns while the NDA was pending even outside the normal channels of communication.  For example, on March 2, 2021, Defendant Blaettler told investors that the Company held a Type C meeting with the FDA to ask whether clinical trial results might support approval for a separate indication, ALS.  A Type C meeting is a meeting usually requested by a company to request specific information or concurrence from the FDA on a pertinent issue.  That Defendants knew they had to ask the FDA whether the contours of an incomplete clinical trial could support approval for ALS, indicates that they also knew such concurrence was material to their pending NDA.

102.    All of these reasons confirm that Defendants knew the material adverse facts that they omitted from their Class Period statements to investors.

## PARTIAL DISCLOSURES

103.    On March 29, 2021, the Company announced that its Phase 2/3 trial evaluating the effect of arimoclomol for the treatment of IBM had failed.  This was a materialization event as the Company itself has acknowledged, as early as in its Offering Documents, the high risk of a "spill-over" effect, including that a failure of any clinical trial involving arimoclomol can halt the Company's entire clinical development portfolio.

42

104. As a result of this partial disclosure and/or the materialization of concealed risks, the Company's stock price declined by nearly 29% from its previous day closing price of $12.39 on March 26, 2021 to close at $8.80 on March 29, 2021, on heavy trading volume.

105. On May 7, 2021, the Company announced that the pivotal clinical trial evaluating the effect of arimoclomol for ALS had also failed.

106. This partial disclosure and/or materialization of concealed risks caused the Company's stock price to decline by over 32% from its previous day closing price of $8.56 on May 6, 2021 to close at $5.75 on May 7, 2021, on heavy trading volume.

107. On June 18, 2021, after the Company announced that it had received a CRL and partially disclosed some, but not all, of the FDA's negative feedback, the Company's stock price declined by nearly 50% from its previous day closing price of $14.56 on June 17, 2021 to close at $7.33 on June 18, 2021, on heavy trading volume. The Company's stock price declined further to close at $6.52 on June 21, 2021, the next trading day, as the market continued to absorb the news.

108. On June 21, 2021, analysts from Guggenheim Securities LLC published a report, in which they expressed "surprise" at the announcement of a CRL given the BT designation, and Defendants' misleading statements made during the Class Period regarding "labeling talks" with the FDA that led analysts to believe that approval of the NDA for arimoclomol was imminent. In light of the CRL, the analysts at Guggenheim downgraded the Company's ADS to a "Sell" with a price target of $1, and observed that "given these recent failures, lack of future development opportunities, and the need for financing (expected YE21 cash of [approximately] $8MM) to continue its operations, we see significant downside from current levels. In fact, we believe it might make sense to wind down the company . . .". Yatin Suneja and Eddie Hickman, Ph.D.,

*ORPH - Arimoclomol Gets a CRL in NPC; Downgrade to Sell as Most Optionality Is Removed*, GUGGENHIEM, (June 21, 2021).

109.    On this partial disclosure and/or materialization of concealed risks, the Company's stock price declined by over 8% from its previous day closing price of $6.52 on June 21, 2021 to close at $5.97 on June 22, 2021, on heavy trading volume.

110.    On June 28, 2021, the Company announced that it would reduce its total workforce by two thirds and initiate a "rigorous cost saving program."  The Company's press release further announced that Defendants Droller, Hedegaard and Kleijwegt would step down from the Board of Directors on June 30, 2021 and would not be replaced "in line with the restructuring" of the Company.

111.    On this partial disclosure and/or materialization of concealed risks, the Company's stock price declined by nearly 8% from its previous day closing price of $7.85 on June 25, 2021 to close at $7.24 on June 28, 2021, on heavy trading volume.

112.    On November 4, 2021, the Company announced that, pursuant to a selling agreement with Cowen and Company, it had filed a Prospectus Supplement with the SEC to issue and sell ADS with an aggregate offering price of up to $50 million, to be sold in the United States, from time to time, at its own option, in "at the market" transactions on the NASDAQ.  The Company stated that it intended to use the proceeds from the sale of ADS to seek regulatory approval of arimoclomol for the treatment of NPC.  For the first time, the Prospectus Supplement disclosed additional details about the litany of problems associated with the clinical data used to support the NDA for arimoclomol and the FDA's severe criticisms and concerns, showing that Defendants omitted material information throughout the Class Period in an attempt to manage the decline in the Company's stock price:

*As we have focused our efforts on the development of arimoclomol, we are currently highly dependent on obtaining and maintaining regulatory approval for arimoclomol and the potential success of this one product candidate.*

. . . On June 17, 2021, the FDA issued a Complete Response Letter, or CRL, from the FDA following its review of the NDA. The FDA issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain, *in the context of the FDA's preferred and recommended statistical approach. Further, the FDA noted in the CRL that additional data is needed to supplement confirmatory evidence beyond the single Phase 2/3 trial for NPC to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS to support the benefit-risk assessment of the NDA.* On October 13, 2021, the Company held a Type A meeting with the FDA to discuss the key topics in the CRL. The Type A meeting resulted in the following take-aways. *Although the FDA stated that the additional rationale and reanalysis we presented to the FDA at this meeting were insufficient to address the deficiencies outlined in the CRL*, the FDA recommended that we submit additional data, information and analyses in order to address the deficiencies noted in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission of the NDA. *With regard to the confirmatory evidence, the FDA recommended that we submit additional information, such as in vivo or PD biomarker data as well as PK data, that demonstrates arimoclomol target engagement and/or modulation of pathological processes relevant to NPC and assess the relationship between arimoclomol exposure and PD biomarker response.* The FDA concurred with our proposal to remove the cognition domain from the NPCCSS endpoint, with the result that the primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, subject to the submission of additional requested information, *including performance-based validity evidence for selected domains inclusive of ambulation, speech and fine motor skills. The FDA did not agree with our proposal to rescore the swallow domain because, in the FDA's view, our submission lacked previously requested evidence, protocols and supporting materials to establish how the scores were initially assigned, and the FDA has requested additional information for consideration, such as documentation related to clarity and standardization in collection of patient experience data. The FDA has also requested additional information to discuss our proposal to use a while-on-treatment estimand of the log transformed ratio to address the timing of both the treatment comparison and potential intercurrent events.* We intend to work with the FDA to provide such information as requested by the FDA, but the FDA may still require us to conduct additional studies or clinical trials. *We are considering the optimal path forward, which could entail a material extension of the time and cost required for resubmission of the NDA . . .*

113.    This partial disclosure and/or materialization of concealed risks caused the Company's stock price to decline by over 4% from its previous day closing price of $4.24 on November 4, 2021 to close at $4.05 on November 5, 2021, on heavy trading volume.  The price of the Company's ADS continued to decline and closed at $4.02 on November 8, 2021, $3.99 on November 9, 2021 and $3.94 on November 10, 2021 as investors continued to absorb the news.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that: (1) purchased or otherwise acquired Orphazyme's ADS pursuant or traceable to Orphazyme's Registration Statement issued in connection with its September 29, 2020 IPO, seeking to pursue remedies under Sections 11 and 15 of the Securities Act; and/or (2) purchased or otherwise acquired the Company's ADS between September 29, 2020 and November 4, 2021, seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

115.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, weekly trading volume averaged over 18 million shares, with 34.95 million shares currently outstanding.  The high average trading volume and weekly turnover creates a strong presumption in favor of market efficiency.  Record

owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

116. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

118. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Registration Statement contained any material omissions;

- whether the Individual Defendants have a viable good faith defense to the strict liability otherwise imposed by Section 11 of the Securities Act or whether the Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;

- For Securities Act claims only, whether Defendants are able to raise a defense of negative causation showing that all or some of the declines following the IPO were caused by specific factors other than material omissions in the Registration Statement;

- for Exchange Act claims only, whether any other statements made by Bourdon, Vadsholt, Blaettler and/or Hansen to the investing public after the IPO omitted material facts about the business and operations of the Company;

- for Exchange Act claims only, whether the Individual Defendants caused the Company to issue misleading statements during the Class Period;

- for Exchange Act claims only, whether the Individual Defendants acted knowingly or recklessly in issuing misleading statements;

• for Exchange Act claims only, whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

• whether Bourdon, Vadsholt, Blaettler, Painter and/or Stratton were control persons of Orphazyme; and

• whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

120. With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• Defendants failed to disclose material facts during the Class Period;

• the omissions were material;

• the Company's securities traded in an efficient market;

• the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

• the Company traded on the NASDAQ and was covered by multiple analysts;

• the omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

• Plaintiffs and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

121. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

122. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act claims herein are based primarily on Defendants' omission of material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 11 of the Securities Act Against Defendants Orphazyme, Stratton, Vadsholt, Painter, Gemayel, Hansen, Bonde, Droller, Verland, Kleijwegt, Hedegaard, Moukheibir and Barlow)**

123. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 66 and Paragraphs 114 through 122 as if fully set forth herein. The allegations contained in Paragraphs 67 through 113 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

124. This claim is asserted by Plaintiffs against Defendants Orphazyme, Stratton, Vadsholt, Painter, Gemayel, Hansen, Bonde, Droller, Verland, Kleijwegt, Hedegaard, Moukheibir and Barlow on behalf of all persons who purchased the Company's ADS pursuant to and/or traceable to the Company's IPO, in which the shares registered under the Registration Statement were sold.

125. The Individual Defendants identified under this Count are strictly liable under the Securities Act as signatories of the Registration Statement for the omissions contained therein as identified in Paragraphs 57 to 66 above.

49

126. Orphazyme is strictly liable as the Issuer under the Securities Act for the omissions it made in the Registration Statement, as identified in Paragraphs 57 to 66.

127. None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 57 to 66 above were true, were without omissions of material fact or were otherwise not misleading.

128. By reason of the conduct alleged herein, each of the Defendants named herein has violated Section 11 of the Securities Act.

129. Plaintiffs and the Class have sustained damages because the value of their ADS has declined. This decline is attributable by law to Defendants in the absence of proof that it was caused by other factors, which proof has not been established.

130. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this Action. The initial complaint was filed within three years of the time that Orphazyme offered the ADS covered by the Registration Statement to the investing public.

131. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## <u>COUNT II</u>

**(Violations of Section 15 of the Securities Act Against Defendants Stratton, Vadsholt and Painter)**

132. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 66 and 114 through 131 as if fully set forth herein. The allegations contained in Paragraphs 67 through 113 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

133. Stratton, by virtue of her office and directorship in Orphazyme, was a controlling person of Orphazyme at the time of the IPO and within the meaning of Section 15 of the Securities Act. Stratton managed the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

134. Vadsholt, by virtue of his office and directorship in Orphazyme, is a controlling person of Orphazyme within the meaning of Section 15 of the Securities Act. Vadsholt manages the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

135. Painter was the President of the Company's U.S. operations from January 2020 to September 2021, signed the Registration Statement on behalf of the Company as its duly authorized representative in the U.S., and holds herself out as responsible for "all medical, regulatory, legal, finance, analytics, and commercial activities of the organization" in the U.S., according to her LinkedIn profile.

136. By virtue of the conduct alleged herein, Defendants Stratton, Vadsholt and Painter are liable as control persons for the primary violations of Section 11 by Orphazyme, as alleged in Count I.

137. Stratton, Vadsholt and Painter did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and

identified in Paragraphs 57 to 66 above were true, were without omissions of material fact, and were not misleading.

138. Each of these Defendants is liable to the Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations of Orphazyme.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Orphazyme, Stratton, Bourdon, Vadsholt, Blaettler, Hansen and Painter)**

139. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that the allegations contained in Paragraphs 57 through 61 and 66 are not alleged against Defendants Bourdon and Blaettler, and the allegations contained in Paragraphs 69 through 93 are not alleged against Defendants Stratton and Painter.

140. This Count is asserted against Orphazyme, Stratton, Bourdon, Vadsholt, Blaettler, Hansen and Painter for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141. At the time of the Registration Statement and during the Class Period, these Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the

52

investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Orphazyme's ADS; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Orphazyme ADS at artificially inflated prices.

142. Specifically, Orphazyme issued a Registration Statement, which Stratton, Vadsholt, Hansen and Painter signed as makers of the representations contained therein, which was materially misleading as particularized in Paragraphs 57 to 66. The primary violations alleged under this Count related to the omissions made in the Registration Statement are brought only against Defendants Orphazyme, Stratton, Vadsholt, Hansen and Painter.

143. Orphazyme, Bourdon, Vadsholt, Blaettler and Hansen further made numerous materially misleading statements between March 2021 and October 2021 as particularized in Paragraphs 69 to 93 above. The primary violations alleged under this Count related to the omissions made between March 2021 and October 2021 are brought against Defendants Orphazyme, Bourdon, Vadsholt, Blaettler and Hansen.

144. Bourdon, Vadsholt, Blaettler and Hansen had actual knowledge of the materially misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially misleading nature of the statements made, although such facts were readily available to them. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that these Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers and/or

directors of Orphazyme, these Defendants had knowledge of the details of Orphazyme's internal affairs.

145. As officers and/or directors of a publicly-held company, the Defendants named under this Count had a duty to disseminate timely, accurate and truthful information regarding Orphazyme's business and operations. As a result of the dissemination of the aforementioned misleading statements and material omissions, the market price of Orphazyme's ADS was artificially inflated throughout the Class Period.

146. In ignorance of the adverse facts concerning Orphazyme's operations which were concealed by the omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Orphazyme's ADS at artificially inflated prices and relied upon the price of the ADS, the integrity of the market for the ADS and/or upon statements disseminated by Defendants, and were damaged thereby.

147. During the Class Period, Orphazyme's ADS were traded on an active and efficient market. Plaintiffs and the other members of the Class, directly relying on the materially misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired Orphazyme's ADS at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADS or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Orphazyme's ADS was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Orphazyme's ADS declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiffs and Class members.

148. By reason of the conduct alleged herein, Orphazyme, Stratton, Bourdon, Vadsholt, Blaettler, Hansen and Painter knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period. Stratton, Bourdon, Vadsholt, Blaettler, Hansen and Painter are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against Defendants Stratton, Bourdon, Vadsholt, Blaettler and Painter)**

150. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except that the allegations contained in Paragraphs 57 through 61 and 66 are not alleged against Defendants Bourdon and Blaettler, and the allegations contained in Paragraphs 69 through 93 are not alleged against Defendants Stratton and Painter.

151. During the Class Period, Stratton, Bourdon, Vadsholt, Blaettler and Painter participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misleading statements.

152. As officers and/or directors of a publicly owned company, Stratton, Bourdon, Vadsholt, Blaettler and Painter had a duty to disseminate accurate and truthful information with

55

respect to the Company's operations, and to correct promptly any public statements issued by the Company which had become materially misleading.

153. Because of their positions of control and authority as senior officers, Stratton, Bourdon, Vadsholt, Blaettler and Painter were able to, and did, control the contents of their direct communications with investors, which the Company disseminated in the marketplace during the Class Period concerning the Company's operations. Throughout the Class Period, Stratton, Bourdon, Vadsholt, Blaettler and Painter exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Stratton, Bourdon, Vadsholt, Blaettler and Painter therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of the Company's ADS.

154. Stratton, Bourdon, Vadsholt, Blaettler and Painter, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, each of these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of these Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

155. By reason of the above conduct, Stratton, Bourdon, Vadsholt, Blaettler and Painter are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated:  November 19, 2021


Respectfully submitted,

**POMERANTZ LLP**

*/s/ Omar Jafri*

Joshua B. Silverman
Omar Jafri
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  jbsilverman@pomlaw.com
           ojafri@pomlaw.com
           boconnell@pomlaw.com


**Bronstein, Gewirtz & Grossman, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York,
New York 10165


57

Phone: 212-697-6484
Fax:     212-697-7296
Email: eitank@bgandg.com

***Lead Counsel for Plaintiffs***