UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARKO BUSIC and ADIL SHEIKH, *individually and on Behalf of All Others Similarly Situated*,<br><br>Plaintiffs,<br><br>v.<br><br>ORPHAZYME A/S, CARROLEE BARLOW THOMAS BLAETTLER, MARTIN BONDE, CHRISTOPHE BOURDON, RÉMI DROLLER, GEORGES GEMAYEL, BO JESPER HANSEN, ANDERS HEDEGAARD, MARTIJN KLEIJWEGT, CATHERINE MOUKHEIBIR, MOLLY PAINTER, KIM STRATTON, ANDERS VADSHOLT, and STEN VERLAND,<br><br>Defendants. | Case No. 1:21-CV-03640<br>Honorable Gary Feinerman |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

COOLEY LLP
Matthew L. Kutcher
444 W. Lake Street
Suite 1700
Chicago, IL 60606
Tel: (312) 881-6645
mkutcher@cooley.com

COOLEY LLP
Aric H. Wu (*pro hac vice*)
Patrick J. Hayden (*pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
phayden@cooley.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

TABLE OF ABBREVIATIONS ...............................................................................................vi

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND....................................................................................................... 4

    I.      Orphazyme and Arimoclomol.......................................................................................... 4

    II.     September 2020:  FDA Accepts NDA And Orphazyme Announces IPO.................. 6

    III.    Spring 2021: Infrastructure Development ...................................................................... 9

    IV.    June 2021 Complete Response Letter.......................................................................... 10

    V.     Fall 2021:  Further Engagement With The FDA And ADS Prospectus
         Supplement ...................................................................................................................... 12

    VI.    This Lawsuit.................................................................................................................... 14

LEGAL STANDARDS ........................................................................................................... 15

ARGUMENT ............................................................................................................................ 16

    I.      Plaintiffs' Section 11 Claim Should Be Dismissed For Failure To Allege An
        Actionable Misrepresentation Or Omission In The Registration Statement ............ 16

          A.    Clinical Trial Results .................................................................................. 17

          B.    FDA Filing Communication ...................................................................... 17

          C.    Risk Factors ................................................................................................ 19

    II.     Plaintiffs' Section 10(b) Claim Should Be Dismissed............................................. 21

          A.    The Amended Complaint Fails To Allege An Actionable
              Misrepresentation Or Omission ................................................................ 21

          B.    The Amended Complaint Fails To Raise A Strong Inference Of Scienter... 30

    III.    Plaintiffs' Section 15 and 20(a) Control Person Claims Should Be Dismissed ....... 35

CONCLUSION.......................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abely v. Aeterna Zentaris Inc.*,
　2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...........................................................17

*Abramson v. NewLink Genetics Corp.*,
　965 F.3d 165 (2d Cir. 2020)...................................................................................5

*In re Alkermes Pub. Ltd. Sec. Litig.*,
　523 F. Supp. 3d 283 (E.D.N.Y. 2021) .............................................................31, 34

*In re Alkermes Sec. Litig.*,
　2005 WL 2848341 (D. Mass. Oct. 6, 2005)............................................................26

*In re Aratana Therapeutics Inc. Sec. Litig.*,
　315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................................23, 30

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
　2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) .......................................................18

*United States ex rel. Bogina v. Medline Indus., Inc.*,
　2015 WL 1396190 (N.D. Ill. Mar. 24, 2015).........................................................12

*Borsellino v. Goldman Sachs Grp., Inc.*,
　477 F.3d 502 (7th Cir. 2007) ...............................................................................16

*CareToLive v. von Eschenbach*,
　525 F. Supp. 2d 938 (S.D. Ohio 2007) ..................................................................24

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
　388 F. Supp. 2d 932 (S.D. Ind. 2005) ...................................................................27

*City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*,
　8 F.4th 592 (7th Cir. 2021) .............................................................................22, 31

*Corban v. Sarepta Therapeutics, Inc.*,
　2015 WL 1505693 (D. Mass Mar. 31, 2015)..........................................................25

*Cozzarelli v. Inspire Pharms., Inc.*,
　549 F.3d 618 (4th Cir. 2008) ...............................................................................32

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*,
　20 F.4th 303 (7th Cir. 2021) ................................................................................15

*Davis v. SPSS, Inc.*,
　431 F. Supp. 2d 823 (N.D. Ill. 2006) ....................................................................27

ii

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Desai v. Gen. Growth Props., Inc.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ...................................................................................24

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .............................................................................................34

*In re EDAP TMS S.A. Sec. Litig.*,
  2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)...............................................................23, 24

*Fryman v. Atlas Fin. Holdings, Inc.*,
  462 F. Supp. 3d 888 (N.D. Ill. 2020) ........................................................................16, 33, 35

*Gallagher v. Abbott Lab'ys.*,
  269 F.3d 806 (7th Cir. 2001) ...........................................................................................3, 19

*Geinosky v. City of Chicago*,
  675 F.3d 743 (7th Cir. 2012) .................................................................................................2

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................3, 25, 28, 32

*In re Harley-Davidson, Inc., Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wis. 2009)..................................................................................33

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .................................................................................26, 30, 35

*Hoey v. Insmed Inc.*,
  2018 WL 902266 (D.N.J. Feb. 15, 2018) ...........................................................18, 19, 23, 28

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
  2021 WL 3079878 (D. Mass. July 21, 2021).....................................................................32, 33

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...............................................................................................................15

*In re Medimmune, Inc. Sec. Litig.*,
  873 F. Supp. 953 (D. Md. 1995)...........................................................................................27

*In re MELA Scis., Inc. Sec. Litig.*,
  2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)...........................................................19, 24, 32

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019)..........................................................................................................24

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) .................................................................................22

iii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ..............................................................................31, 32

*In re Northfield Lab'ys, Inc.*,
  527 F. Supp. 2d 769 (N.D. Ill. 2007) .........................................................................1

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................22

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ...................................................................................15

*Pugh v. Trib. Co.*,
  521 F.3d 686 (7th Cir. 2008) ..............................................................................10, 35

*Ret. Sys. & Loc.295/Loc. 851 v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ...................................................................................32

*Ret. Sys. v. PrivateBankcorp, Inc.*,
  2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) .............................................................19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).....................................................................................16

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)..........................................................2, 18, 20, 27

*SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) .......................................................................10

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ......................................................................19

*Vallabhaneni v. Endocyte, Inc.*,
  2016 WL 51260 (S.D. Ind. Jan. 4, 2016)............................................................ *passim*

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020) ................................................................ *passim*

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) ...................................................................................32

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*,
  2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) .................................................................15

*Zerger v. Midway Games, Inc.*,
  2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)............................................................34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

15 U.S.C. § 77k(a) ...............................................................................................................15

15 U.S.C. § 78u-4(b)(1) .......................................................................................................16

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................21, 30

15 U.S.C. § 78u-5(c)(1) ..................................................................................................24, 31

**Regulations**

17 C.F.R. § 229.105 .............................................................................................................30

17 C.F.R. § 240.10b-5 ..........................................................................................................15

21 C.F.R. § 312.21 .................................................................................................................5

21 C.F.R. § 314.110 .......................................................................................................10, 25

**Other Authorities**

FDA, *CDER 21st Century Review Process: Desk Reference Guide*,
    https://www.fda.gov/media/78941/download ..................................................................6

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **1933 Act** | Securities Act of 1933, as amended |
| **1934 Act** | Securities Exchange Act of 1934, as amended |
| **ADS** | American Depository Shares |
| **CGI-I** | Clinical Global Impression of Improvement |
| **CRL** | Complete Response Letter |
| **Company or ORPH** | Orphazyme A/S |
| **Defendants** | Orphazyme A/S, Carrolee Barlow, Thomas Blaettler, Martin Bonde, Christophe Bourdon, Rémi Droller, Georges Gemayel, Bo Jesper Hansen, Anders Hedegaard, Martijn Kleijwegt, Catherine Moukheibir, Molly Painter, Kim Stratton, Anders Vadsholt, and Sten Verland |
| **FDA** | U.S. Food and Drug Administration |
| **HSPs** | Heat Shock Proteins |
| **IBM** | Inclusion Body Mytosis |
| **IPO** | Initial Public Offering |
| **NDA** | New Drug Application |
| **NPC** | Niemann-Pick Disease Type C |
| **NPCCSS** | Niemann-Pick Disease Type C Clinical Severity Scale |
| **PDUFA** | Prescription Drug User Fee Act |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |
| **SEC** | U.S. Securities and Exchange Commission |
| **Section 10(b)** | 15 U.S.C. § 78j(b) |
| **Section 10(b) Defendants** | Orphazyme A/S, Thomas Blaettler, Christophe Bourdon, Bo Jesper Hansen, Molly Painter, Kim Stratton, and Anders Vadsholt |
| **Section 11** | 15 U.S.C. § 77k |
| **Section 11 Defendants** | Orphazyme A/S, Carrolee Barlow, Martin Bonde, Rémi Droller, Georges Gemayel, Bo Jesper Hansen, Anders Hedegaard, Martijn Kleijwegt, Catherine Moukheibir, Molly Painter, Kim Stratton, Anders Vadsholt, and Sten Verland |
| **Section 15** | 15 U.S.C. § 77o |
| **Section 20(a)** | 15 U.S.C. § 78t(a) |

vi

**INTRODUCTION**

Defendant Orphazyme S/A is a Danish biopharmaceutical company whose primary drug candidate, arimoclomol, is designed to treat neurodegenerative diseases. In September 2020, shortly after announcing the U.S. Food and Drug Administration had accepted its New Drug Application for arimoclomol, ORPH commenced an initial public offering of American Depositary Shares. ORPH repeatedly and clearly disclosed that it could not provide assurance that the FDA would approve its NDA. Purchasers of ORPH ADS thus took a risk: investing in a drug candidate prior to FDA approval is "like investing in an airplane company before Orville and Wilbur Wright figured out how to make them fly: there [i]s a huge upside potential but also a pretty good chance of losing everything." *In re Northfield Lab'ys., Inc.*, 527 F. Supp. 2d 769, 784 (N.D. Ill. 2007).

Lead Plaintiff Marko Busic made an opportunistic bet. On June 16, 2021, just one day before the disclosed FDA target date for completing its review of ORPH's NDA, Busic began purchasing ORPH ADS. On June 18, 2021, after ORPH announced it had received notice the FDA would not approve the NDA in its then-present form, Busic sold all of his ADS. Instead of accepting that they took a gamble and lost, Busic and an additional plaintiff now claim that ORPH misled investors about the clinical trial results for arimoclomol and the FDA's review of its NDA. As explained herein, Plaintiffs have not come close to satisfying the pleading requirements for their claims under the Securities Act of 1933 and Securities Exchange Act of 1934.

***No Actionable Misrepresentation or Omission.*** Far from "present[ing] a rosy and misleading picture of Orphazyme's trial results" by secretly "manipulat[ing] clinical data in a post-hoc fashion," ¶ 37,[1] ORPH's Registration Statement for its IPO fully disclosed that arimoclomol had ***not*** achieved statistical significance with regard to its two primary metrics, or "endpoints,"

---

[1] Citations to "¶_" refer to paragraphs of Plaintiffs' Amended Class Action Complaint (Dkt. 23).

and that its post-hoc analysis of the trial results—conducted in agreement with the FDA—had used a modified endpoint, which excluded certain patient categories. Ex. 1 at 21, 116–17.[2] ORPH further cautioned that, given the limited clinical experience with the diseases arimoclomol was being developed to treat, the FDA might not accept its trial results as "clinically meaningful." *Id.* at 7, 23. ORPH also disclosed the FDA had provided preliminary notice of "six potential review issues" and warned that "[w]e cannot assure you that such issues will not result in a delay of any potential approval . . . or a determination by the FDA not to approve." *Id.* at 6, 22.

Plaintiffs contend the Registration Statement should have provided more detail about the "potential review issues" the FDA identified shortly after accepting the NDA in September 2020. But "interim FDA feedback is not material because it does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 542 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). Alternatively, Plaintiffs contend the Registration Statement should have disclosed everything the FDA disclosed to ORPH in a June 2021 Complete Response Letter. Indeed, every "concern" Plaintiffs say the Registration Statement omitted is lifted from descriptions of the June 2021 CRL, which ORPH received nine months *after* the Registration Statement was filed. ¶ 58 (quoting Ex. 14 at S-7–S-8). Plaintiffs plead no facts showing that ORPH learned about the FDA's June 2021 determinations before June 2021. Instead, they simply aver that ORPH was "entitled to receive regular and intense feedback from the FDA" even "before the NDA was submitted." ¶ 3. That is patently insufficient.

---

[2] Citations to "Ex. _" refer to the exhibits to the Declaration of Matthew L. Kutcher, dated January 21, 2022, which are documents the Court may properly consider on this motion to dismiss—*i.e.*, "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n.1 (7th Cir. 2012). Page numbers refer to the native pagination of each cited exhibit.

2

*See Gallagher v. Abbott Lab'ys.*, 269 F.3d 806, 810 (7th Cir. 2001) (rejecting claim based on failure to describe a March 17 FDA letter in a March 9 SEC filing because "[u]nless [the company] had a time machine, it could not have described on March 9 a letter that had yet to be written").

Plaintiffs' efforts to manufacture a claim based on post-IPO statements fare no better. Plaintiffs contend that ORPH should have provided more detail about the June 2021 CRL and a post-CRL meeting ORPH had with the FDA in October 2021, but again ignore that there is no duty to disclose the specifics of such interim FDA feedback. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 586–88 (S.D.N.Y. 2016) (rejecting claim that company should have disclosed the type of additional "evidence" the CRL indicated FDA would require, where company had disclosed the CRL requested "additional information with regard to . . . safety and efficacy"). Nor can Plaintiffs contrive a claim based on a statement by ORPH's CEO, Christophe Bourdon, during an August 31, 2021 earnings call that "arimoclomol has demonstrated statistically significant and clinically meaningful effects on the disease progression in NPC [*i.e.*, Niemann-Pick Disease Type C]." ¶ 88. Plaintiffs complain that Bourdon "omitted to disclose that the CRL, in fact, criticized the clinical trial results for a lack of statistical significance," ¶ 89, but omit that Bourdon (i) opened the earnings call by noting the "very disappointing news" in the CRL the Company had reported on June 18; and (ii) made clear that he was referring to the August 21 edition of the *Journal of Inherited Metabolic Disease*, which showed that the results of Orphazyme's Phase 2/3 trial for arimoclomol *had* achieved statistical significance in treating NPC. Ex. 12 at 4.

***No Scienter.*** The Section 10(b) claim should be dismissed on the independent ground that Plaintiffs fail to plead particularized facts giving rise to a "strong" inference of fraudulent intent. Plaintiffs do not explain why Defendants would have invested virtually all of ORPH's time and resources into the development of arimoclomol if they knew it could not receive FDA approval.

3

Nor do Plaintiffs suggest that any Defendant had a motive for the alleged fraud or hoped to benefit from it—indeed, no Individual Defendant sold Orphazyme shares during the putative class period, even though Plaintiffs claim Defendants knew the stock price was inflated. The fraud Plaintiffs imagine is illogical, and the Court need not suspend disbelief to accept it.

For all the reasons herein, the Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I. Orphazyme and Arimoclomol

ORPH is headquartered in Copenhagen, Denmark. ¶¶ 16, 33. Bourdon and Defendant Anders Vadsholt are its current CEO and CFO; Defendants Kim Stratton and Thomas Blaettler are former officers; and Defendant Molly Painter is a former officer of ORPH's U.S. subsidiary. ¶¶ 17–20, 30. The other individual defendants are current or former ORPH directors. ¶¶ 21–29.

ORPH is focused on the treatment of neurodegenerative diseases through the amplification of heat shock proteins. ¶ 33. HSPs are critical to the natural cellular response to stress, and their production protects against the major characteristics of neurodegenerative diseases. ¶ 34. ORPH's primary drug candidate, arimoclomol, selectively amplifies HSP production. *Id.* ORPH has investigated the use of arimoclomol to treat a variety of neurodegenerative diseases, including NPC, Amyotrophic Lateral Sclerosis (ALS), and Inclusion Body Myositis (IBM). ¶ 39.

The most advanced of ORPH's arimoclomol programs has been for the treatment of NPC, a rare and devastating genetic disorder that impairs the ability to recycle cholesterol and other lipids. ¶ 35. NPC causes damage to the brain, and its symptoms include difficulties in swallowing and loss of speech, cognition, motor coordination, and ambulation. *Id.* Symptoms of NPC usually occur during mid to late childhood; in more aggressive forms, NPC is often fatal by adulthood. *Id.* ORPH estimates that there are approximately 1,800 individuals with NPC in the U.S. and Europe.

4

Ex. 1 at 2, 105, 114. There is no approved treatment for NPC in the U.S., ¶ 35, although a drug called miglustat has been approved in other countries, Ex. 1 at 33.

In July 2016, ORPH initiated a randomized Phase 2/3 clinical trial[3] of arimoclomol to treat NPC. *Id.* at 115. With 50 enrolled patients aged two to 18 years, the trial measured the efficacy of arimoclomol using two primary endpoints. *Id.* at 115–16. The first endpoint was the 5-domain NPC Clinical Severity Scale (NPCSS), which measures a patient's swallowing, ambulation, cognition, fine motor skills, and speech. *Id.*; ¶ 36. The second endpoint was the Clinical Global Impression of Improvement (CGI-I), which is used in psychiatry. Ex. 1 at 116, 118; ¶ 36.

In January 2019, ORPH announced the results of the Phase 2/3 clinical trial. ¶¶ 35–36. As to the NPCCSS endpoint, the benefit of arimoclomol treatment over placebo corresponded to a 63% relative reduction in disease progression, but "statistical significance [was] not reached" for that result. Ex. 1 at 116–18. However, ORPH found arimoclomol *did* achieve statistical significance in a post-hoc analysis of three sub-groups: (i) patients aged four and older; (ii) patients who also received miglustat; and (iii) patients without particular mutations that tend to result in early and rapid disease progression. *Id.* In this post-hoc analysis—conducted in agreement with the FDA—disease progression decreased significantly, by 77% to 101%. *Id.* As to the CGI-I endpoint, arimoclomol's effect likewise was "not statistically significant," but among patients whose disease severely progressed during the trial, only 10.7% of those receiving arimoclomol got "much worse" or "very much worse," as compared to 26.7% in the placebo group. *Id.* at 118.

---

[3] FDA regulations generally require drug manufacturers to conduct three phases of human clinical trials before presenting the drug to the FDA for approval. *See* 21 C.F.R. § 312.21; *see also* Ex. 1 at 150 (noting that phases may "overlap"). In a Phase 2 trial, a drug is typically administered to a limited patient population to ascertain early evidence of effectiveness, whereas a drug in a Phase 3 trial is typically administered to an expanded patient population to "gather additional information about the effectiveness and safety" of the drug. 21 C.F.R. § 312.21(b)–(c); *see generally Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 169–70 (2d Cir. 2020) (providing an overview of the FDA clinical trial process).

On the basis of these results, ORPH began the process of seeking FDA approval. In 2019, the FDA designated the use of arimoclomol for NPC a "breakthrough therapy," which applies to drugs intended to treat a life-threatening disease or condition, where preliminary clinical evidence suggests a drug may demonstrate substantial improvement over existing therapies. *Id.* at 155, 169.

## II. September 2020: FDA Accepts NDA And Orphazyme Announces IPO

ORPH submitted its NDA to the FDA on a rolling basis, ending on July 20, 2020. ¶ 38. In September 2020, the FDA accepted the NDA and granted it a "priority review" designation, which is generally reserved for drugs that would significantly improve treatment or provide treatment where none exists. Ex. 1 at 22, 113, 121, 155. The FDA set a target action date of March 17, 2021 for completion of its review of the NDA, *id.* at 88, 104–106, 121, and, in December 2020, extended the target action date to June 17, 2021, Ex. 2 at 1; Ex. 14 at S-7.

On September 24, 2020, shortly after the FDA accepted the NDA, ORPH received an FDA filing communication,[4] discussing "six potential review issues, four of which [ORPH] previously discussed with the FDA." ¶ 57 (quoting Ex. 1 at 6). The FDA "requested that [Orphazyme] submit reports" in response to the issues it raised. *Id.*

On September 29, 2020, after the SEC declared its Registration Statement effective, ORPH filed the final Prospectus for its IPO. *See* Ex. 1 at 9 (prospectus "forms a part" of registration statement). ORPH warned that investing in its ADS "involve[d] a high degree of risk," as "[b]iopharmaceutical product development is a highly speculative undertaking and involves a substantial degree of risk, including risks related to the regulatory approval process for arimoclomol." Ex. 1 at 15. Over 60 pages were devoted to risk disclosures, *id.* at 15–76, including:

---

[4] A "filing communication" is issued 74 days after an application has been submitted and "describ[es] deficiencies," "filing review issues," and the "final review designation" for an NDA. *See* FDA, *CDER 21st Century Review Process: Desk Reference Guide* 21, https://www.fda.gov/media/78941/download (last visited Jan. 21, 2022) (cited in Am. Compl. ¶ 49).

***Lack of Profitability and Reliance on Arimoclomol***.  ORPH warned it had never generated

any revenue and relied significantly on the development of arimoclomol:

- "We have not received approval for any product candidate for commercial sale and, as a result, we have never generated any revenue and have incurred significant financial losses, and expect to continue to incur significant financial losses in the future, which makes it difficult to assess our future viability." *Id.* at 6, 15.

- "[I]f arimoclomol does not become a success, this will have a material adverse effect on our business, . . . financial condition and/or prospects." *Id.* at 22.

***Prospects for Regulatory Approval***.  ORPH warned it could not predict whether the FDA

would accept the arimoclomol clinical trial results or approve the drug candidate, in light of the

limited clinical experience with the diseases arimoclomol was being developed to treat:

- "We are highly dependent on obtaining and maintaining required regulatory approvals and may not receive such approvals." *Id.* at 22.

- "Because we are developing arimoclomol for the treatment of diseases in which there is little clinical experience, the FDA . . . may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results." *Id.* at 23.

- "In some cases, we may use endpoints or methodologies that regulatory authorities may not consider to be clinically meaningful and that we may not continue to use in clinical trials or that we may determine after the initiation of the trial to no longer be an appropriate endpoint or methodology. Any such regulatory authority may require evaluation of additional or different clinical endpoints in our clinical trials or ultimately determine that these clinical endpoints do not support marketing approval." *Id.* at 23.

- "Further, as part of its review process, the FDA may request additional information and data, require us to make modifications to ongoing NPC-related clinical trials, manufacturing or other processes, run additional studies or clinical trials or incur significant additional expenditures in order to obtain such approval." *Id.* at 22.

- "[T]he FDA, the EMA or other comparable regulatory authority may disagree as to the number, design or implementation of our clinical trials, or may not interpret the results from clinical trials as we do[.]" *Id.* at 20.

***Potential FDA Review Issues.***    ORPH disclosed a September 24, 2020 filing

communication "in which the FDA summarized six potential review issues, including the FDA's

continuing evaluation of the integrity of data from [its] Phase 2/3 trial for NPC; the effect of the

high degree of concomitant miglustat use in [its] Phase 2/3 trial for NPC on its ability to determine the safety and efficacy of arimoclomol, which could have potential implications for labeling/recommended dosing and post-marketing studies; the proposed primary hypothetical treatment effect used in [its] Phase 2/3 trial for NPC to estimate the treatment benefit effect; the meaningfulness of one metric utilized to evaluate patient progress in [its] Phase 2/3 trial of NPC; the timing of submission of the QTc and other study reports to the FDA, including in light of evidence suggesting a potential QT safety signal; and differences among the formulations of arimoclomol used in [its] Phase 2/3 trial of NPC as compared to the formulation of arimoclomol to be marketed." *Id.* at 6. Although the filing communication was "not necessarily indicative of deficiencies that may be identified during the review," ORPH cautioned that "[w]e cannot assure you that such issues will not result in a delay of any potential approval of arimoclomol . . . or a determination by the FDA not to approve the product candidate." *Id.* at 22; ¶ 57.

*Limited Phase 2/3 Trial Results*. The Registration Statement disclosed that the Phase 2/3 trials were "small" thus far; that arimoclomol had ***not*** achieved statistical significance under either the NPCCSS or CGI-I primary endpoints; and that ORPH's post-hoc analysis of the trial results used a modified NPCCSS endpoint, which excluded certain categories of patients:

- "[T]hus far, we have only conducted relatively small Phase 2/3 and Phase 2 clinical trials, only one of which was designed to measure efficacy. Such clinical trials may not lead to pharmaceutical products that can be effectively commercialized." Ex. 1 at 21.

- "Statistical significance [was] not reached [under NPCCSS] when including individuals with double functional null mutations (n – 3)." *Id.* at 116.

- "In agreement with the FDA, a post-hoc analysis [under NPCCSS] was conducted to exclude three patients with double functional null mutations . . . . Two preplanned subgroup analyses were also conducted which showed a statistically significant benefit of arimoclomol over placebo on the 5-domain NPCCSS score: patients aged ≥ 4 years . . . and in patients receiving miglustat." *Id.* at 117.

- "Because the FDA requested we add CGI-I as a co-primary endpoint only after the clinical trial had already been initiated, only eight patients had a formal baseline

8

assessment for CGI-I – for the remaining patients such data had to be reconstructed afterwards. A responder rate of more than 50% in CGI-I in the placebo control group impeded the ability to show an overall effect on this endpoint and therefore was not statistically significant." *Id.* at 118.

***Future Clinical Trial Results***.  Orphazyme further disclosed that results of subsequent clinical trials may ultimately be negative or inconsistent with results it had reported to date:

- "There is a risk that the clinical trials that we currently sponsor will not confirm previous results or will not demonstrate sufficient evidence of safety and efficacy to receive requisite regulatory approvals." *Id.* at 21.

- "We have limited long-term data regarding the safety and effectiveness of arimoclomol and results in preclinical studies or clinical trials of our current and future product candidates may not be indicative of results in future clinical trials, and does not assure FDA or EMA approval of arimoclomol." *Id.* at 26.

- "Clinical trials being conducted to test our product candidate, arimoclomol, may not obtain the desired safety and efficacy results or may be delayed." *Id.* at 19.

### III.  Spring 2021: Infrastructure Development

Following its September 2020 IPO, ORPH awaited the FDA's response to the NDA while developing the operations and infrastructure it would need to market arimoclomol.  Also during this period, ORPH announced that its trials of arimoclomol to treat IBM and ALS were not successful—further focusing the business on NPC treatment.  *See* ¶¶ 103, 105.

***April 2021 Cowen Analyst Report***.  Plaintiffs claim that, based on an alleged statement by Vadsholdt at a March 3, 2021 conference hosted by Cowen and Company, an April 27 Cowen analyst report stated:  "ORPH has indicated it is in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements."  Ex. 3 at 1; ¶ 71.  The Cowen report does not mention Vadsholt or the March 3 conference.  Ex. 3.  Plaintiffs claim that analysts, in "numerous reports" starting in March 2021, "understood [Vadsholdt's] statement to mean that approval for the arimoclomol NDA was imminent."  ¶ 71.  Plaintiffs do not identify any of these reports, and analyst reports following the April 27 Cowen report indicated that "[m]anagement

9

reported to have *begun* discussions on the labeling and safety data." Ex. 4 at 3 (May 7, 2021 BofA Analyst Report) (emphasis added).[5]  Moreover, the price of ORPH ADS declined from $12.95 on March 3, 2021, to $9.42 by the end of April, and $5.60 by the end of May.  Ex. 5.[6]

*April 2021 B. Riley Neurosciences Conference*.  At an April 29, 2021 conference hosted by B. Riley Financial, Inc., ¶¶ 74–77, Bourdon stated that ORPH had "basically . . . set up the pre-launch and launch strategy," including by assembling "a team with significant rare disease expertise," Ex. 6 at 3.  In light of this, Bourdon stated: "I feel . . . for an organization at this stage, we are absolutely ready to launch." *Id*.  In the same vein, Bourdon noted: "I feel we are ready to launch," "we are absolutely launch-ready in the U.S.,"[7] and "we are ready–NPC launch ready." *Id.* at 3, 7.  But Bourdon was careful to note that any launch was "pending FDA approval," as the Company was "watching very carefully [for the] FDA decision." *Id.* at 2–3.

## IV.    June 2021 Complete Response Letter

On June 18, 2021, ORPH announced it had received a CRL indicating that the FDA would not approve in its then-present form the Company's NDA for the use of arimoclomol to treat NPC.[8] Ex. 7 at 1; ¶ 78.  The press release explained:

---

[5] On this motion to dismiss, the Court may properly take judicial notice of analyst reports for the publication of their contents.  *See SEC v. Ustian*, 229 F. Supp. 3d 739, 761–62 (N.D. Ill. 2017).

[6] "[Courts] may take judicial notice of . . . publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment."  *Pugh v. Trib. Co.*, 521 F.3d 686, 691 (7th Cir. 2008).

[7] The Amended Complaint misquotes Bourdon as stating that Orphazyme had "launched already" in the U.S.  ¶¶ 74–75.  The recording of this conference, available at https://www.webcaster4.com/ Webcast/Page/2433/41093, and transcription, filed herewith as Exhibit 6, make clear that Bourdon stated that ORPH was "launch-ready" (not "launched already").

[8] A "complete response letter" communicates that the FDA "will not approve the application or abbreviated application in its present form," describes "specific deficiencies," and, when possible, provides a "[r]ecommendation of actions for approval."  21 C.F.R. § 314.110(a).  An applicant must resubmit the application to address the deficiencies identified in the CRL, withdraw the application, or request a hearing. *Id.* § 314.110(b).  The CRL is not itself a final determination; rather, the "review period" is "extend[ed]" while the applicant takes one of these actions in response to the CRL.  *Id.* § 314.110(c)(1).

10

> The FDA issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain. Further, the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single phase 2/3 clinical trial to support the benefit-risk assessment of the NDA.

*Id.* Defendant Bo Jesper Hansen stated: "As representative for Orphazyme's shareholders and as a shareholder myself, I am extremely disappointed." *Id.* He noted, however, that he "strongly believe[d] there is a path forward for Orphazyme based on our pursuit of regulatory approval from the European Medicines Agency and continued dialogue with the FDA." *Id.*

ORPH executives held two conference calls on June 18, 2021—the same day as the press release. ¶¶ 80–88. During the first call, Bourdon stated that management was "not able to share any details outside of what is in the press release," but "felt it was important to hold this call today to communicate our resiliency and dedication to NPC patients and our key stakeholders." Ex. 8 at 4. Bourdon summarized the CRL as the press release had done, explaining that "the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single Phase II/III clinical trial to support the benefit-risk assessment of the NDA." *Id.* In response to a question about what "additional data" the FDA might require, Bourdon stated that "on the additional evidence beyond clinical, there could be . . . pharmacodynamic data," but "[a]t this stage, it's very important for us to ensure that we find the most constructive path forward with the FDA." *Id.* at 6. When asked about data on the swallowing domain, Bourdon responded: "So we had good effect on the swallow domain. It was 1 of 3 domains that mostly carried the effect." *Id.* Blaettler added that "all 5 domain[s] should be considered in totality," but "the swallow domain is one of the strong domains for arimoclomol and is associated with survival." *Id.* at 7; ¶ 82.

During the second conference call, Bourdon was asked whether ORPH would be willing to "run a study" in response to the CRL if required. Bourdon stated that ORPH was "at the

11

moment, reassessing the kind of data, not only like clinical data, but could be also pharmacodynamic data," adding that "we are assessing this as we speak and then we're going to revert back when we have more clarity on the path forward." Ex. 9 at 6; ¶ 86.

On June 18, 2021, following the CRL announcement and conference calls, the price of ORPH's ADS dropped by nearly 50% from the previous day's closing price. ¶ 107. On June 28, 2021, ORPH announced a restructuring, ¶ 110, in which it would "significantly scale back" its organization and focus its resources on the development of arimoclomol for NPC, Ex. 10 at 1.

## V. Fall 2021: Further Engagement With The FDA And ADS Prospectus Supplement

Following the CRL, ORPH continued to press forward in evaluating arimoclomol for the treatment of NPC—with promising results—while maximizing its transparency with investors regarding its interactions with regulators.

*August 2021 Earnings Call*. On August 31, 2021, ORPH held an earnings call. ¶ 86. Only ten days before, the *Journal of Inherited Metabolic Disease*, a peer-reviewed journal, had published an article concluding that arimoclomol **had** achieved statistical significance in treating NPC as measured by NPCCSS, with a treatment difference corresponding to a 65% reduction in annual disease progression. Ex. 11 at 1464, 1472.[9] Bourdon stated that the article "provides validation of our program through a robust peer-reviewed scientific process." Ex. 12 at 4.

*October 2021 Type A Meeting*. In an October 31, 2021 press release, ¶ 90, ORPH identified two takeaways from a Type A meeting[10] with the FDA:

---

[9] The Court may properly take judicial notice of the publicly available *Journal of Inherited Metabolic Disease* article "as to the publication of [its] contents." *United States ex rel. Bogina v. Medline Indus., Inc.*, 2015 WL 1396190, at *3 n.7 (N.D. Ill. Mar. 24, 2015), *aff'd*, 809 F.3d 365 (7th Cir. 2016).

[10] A Type A meeting is generally a meeting "necessary for an otherwise stalled product development program to proceed," including "[p]ost-action meetings requested within 3 months after an FDA regulatory action other than an approval (i.e. issuance of a complete response letter)." FDA, *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products (Draft Guidance)* 2–3 (Dec. 2017), https://www.fda.gov/media/109951/download.

- "The FDA recommended that the Company submit additional data, information, and analyses to address certain topics in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission." Ex. 13 at 1; ¶ 90.

- "The FDA concurred with the Company's proposal to remove the cognition domain from the NPCCSS endpoint, with the result that the primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, subject to the submission of additional requested information which the Company intends to provide. To bolster the confirmatory evidence already submitted, the FDA affirmed that it would require additional in vivo or pharmacodynamic (PD)/pharmacokinetic (PK) data; the Company is considering the optimal path forward to address the FDA's requests." *Id.*

The press release quoted Bourdon as stating the meeting represented "good progress," as it had provided "a greater understanding from the FDA on the information that could address topics in the CRL." *Id.* Bourdon added: "While we have not yet established a path to resubmission, our team will now work on putting a plan in place to discuss with the FDA during our next interactions and we will share more details about our strategy as and when appropriate." *Id.*

*November 2021 Prospectus Supplement*. On November 4, 2021, ORPH filed a Prospectus Supplement with the SEC, pursuant to which it may issue and sell ADS with an aggregate offering price of up to $50 million, with the proceeds to be used to further seek regulatory approval of arimoclomol for the treatment of NPC. ¶ 112. ORPH warned that it was "highly dependent on obtaining and maintaining regulatory approval for arimoclomol and the potential success of this one product candidate." Ex. 14 at S-7. To illustrate this risk, the Prospectus Supplement stated that "the FDA noted in the CRL that additional data is needed to supplement confirmatory evidence beyond the single Phase 2/3 trial for NPC to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS to support the benefit-risk assessment of the NDA." *Id.* The Prospectus Supplement also noted that, in the October 2021 Type A meeting, "the FDA recommended that we submit additional data, information and analyses to address the deficiencies noted in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission of the NDA." *Id.*

13

## VI.     <u>This Lawsuit</u>

Busic filed this action on July 9, 2021.  Dkt. 1.  Busic first purchased Orphazyme ADS on June 16, just before the FDA's June 17 target action date for completing review of ORPH's NDA, and sold all his ADS on June 18, after ORPH disclosed the CRL.  Dkt. 13-3.  After Busic filed the sole motion for lead plaintiff, the Court appointed him Lead Plaintiff for purchasers of ADS between September 29, 2020 and June 18, 2021.  Dkts. 11, 18.  On November 19, Busic filed an Amended Complaint purporting to extend the putative class period to November 4, 2021.  ¶ 1.

Although the September 2020 IPO Registration Statement disclosed that arimoclomol had failed to achieve statistical significance as to its two primary endpoints, and that the FDA had identified six "potential review issues," Plaintiffs contend that ORPH misled investors by concealing FDA concerns.  Every "concern" Plaintiffs say the Registration Statement (and post-IPO statements) omitted, including that certain trial evidence was "weak and contradictory," is lifted wholesale from descriptions of the June 2021 CRL, which ORPH received nine months *after* the Registration Statement was filed.  ¶¶ 1–2, 5, 7, 37, 58, 60, 70, 73, 77, 79, 83, 89, 99, 112.

The Amended Complaint includes allegations relating to an anonymous former employee, CW1, who was allegedly a Director of Field Medical Affairs from July 2020 to July 2021 based in the U.S.  ¶ 94.  According to Plaintiffs, CW1 stated that, in May 2021, ORPH's U.S. office received a "question" from the FDA about the technique used to measure the swallowing domain, one of the five domains of the NPCCSS.  ¶ 95.  In statements the Amended Complaint attributes to *no* source—not CW1 or anyone else—Plaintiffs claim that CW1 "confirms" or "further confirms" their arguments, including that "the Company . . . knew that an entirely new study would be required . . . assuring that the NDA would be denied before the Company acknowledged receipt of the CRL."  ¶ 96.  Plaintiffs do not allege that CW1 made or agreed with these statements.  *Id.* Nor do Plaintiffs allege that CW1 ever communicated with any Individual Defendant.

14

Plaintiffs assert claims under Sections 11 and 15 of the 1933 Act for alleged misstatements and omissions in the Registration Statement and claims under Sections 10(b) and 20(a) of the 1934 Act for alleged misstatements and omissions in both the Registration Statement and subsequent statements during the putative class period. ¶¶ 123–55.

## LEGAL STANDARDS

On a motion to dismiss, courts "accept the allegations in the complaint as true, and . . . draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021). "Yet the complaint must still include enough facts to state a claim to relief that is plausible on its face." *Id*. at 308. (internal quotation and citation omitted). To state a Section 11 claim, a plaintiff must plead facts showing that a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To state a Section 10(b) claim, a plaintiff must plead facts showing "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018); *see* 17 C.F.R. § 240.10b-5. An omission is actionable "only" when additional disclosure is "necessary to make statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotation and citation omitted).

Plaintiffs' Section 10(b) claim is subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act. "Rule 9(b) requires plaintiffs to 'state with particularity the specific facts in support of plaintiffs' belief that defendants' statements were false when made.'" *Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, 2020 WL 71163, at *3 (S.D.N.Y. Jan.

15

2, 2020) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)); *see also Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (Rule 9(b) "requires that allegations of fraud be stated 'with particularity'"). Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Where a Section 11 claim is based upon the same course of conduct as a Section 10(b) claim, the Section 11 claim "sounds in fraud" and is also subject to Rule 9(b). *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 636–37 (N.D. Ill. 2020); *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at \*21 (S.D. Ind. Jan. 4, 2016). Here, Plaintiffs do not substantively "differentiate their asserted negligence claims from the fraud claims which permeate the Complaint." *Rombach*, 355 F.3d at 172. Instead, Plaintiffs allege that "Defendants engaged in a plan, scheme, conspiracy and course of conduct" to defraud investors both "*[a]t the time of the Registration Statement and during the Class Period*." ¶¶ 141–42 (emphasis added). And in challenging the Registration Statement and post-IPO statements, Plaintiffs claim the omission of the *same* FDA feedback. *Compare, e.g.*, ¶¶ 58, 60, *with* ¶¶ 70, 73, 75, 77, 79, 83, 87, 89. Rule 9(b) thus applies to both their Section 10(b) and Section 11 claims.

## ARGUMENT

**I.    Plaintiffs' Section 11 Claim Should Be Dismissed For Failure To Allege An Actionable Misrepresentation Or Omission In The Registration Statement**

Plaintiffs' Section 11 claim should be dismissed because the Amended Complaint fails to allege an actionable misrepresentation or omission in the Registration Statement. *See*

16

*Vallabhaneni*, 2016 WL 51260, at *21 (dismissing complaint for failure to plead facts showing that, at time of registration statement, the defendant biopharmaceutical company "knew the Phase 2 study was fatally flawed or that the Phase 3 study was futile").

### A.     Clinical Trial Results

Plaintiffs claim the Registration Statement for ORPH's IPO "presented a rosy and misleading picture of Orphazyme's trial results" and concealed that ORPH "manipulated clinical data in a post-hoc fashion." ¶ 37.  Not so.  The Registration Statement disclosed that arimoclomol had ***not*** achieved statistical significance with regard to its two primary endpoints, and  made clear that ORPH's post-hoc analysis of the trial results used a modified endpoint, which excluded certain categories of patients.  Ex. 1 at 116, 118.  With such disclosure, "no reasonable investor could have understood the [announcement] to mean anything other than positive subgroup results." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (disclosure of "encouraging preliminary findings" in post-hoc analysis was not misleading, where company also disclosed the "overall study population did not attain statistically significant results based on the primary endpoints" (internal quotations omitted)).  The Registration Statement also disclosed relevant details of the clinical trial's design and methodology, and warned that, given the limited clinical experience with the diseases arimoclomol was being developed to treat, the FDA might not find its trial results to be "clinically meaningful."  Ex. 1 at 20–23, 115–16.  *See Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, *2–3, *6–9 (S.D.N.Y. May 29, 2013) (rejecting challenge to disclosure of positive study results, where defendants disclosed study methodology).

### B.     FDA Filing Communication

Plaintiffs contend that even more detail about the FDA's September 24, 2020 filing communication should have been disclosed, ¶¶ 58, 66, but it is well established that "interim FDA feedback is not material because it does not express a binding agency decision and is subject to

17

change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications." *Sanofi*, 87 F. Supp. 3d at 542. Investors understand that "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process," *Tongue*, 816 F.3d at 211 (citation omitted), and companies "are not bound to disclose the ins and outs of that process to investors," *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *6 (C.D. Cal. Sept. 20, 2017); *see also Hoey v. Insmed Inc.*, 2018 WL 902266, at *14 (D.N.J. Feb. 15, 2018) ("[T]he law with respect to this issue is clear: a biopharmaceutical corporation need not share a regulatory agency's response or criticism to a trial and its results if it does not constitute a final determination." (collecting cases)); *Vallabhaneni*, 2016 WL 51260, at *12 ("[A] defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology." (collecting cases)).

Here, the FDA issued the filing communication only eight days after *accepting* ORPH's NDA—kicking off a review process expected to last for several months. *See* ¶ 38. Thus, Plaintiffs do not, and cannot, allege the filing communication contained any final determinations. Instead, the filing communication simply "requested that [ORPH] submit reports" in response to the issues it raised. ¶ 57. While the Company was particularly forthcoming with investors by disclosing the filing communication and the "potential review issues" it raised, Plaintiffs have failed to allege "facts to distinguish [this case] from the long line of cases wherein interim FDA criticism regarding study design was considered part of an ongoing dialogue and was, therefore, determined to be immaterial to investors." *Vallabhaneni*, 2016 WL 51260, at *14.

Moreover, Plaintiffs fail to identify any *contemporaneous* contrary information that the Registration Statement plausibly omitted. Instead, Plaintiffs rely entirely on hindsight: every "concern" Plaintiffs claim the Registration Statement omitted is lifted from descriptions of the

June 2021 CRL, which ORPH received nine months *after* the Registration Statement was filed. ¶ 58 (quoting Ex. 14 at S-7–S-8). But "[t]o be actionable, a statement must be false or misleading at the time it was made; how things turn out *ex post* do not matter to liability." *City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, 2011 WL 5374095, at *9 (N.D. Ill. Nov. 3, 2011). Here, the Amended Complaint does not plead facts showing that the FDA had made its determinations, and conveyed them to ORPH, at the time of the September 2020 IPO. *See Gallagher*, 269 F.3d at 810 (rejecting claim based on company's failure to describe a March 17 FDA letter in a March 9 SEC filing because "[u]nless [the company] had a time machine, it could not have described on March 9 a letter that had yet to be written"); *Hoey*, 2018 WL 902266, at *25 (dismissing Section 11 claim based on alleged omission of regulatory issues because plaintiff failed to allege facts showing the defendant was aware of the issues at the time); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *7 (S.D.N.Y. Sept. 19, 2012) (rejecting disclosure claim based upon subsequent receipt of "non-approval letter from the FDA").

### C.     Risk Factors

Nor can Plaintiffs contrive a claim by challenging the Registration Statement's disclosure that "the FDA or other regulatory authorities may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results." ¶¶ 59–60. While "[e]xpressing . . . risks only in the vaguest terms or as a hypothetical when they have already come to fruition, in whole or in part, can be a basis for liability under the securities laws," *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 838 (N.D. Ind. 2018), Plaintiffs fail to allege that any disclosed risk had "already come into fruition" at the time the Registration Statement was filed. Instead, Plaintiffs simply recite the FDA's determinations in the June 2021 CRL and claim, without any supporting factual allegations, that the FDA had "already" communicated these same determinations when ORPH filed the Registration Statement in September 2020. ¶ 60.

19

Plaintiffs' suggestion that the FDA had expressed fatal concerns prior to the Company's IPO—or even the same concerns as in the June 2021 CRL—simply defies common sense. In September 2020, the FDA accepted the NDA. Ex. 1 at 6. Plaintiffs do not explain why the FDA would have done so while simultaneously expressing concerns that, in Plaintiffs' view, doomed the NDA's chances at approval. Nor do Plaintiffs explain why, if the FDA had already communicated its final assessment of the NDA, it would nonetheless spend the next nine months reviewing the application—a rigorous regulatory process that Plaintiffs cast as an empty gesture. *See Valllabhaneni*, 2016 WL 51260, at *13 ("[T]he FDA permitted the [defendant's] testing to proceed to the Phase 3 study, suggesting that the FDA's concerns were not as severe as the Plaintiff asserts."); *Sanofi*, 87 F. Supp. 3d at 533 ("Despite the concerns the FDA had expressed about the design of the clinical trials, it allowed those trials to proceed.").

No reasonable investor reviewing the Registration Statement could fail to appreciate the significant risk that the FDA might not approve the NDA for arimoclomol. The Registration Statement disclosed that the FDA had communicated "six potential review issues" in the filing communication, ¶ 57; Ex. 1 at 6—adding precisely the context that, in Plaintiffs' view, translated to an "increased" risk of non-approval, *see* ¶ 60. And far from "boilerplate," ¶ 59, the Registration Statement explained *why* the risk of FDA non-approval was particularly acute: unlike other drugs, arimoclomol was designed "for the treatment of diseases in which there is little clinical experience" (*i.e.*, "orphan disease indications"), Ex. 1 at 23. ORPH thus made clear that it might "use endpoints or methodologies that regulatory authorities may not consider to be clinically meaningful," and regulatory authorities may require "additional or different clinical endpoints" or "determine that these clinical endpoints do not support marketing approval." *Id.* The Registration Statement also flagged key vulnerabilities: the clinical trials had been "small" thus far, *id.* at 7, and arimoclomol

20

had not achieved statistical significance under either of the primary endpoints, *id.* at 116, 118, leaving little question that the risk of non-approval was not remote.[11]

\* \* \*

Because the Amended Complaint fails to allege an actionable misrepresentation or omission in the Registration Statement, Plaintiffs' Section 11 claim should be dismissed.

## II.     Plaintiffs' Section 10(b) Claim Should Be Dismissed

Plaintiffs' Section 10(b) claim should be dismissed for (i) failure to allege an actionable misrepresentation or omission; and (ii) failure to plead particularized facts giving rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).

### A.     The Amended Complaint Fails To Allege An Actionable Misrepresentation Or Omission

#### 1.     September 2020 Registration Statement

As discussed in Section I above, the Amended Complaint fails to allege an actionable misrepresentation or omission in the Registration Statement.  Plaintiffs' Section 10(b) claim relating to the Registration Statement, ¶¶ 141–42, should therefore be dismissed.  Plaintiffs' Section 10(b) claim relating to the March 2021 Annual Report, which Plaintiffs claim is misleading "for the same reasons" as the Registration Statement, ¶¶ 69–70, should likewise be dismissed.

#### 2.     April 2021 B. Riley Neurosciences Conference

Plaintiffs claim that Bourdon stated at an April 2021 conference that "we are absolutely launched already in the US." ¶¶ 74–75.  What Bourdon actually said was that he believed ORPH was "absolutely launch-ready in the U.S." Ex. 6 at 2.  He stated that ORPH had "basically . . . set

---

[11] Plaintiffs' claim that the Registration Statement omitted any known risks in violation of Items 303 or 503 of Regulation S-K, *see* ¶¶ 62–66, fails for the same reasons.  The Registration Statement amply disclosed the risks Plaintiffs identify, including those related to the FDA's "concerns about the clinical data."  ¶ 66; *see supra* pp. 6–9, 20–21; *W. Palm Beach*, 495 F. Supp. 3d at 646–47.

up the pre-launch and launch strategy," including by assembling "a team with significant rare disease expertise," and that "I feel we are ready to launch." Ex. 6 at 3.

Bourdon's statement that "I feel we are ready to launch" is a classic statement of opinion, expressing a subjective belief. *See Vallabhaneni*, 2016 WL 51260, at *16–17 (holding that "[w]e are ready to launch" was an inactionable statement of opinion). Statements of opinion are actionable only if: (i) "the speaker did not hold the belief she professed;" (ii) "the supporting fact she supplied were untrue," or (iii) the speaker omits information that "conflict[s] with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186–89 (2015).

Plaintiffs do not allege facts showing that Bourdon did not honestly hold the opinion he expressed. Plaintiffs claim ORPH was not "even launch ready," ¶ 75, but fail to allege any facts showing that ORPH had not "set up the pre-launch and launch strategy" or assembled "a team with significant rare disease expertise," such that it was not "ready" for the operational "launch" Bourdon described. Moreover, Bourdon cautioned that any "launch" was "pending FDA approval," and that ORPH was "watching very carefully [for the] FDA decision." Ex. 6 at 2–3. Plaintiffs' contention that Bourdon should have disclosed the FDA's determinations in the June 2021 CRL, ¶ 77 (quoting CRL-related disclosure), is unsupported by any facts showing the FDA had already made and conveyed these determinations by the April 2021 B. Riley conference.[12]

---

[12] Bourdon's expressed belief that "[ORPH] can make a difference for patient[s] and generate substantial . . . value for our shareholders and investors," ¶ 74, is also inactionable as a statement of corporate optimism or "puffery." "Courts have held immaterial as a matter of law loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004). Bourdon's stated belief falls within this category because it "did not make any concrete assertion" and "expressed only vague optimism." *City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021); *see Vallabhaneni*, 2016 WL 51260, at *16 (statement that "[w]e are ready to launch" may "rightly be considered 'puffery' and not actionable as a matter of law") (citation omitted)).

22

### 3. April 2021 Cowen Analyst Report

Plaintiffs complain that, based on an alleged statement by Vadsholt at a March 3, 2021 health conference, an April 27, 2021 Cowen analyst report stated: "ORPH has indicated it is in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements." Ex. 3 at 1.[13] Plaintiffs claim Vadsholt's alleged statement was misleading, but the Amended Complaint is devoid of any facts addressing labeling discussions or liver/renal monitoring requirements, much less facts that conflict with anything Vadsholt allegedly said on these topics. Plaintiffs also claim the market "understood this misleading statement [by Vadsholt] to mean that approval for the arimoclomol NDA was imminent," ¶ 71, but the objective facts show just the opposite: the price of ORPH ADS declined from $12.95 on March 3, 2021, to $9.42 by the end of April, and $5.60 by the end of May. Ex. 5 at 2–3.

Even indulging Plaintiff's unsupported characterization of Vadsholt's alleged statement, an alleged "positive spin on developments in the [FDA approval] process" is an inactionable statement of corporate optimism or puffery. *See In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (statements that company was "moving through the approval process in a timely manner" and had "a much clearer path toward FDA approval" were puffery); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (statement that company was "on track to have these products . . . reach the market" was puffery).

Vadsholt's alleged statement is also protected by the PSLRA safe harbor for forward-looking statements. *See Hoey*, 2018 WL 902266, at *19 (statement that company was in a "good place to secure a label in Europe" was forward-looking statement). Under the PSLRA, a defendant "shall not be liable" for a forward-looking statement that is "accompanied by meaningful

---

[13] Analyst reports subsequent to the April 27, 2021 Cowen analyst report indicated that "[m]anagement reported to have *begun* discussions on the labeling and safety data." Ex. 4 at 3 (emphasis added).

23

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). Here, ORPH provided meaningful cautionary language related to the risk that it would not receive FDA approval—making clear the FDA may not find its trial results "clinically meaningful" because arimoclomol was designed for "diseases in which there is little clinical experience." Ex. 1 at 23.[14]

### 4. June 2021 Complete Response Letter

Plaintiffs also have no claim based on ORPH's June 18, 2021 disclosure of the CRL. *See* ¶¶ 78–87 (discussing press release and statements by Bourdon and Blaettler). *First*, Plaintiffs do not, and cannot, allege that ORPH misrepresented any *facts* related to the CRL. The Company accurately disclosed it had received a CRL, in which the FDA requested additional information, including with respect to the swallow domain. ¶ 78; Ex. 7 at 1; *see, e.g.*, *EDAP*, 2015 WL 5326166, at *9–10 (statements regarding status of company's application were "not actionable to the extent they merely recite[d] historical fact"); *MELA*, 2012 WL 4466604, at *12 (same).

*Second*, Plaintiffs fail to allege an actionable omission because ORPH had no duty to disclose further details about the CRL—indisputably part of an ongoing dialogue with the FDA. "[C]omplete response letters merely 'infor[m] sponsors of changes that must be made before an application can be approved, *with no implication as to the ultimate approvability of the application*.'" *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1683 (2019) (Thomas, J., concurring) (quoting 73 Fed. Reg. 39588 (2008)); *accord CareToLive v. von Eschenbach*, 525 F. Supp. 2d 938, 949 (S.D. Ohio 2007) ("A Complete Response Letter does not signal the end for

---

[14] For purposes of the PSLRA safe harbor, "meaningful cautionary language" may be found in an SEC filing incorporated by reference or publicly available at the time a forward-looking statement was made. *See, e.g.*, *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009). The September 2020 Registration Statement and March 2021 Annual Report were publicly available to investors at the time of the April 2021 conference and were accordingly "absorbed into the market." *Id.* at 844.

a product; rather, it is a step the FDA takes to assure that it has sufficient data to establish safety and effectiveness prior to licensure. The FDA continues to work with sponsors to resolve any outstanding issues."), *aff'd*, 290 F. App'x 887 (6th Cir. 2008); 21 C.F.R. § 314.110 (FDA will send a CRL where it will not approve NDA in the "present form," but will "recommend[]" actions for approval and "extend" the "review period" while applicant "address[es] all deficiencies"). That is precisely what the CRL here did: it stated the FDA would require "additional qualitative and quantitative evidence," "additional data," and "confirmatory evidence" for approval. ¶ 78.

When companies disclose receipt of a CRL, as ORPH did, courts have rejected claims they must lay out the details a CRL contains—particularly where, as here, the nature of the FDA's concerns is disclosed. In *Gillis*, for example, the court rejected the claim that a company was required to disclose the specifics of its CRL, such as the type of additional "evidence" the CRL indicated that the FDA would require, where the company had disclosed that the CRL requested "additional information with regard to safety and efficacy," including "data and analyses" from a particular study. 197 F. Supp. 3d at 586–88. Here, in addition to disclosing its receipt of the CRL, ORPH announced two key aspects of the CRL that Plaintiffs claim it omitted: (i) the FDA had focused, "in particular," on the "swallow domain," and (ii) the FDA had requested data "beyond the single phase 2/3 clinical trial" the Company had conducted. ¶ 78; Ex. 7 at 1. These disclosures put investors on notice not only that ORPH's trial results had not been sufficient to obtain approval, but also of what *would* be required to obtain approval—*i.e.*, additional data on the swallowing domain and data from outside the clinical trial. ORPH had no duty to disclose more. *See Gillis*, 197 F. Supp. 3d at 587–88; *see also Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *8 (D. Mass Mar. 31, 2015) ("Defendants were under no duty . . . to delve into the FDA's specific concerns over the sufficiency of [the drug's] potential NDA application"); *In re Alkermes Sec.*

25

*Litig.*, 2005 WL 2848341, at \*16 (D. Mass. Oct. 6, 2005) ("The Defendants had no duty to disclose that the FDA had requested additional studies because they had never guaranteed FDA approval.").

*Third*, contrary to Plaintiffs' assertions, CW1's alleged statements regarding the FDA's May 2021 "question" do not suggest that the Company's disclosure of the CRL was misleading. ¶ 79; *see* ¶¶ 81, 83, 85, 87 (asserting falsity based on CW1 allegations). "The Seventh Circuit has reacted strongly against reliance on confidential witnesses in securities fraud cases, noting that allegations from such witnesses are to be steeply discounted." *Vallabhaneni*, 2016 WL 51260, at \*8; *cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). "Accordingly, if a plaintiff supports an allegation based on the testimony of a confidential source, the plaintiff must describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Vallabhaneni,* 2016 WL 51260, at \*8 (internal quotation and citation omitted).

The Amended Complaint entirely fails to meet this standard as to CW1. Despite purporting to opine on a "question" the Company received from the FDA in May 2021, CW1 is not alleged to have ever communicated with the FDA or to have held any role related to ORPH's regulatory strategy or operations. *See* ¶ 95. To the contrary, Plaintiffs allege that "the clinical and regulatory departments *in Copenhagen* had spearheaded communications with the FDA," ¶ 97 (emphasis added)—but CW1, who was based in the U.S., was not a part of either of those departments, and the Amended Complaint does not allege that CW1 communicated with anyone who was. At most, CW1 received a hearsay account of the FDA's alleged "question," and the Amended Complaint does not say that CW1 has any knowledge of the Company's response. These allegations are plainly insufficient. *See, e.g.*, *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 828 (N.D. Ill. 2006)

26

("Plaintiffs must plead with substantial specificity how confidential witnesses came to learn of the information they provide in the complaint. The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo." (internal quotation omitted)); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 943 (S.D. Ind. 2005) (CW allegations insufficient where "there is no way to tell if they are relaying information received first, second, or even third hand").

Even if Plaintiffs' allegations about CW1 were credited, they fail to support an inference that ORPH's CRL-related disclosures contained any material omissions. CW1 is only alleged to have stated that, in May 2021, the FDA asked a "question" about the validity of a technique used to measure the swallowing domain and that measuring this domain would require the use of a video fluoroscopic exam. ¶ 95. There is no duty to disclose the FDA's specific "questions" as part of an ongoing regulatory review. *See In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) ("Mere questioning by the FDA imposed no duty upon Defendants either to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose."); *accord Sanofi*, 87 F. Supp. 3d at 566. And while CW1 allegedly said that the FDA asked for additional evidence regarding the swallowing domain, *see* ¶ 95, ORPH disclosed the same point—noting that the CRL focused "in particular" on the need for additional data regarding "the swallow domain." ¶ 78; Ex. 7 at 1. Plaintiffs' remaining points related to CW1—for example, that "an entirely new study would be required" to address the FDA's alleged concerns, ¶ 96—are not statements that CW1 made or endorsed; they are unsubstantiated arguments from Plaintiffs themselves. Thus, CW1's account—even if accepted—fails to show that ORPH's disclosures were materially misleading. *See, e.g.*, *Vallabhaneni*, 2016 WL 51260, at *9–10 (dismissing securities claims because alleged CW statement that the FDA "questioned how

27

efficacy had been previously documented" did not show that company "knew that Phase 3 trials would not, or were not, demonstrating efficacy" and alleged CW statement that "it was readily apparent . . . [from] the new imaging protocols suggested by the FDA that [the drug] was not demonstrably effective" was not "supported by any corroborating facts").

*Fourth*, contrary to Plaintiffs' assertions, the Company's discussion of the CRL as a "risk factor" in a November 2021 prospectus supplement does not suggest any material omission in the June 2021 disclosures. ¶¶ 79, 81, 83, 85, 87; Ex. 14 at S-7–S-8. While ORPH provided additional information in November 2021, it had no duty to provide precisely the same amount of information when it first disclosed its receipt of the June 2021 CRL. Moreover, nothing in the November 2021 "risk factor" renders the June 18 disclosures deficient: in both disclosures, the Company stated that "additional data . . . beyond the single phase 2/3 clinical trial" would be required, ¶¶ 78, 112; Ex. 7 at 1, and the Company had already disclosed the "lack of statistical significance on the 5-domain NPCCSS" in the Registration Statement a year before, ¶ 112; Ex. 1 at 116.

*Fifth*, the other challenged statements relating to the CRL are likewise inactionable:

- Hansen's statement that "I strongly believe there is a path forward," ¶ 78, is an inactionable opinion. Plaintiffs do not allege facts showing that Hansen did not honestly believe there was a "path forward," and his belief in a "path forward" was consistent with the fact that the CRL "recommended that [ORPH] submit additional data" and engage with the FDA to "identify a pathway to resubmission of the NDA." ¶ 112. Hansen's statement is also inactionable as a statement of corporate optimism and a forward-looking statement. *See, e.g.*, *Hoey*, 2018 WL 902266, at *16–18 (finding similar statements regarding regulatory approval inactionable as opinions, forward-looking statements, and puffery).

- Bourdon's statement that the Company was "not able to share any details outside of what is in the press release" was entirely appropriate, as the Company had received the CRL only the day before and, as Bourdon noted, intended to meet with the FDA to better understand the CRL. ¶¶ 80, 82. Moreover, as already discussed, there is no duty to disclose the specifics of interim FDA feedback in a CRL. *See Gillis*, 197 F. Supp. 3d at 586–88.

- Bourdon's statement that the FDA may seek "additional evidence beyond clinical" in the form of "pharmacodynamic data" is not alleged to be misleading. ¶ 82. Plaintiffs provide no basis to infer that the FDA would *not* seek, or be satisfied with, such "pharmacodynamic data"—indeed, the Amended Complaint does not discuss pharmacodynamic data at all.

28

- There are no facts alleged showing the falsity of Blaettler's statements that "we had good effect on the swallow domain" and "the swallow domain is one of the strong domains for arimoclomol and is associated with survival." ¶ 82. Blaettler made those statements in response to an analyst question about how ORPH's data for that domain looked, Ex. 8 at 7, and Plaintiffs allege no facts showing that ORPH's measured effect for the swallowing domain was not "good."

For all of these reasons, the Amended Complaint fails to identify any materially misleading statement in the Company's fulsome disclosures of the June 2021 CRL.

### 5. August 31, 2021 Half-Year Earnings Call

Bourdon's statement in an August 31, 2021 call that "arimoclomol has demonstrated statistically significant and clinically meaningful effects on the disease progression in NPC," ¶ 88; Ex. 12 at 4, was indisputably accurate: ten days before, the *Journal of Inherited Metabolic Disease* had published the results of ORPH's trial and found that arimoclomol *had* achieved statistical significance in treating NPC as measured by NPCCSS. *See* Ex. 11 at 1464, 1472. Plaintiffs entirely ignore this context, even though Bourdon's very next statement made clear that he was relying on this publication, which "provide[d] validation of our program through a robust peer-reviewed scientific process." Ex. 12 at 4. Moreover, far from omitting any reference to the CRL, ¶ 89, Bourdon opened the call by noting the "very disappointing news" in the CRL that the Company had reported on June 18. Ex. 12 at 4. No further detail was required. *See supra* § II.A.4.

### 6. October 2021 Type A Meeting

Plaintiffs contend the October 31, 2021 press release discussing ORPH's Type A meeting with the FDA, Ex. 13, was misleading because it omitted details about the meeting—all of which Plaintiffs borrow from the November 4, 2021 prospectus supplement filed five days later. ¶ 92 (quoting Ex. 14 at S-7–S-8). This claim fails because the Type A meeting was part of an ongoing dialogue with the FDA. Indeed, the FDA expressly "offer[ed] to have further interactions to identify a path to resubmission" and recommended the submission of "supplemental information

29

and analyses."[15]  Ex. 13 at 1.  ORPH had no duty to disclose the details of interim, non-final communications with the FDA.  *Supra* § I.B.  Providing these details as part of a "risk factor" disclosure in a more comprehensive prospectus supplement—where further detail is customary, *see* 17 C.F.R. § 229.105—does not render its earlier press release misleading, *supra* § II.A.5.

The remaining statements in the October 31, 2021 press release are plainly inactionable as puffery or as opinions.  For example, Bourdon's statements that the meeting represented "good progress" and that the Company "firmly believe[s] in the establishment of a positive benefit-risk balance for arimoclomol," Ex. 13 at 1, are classic statements of corporate optimism.  *See, e.g.*, *Aratana*, 315 F. Supp. 3d at 757 (reference to "remarkable progress" was inactionable puffery). They also convey subjective opinions, which Plaintiffs provide no basis to challenge:  there are no facts alleged showing that Bourdon did not hold the belief he expressed, and these statements are not misleading by virtue of any omission for the reasons discussed above.  *See supra* p. 22.

## B.      The Amended Complaint Fails To Raise A Strong Inference Of Scienter

The Section 10(b) claim should be dismissed for the independent reason that it fails adequately to allege that any Defendant acted with the requisite scienter.  For "each act or omission alleged to violate" the securities laws, and for each Defendant against whom Plaintiffs have asserted a Section 10(b) claim, Plaintiffs must plead particularized facts giving rise to a *strong* inference that the Defendant acted either with intent to deceive or with "reckless disregard of a substantial risk" that the statement was false.  *Higginbotham*, 495 F.3d at 756; *see* 15 U.S.C. § 78u-4(b)(2)(A).  "Recklessness in this context means . . . an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that

---

[15] *See also* FDA, *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products (Draft Guidance)*, 2 (Dec. 2017), https://www.fda.gov/media/109951/download (Type A meetings are designed to enable "an otherwise stalled product program to proceed," including after receipt of a CRL).

the defendant must have been aware of it[.]" *In re Alkermes Pub. Ltd. Sec. Litig.*, 523 F. Supp. 3d 283, 292 (E.D.N.Y. 2021) (internal citations and quotations omitted).[16] To plead scienter, "[a] plaintiff must do more than tell a possible or even plausible story about a defendant's intent." *City of Taylor*, 8 F.4th at 595. "Rather, the plaintiff must 'plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.'" *Id.* (quoting *Tellabs*, 551 U.S. at 328). Plaintiffs' scienter allegations fall far short of this standard.

### 1. Plaintiffs Allege No Coherent Theory Of Fraud

Plaintiffs' scienter allegations suffer from an "immediate first-level problem": their scienter "theory does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). The Amended Complaint does not explain why Defendants would have made misleading statements throughout 2021 about the prospects for FDA approval if they "knew the FDA would eventually figure out that [arimoclomol] could not be approved." *Id.* Indeed, ORPH continued to stake its existence on arimoclomol throughout the putative class period—investing virtually all of its limited resources into seeking regulatory approval and preparing for arimoclomol's commercial launch. Even after receiving the CRL, ORPH continued to engage with the FDA, including during the October 2021 Type A meeting, and raised funds to invest further in its efforts to obtain approval. Plaintiffs do not explain why the Company would have expended its time and resources doing so if it did not believe that FDA approval was in reach. The far more compelling inference is that ORPH honestly believed in arimoclomol's potential to treat NPC and expected it could achieve approval through ongoing dialogue with the FDA. *See Nguyen*, 962 F.3d at 415 (rejecting "improbable" theory that defendants would make misleading statements

---

[16] With respect to forward-looking statements, such as those discussed *supra* § II.A, Plaintiffs must allege facts giving rise to a strong inference that the defendant who made the statement had "actual knowledge" of the statement's falsity. 15 U.S.C. § 78u-5(c)(1).

regarding FDA approval if they "knew the FDA would eventually figure out that [the drug] could not be approved"); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("It is improbable that [defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure."); *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 2021 WL 3079878, at *7 (D. Mass. July 21, 2021) ("[T]he reasonable inference supported by the factual allegations is that the defendants genuinely believed that the available data could support FDA approval for [their drug]"); *Gillis*, 197 F. Supp. 3d at 600 (similar).

Moreover, the Amended Complaint does not allege any motive for fraud or explain how any Defendant benefited, or could hope to benefit, from it. "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia Emps.' Ret. Sys. & Loc.295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013). Plaintiffs do not allege that any Defendant profited from the alleged fraud—to the contrary, all Individual Defendants held their shares throughout the Class Period, and some of their spouses even *increased* their holdings. *See* Ex. 15. This behavior simply is "not consistent with scienter." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); *W. Palm Beach*, 495 F. Supp. 3d at 667 ("[W]here, as here, the allegations do not support a strong inference of scienter, a lack of stock sales can help seal the deal."); *MELA*, 2012 WL 4466604, at *5 ("[N]o defendant sold [] shares . . . during the class period. This is inconsistent with an intent to commit fraud.").

### 2. Plaintiffs Do Not Allege Facts Showing That Any Defendant Had Information Contradicting A Challenged Statement When Made

Rather than advance any coherent narrative of fraud, Plaintiffs attempt to rely on (i) CW1; (ii) speculation about potential FDA meetings; and (iii) disclosures in ORPH's November 2021 Prospectus Supplement. What is conspicuously absent from this hodge-podge are facts showing that any Defendant had information contradicting a challenged statement when made. *See Fryman*,

462 F. Supp. 3d at 902 (dismissing claim because "Plaintiffs have not adequately alleged the existence of any internal information that contradicted [defendant's] public statements[.]")

*CW1*. In addition to the Amended Complaint's failure to allege that CW1 was in a position to know of the facts he or she allegedly provided, *see supra* pp. 26–27, CW1's account does not support a "strong" inference of scienter because CW1 lacks even an *alleged* link to any Individual Defendant. *See* ¶¶ 95–97. Plaintiffs do not allege that CW1 ever interacted with any Individual Defendant, or even that CW1 has knowledge of what information any Individual Defendant actually received—much less whether that information conflicted with their public statements. CW1 refers obliquely to "management in Copenhagen," ¶ 97, but even then, CW1 does not say who this "management" is or even claim that "management" knew of the FDA's "question" that CW1 described. Untethered to any Individual Defendant, CW1's account is plainly insufficient to establish scienter. *See, e.g.*, *Karyopharm*, 2021 WL 3079878, at *9 (no inference of scienter where CW accounts did not "allege[] any contact with the Individual Defendants, or anyone else alleged to have had any involvement in preparing any of the challenged statements"); *In re Harley-Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) ("Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made."); *W. Palm Beach*, 495 F. Supp. 3d at 660 (similar).

Moreover, as discussed above, even if CW1's account could plausibly be linked to any Individual Defendant, it simply does not conflict with any challenged statements. *See supra* pp. 27–28. And while Plaintiffs aver that CW1 "confirms" various arguments—for example, that "an entirely new study would be required," ¶ 96—there are no allegations that CW1 made or endorsed those arguments. Thus, CW1's account of an FDA "question" in May 2021 does not support an

inference of scienter. *See Alkermes*, 523 F. Supp. 3d at 295 ("[N]one of the interactions between the FDA and [defendant] support a strong inference of scienter," as "[d]espite expressing concerns regarding [defendant]'s trial methodology, the FDA nonetheless permitted the drug to proceed through various stages of approval prior to its ultimate denial of the application.").

*FDA Meetings*. Plaintiffs speculate that the FDA must have conveyed other information contradicting ORPH's public statements at unspecified meetings during the putative class period. *See, e.g.*, ¶¶ 6, 52–54, 70, 72, 85. "[C]ourts in this district have declined to allow plaintiffs to use a 'must have known' theory as an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *W. Palm Beach*, 495 F. Supp. 3d at 659. The Amended Complaint does not even allege that any undisclosed meetings with the FDA actually occurred—much less who attended, what information was conveyed, and whether that information conflicted with any statement challenged in this case. Plaintiffs' speculation as to other potential FDA meetings cannot raise a strong inference of scienter. *See, e.g.*, *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *9 (N.D. Ill. Oct. 19, 2009) ("Plaintiffs' bald allegation . . . does [not] show that the financial consequences of that decision were known, or could have been known, at the time *those* guidances were issued") (emphasis added)); *see generally DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (under the PSLRA, Plaintiffs must allege "the who, what, when, where, and how" of alleged fraud).

*November 2021 Prospectus Supplement*. Plaintiffs contend Defendants knew their public statements were misleading because ORPH's November 2021 prospectus supplement supplied further detail about its interactions with the FDA—particularly as to the June 2021 CRL and the October 2021 Type A meeting. ¶¶ 90–93. But as discussed above, Plaintiffs fail to allege that any information in the November 2021 prospectus supplement conflicted with—or corrected any

34

material omissions in—any challenged statements. *See supra* pp. 28–31. Thus, Defendants'

awareness of information contained in the prospectus supplement does not support the inference

that Defendants had an "intent to deceive" in earlier disclosures. *Higginbotham*, 495 F.3d at 756.[17]

### III.    Plaintiffs' Section 15 and 20(a) Control Person Claims Should Be Dismissed

Because Plaintiffs have not pled any primary violation, their "control person" claims under

Section 15 of the 1933 Act and Section 20(a) of the 1934 Act should likewise be dismissed. *See*

*Pugh*, 521 F.3d at 698; *W. Palm Beach*, 495 F. Supp. 3d at 673.

### CONCLUSION

For these reasons, the Court should dismiss the Amended Complaint with prejudice.

Dated: January 21, 2022

Respectfully submitted,

By: */s/ Matthew L. Kutcher*

COOLEY LLP
Matthew L. Kutcher
444 W. Lake Street, Suite 1700
Chicago, IL 60606
Tel: (312) 881-6645
mkutcher@cooley.com

COOLEY LLP
Aric H. Wu (*pro hac vice*)
Patrick J. Hayden (*pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
phayden@cooley.com

*Attorneys for Defendants*

---

[17] As a last resort, Plaintiffs invoke the so-called "core operations" theory, ¶¶ 98–102, under which "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Fryman*, 462 F. Supp. 3d at 902 (cleaned up). This theory has no application here because "Plaintiffs have not adequately alleged the existence of any internal information that contradicted [ORPH's] public statements" when made. *Id.*; *see supra* § II.B.2.