# Exhibit 1

 Neutral

As of: April 14, 2022 10:53 PM Z

## *City of Taylor Gen. Employees Ret. Sys. v. Astec Indus.*

United States Court of Appeals for the Sixth Circuit

January 28, 2022, Argued; March 31, 2022, Decided; March 31, 2022, Filed

File Name: 22a0058p.06

No. 21-5602

### Reporter

2022 U.S. App. LEXIS 8513 *; 2021 FED App. 0058P (6th Cir.) **; __ F.4th __; 2022 WL 970290

CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, Plaintiff, LYNN JOHNSON, Plaintiff-Appellant, v. ASTEC INDUSTRIES, INC.; BENJAMIN G. BROCK; DAVID C. SILVIOUS; MALCOLM SWANSON, Defendants-Appellees.

**Prior History:** **[*1]** Appeal from the United States District Court for the Eastern District of Tennessee of Chattanooga. No. 1:19-cv-00024—Charles Edward Atchley, Jr., District Judge.

*City of Taylor Gen. Emples. Ret. Sys. v. Astec Indus., 2021 U.S. Dist. LEXIS 31343, 2021 WL 664841 (E.D. Tenn., Feb. 19, 2021)*

## Core Terms

plant, scienter, pellet, investors, misleading, wood-pellet, stock, strong inference, district court, allegations, plaintiffs', suspicious, pleaded, fraudulent, sales, securities-fraud, recklessness, progress, trading, state of mind, omission, factors, insider

## Case Summary

### Overview

HOLDINGS: [1]-The district court properly dismissed the *§ 10(b)* claim against one executive as although he signed the company's reports to regulators and investors, the complaint did not include allegations showing that he knowingly or deliberately intended to manipulate or was reckless; [2]-Plaintiffs pled plausible claims against the company's CEO and the company itself as to committing securities fraud during a recent expansion as those defendants painted a rosy picture of the company's performance without disclosing the plants' problems and without providing a fair disclosure of the financial consequences of the plants' failure to meet contractual obligations, which deceits led to an artificial inflation of the company's stock price.

### Outcome

Judgment reversed, in part, affirmed, in part; case remanded to district court for further proceedings.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN1*[⬇] Standards of Review, De Novo Review

The appellate court reviews de novo a district court's *Fed. R. Civ. P. 12(b)(6)* dismissal of a

Case: 1:21-cv-03640 Document #: 39-1 Filed: 04/15/22 Page 3 of 15 PageID #:946

Page 2 of 14

2022 U.S. App. LEXIS 8513, *1; 2021 FED App. 0058P (6th Cir.), **Cir.)

complaint.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN2*[⬇] **Motions to Dismiss, Failure to State Claim**

A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The appellate court must construe the complaint in the light most favorable to plaintiffs and draw all reasonable inferences in plaintiffs' favor.

Business & Corporate Compliance > ... > Regulators > US Securities & Exchange Commission > Necessity for Regulation

Securities Law > ... > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Burdens of Proof

Securities Law > ... > Implied Private Rights of Action > Elements of Proof > Connection Requirement

Securities Law > ... > Elements of Proof > Reliance > Justifiable & Reasonable Reliance

Securities Law > ... > Express Liabilities > Misleading Statements > Elements

of Proof

*HN3*[⬇] **US Securities & Exchange Commission, Necessity for Regulation**

*Section 10(b)* prohibits violating any rule or regulation prescribed by the Securities and Exchange Commission as necessary or appropriate in the public interest or for the protection of investors. *15 U.S.C.S. § 78j(b)*. In accordance with this provision, the Commission has issued *Rule 10b-5*, which prohibits untrue statements of material fact, omissions of material fact, and any other kind of fraud in connection with the purchase or sale of a security. *17 C.F.R. § 240.10b-5*. A securities-fraud claim under *§ 10(b)* requires (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's injury. Both of these elements have heightened pleading requirements.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Mistake

*HN4*[⬇] **Heightened Pleading Requirements, Fraud Claims**

*Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act of 1995 (PSLRA), *15 U.S.C.S. § 78u-4(b)(1)*, apply to the misstatement-or-omission element. *Rule 9(b)* requires a plaintiff to state with particularity the circumstances constituting fraud or mistake. *Fed. R. Civ. P. 9(b)*. To satisfy *Rule 9(b)*, a plaintiff's complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

Brian O'Connell

explain why the statements were fraudulent. The PSLRA also requires plaintiffs to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

*HN5*[↓] **Heightened Pleading Requirements, Fraud Claims**

Together, *Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act of 1995 (PSLRA), *15 U.S.C.S. § 78u-4(b)(1)*, require a complaint to allege the who, what, where, when, and why of the fraudulent statements. So, when examining allegedly fraudulent statements, we ask: Who said the statement? What is the statement? Where did they say it? When did they say it? Why is it misleading? *15 U.S.C.S. § 78u-4(b)(1)*. If the complaint does not answer all of these questions, it fails to sufficiently plead securities fraud.

Evidence > Inferences & Presumptions > Inferences

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

Securities Law > ... > Elements of Proof > Scienter > Relevant Factors

*HN6*[↓] **Inferences & Presumptions, Inferences**

Regarding the scienter element, the Private Securities Litigation Reform Act of 1995 (PSLRA), *15 U.S.C.S. § 78u-4(b)(1)*, provides that a securities-fraud plaintiff shall, with respect to each act or omission alleged state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind in violating the securities laws. *15 U.S.C.S. § 78u-4(b)(2)(A)* A strong inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Courts must consider plausible opposing inferences. Complaints that fail to meet this standard shall be dismissed. *15 U.S.C.S. § 78u-4(b)(3)(A)*.

Securities Law > ... > Elements of Proof > Scienter > Recklessness

Securities Law > ... > Civil Liability > Fraudulent Interstate Transactions > Scienter

*HN7*[↓] **Scienter, Recklessness**

In securities-fraud cases, scienter can be established by either demonstrating a knowing and deliberate intent to manipulate, deceive, or defraud or recklessness. Recklessness is highly unreasonable conduct which is an extreme departure from the standards of ordinary care. Recklessness requires more than negligence and is akin to conscious disregard. Before drawing an inference of recklessness, courts typically require multiple, obvious red flags, demonstrating an egregious refusal to see the obvious or to investigate the doubtful.

Evidence > Inferences & Presumptions > Inferences

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading

2022 U.S. App. LEXIS 8513, *1; 2021 FED App. 0058P (6th Cir.), **Cir.)

Requirements

Securities Law > ... > Elements of Proof > Scienter > Relevant Factors

Securities Law > ... > Civil Liability > Fraudulent Interstate Transactions > Scienter

*HN8*[⬇] **Inferences & Presumptions, Inferences**

To decide if a plaintiff adequately pleaded a strong inference of scienter, the appellate court uses a three-part test to determine the sufficiency of a plaintiff's scienter allegations. First, the appellate court must accept all factual allegations in the complaint as true. Next, the appellate court reviews the allegations holistically to determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter. Finally, the appellate court must take into account plausible opposing inferences and decide whether a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Securities Law > ... > Securities Exchange Act of 1934 Actions > Insider Trading > Classical Theory

Securities Law > ... > Elements of Proof > Scienter > Insider Trading

Securities Law > ... > Elements of Proof > Scienter > Motive & Opportunity

Securities Law > ... > Elements of Proof > Scienter > Relevant Factors

*HN9*[⬇] **Insider Trading, Classical Theory**

Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter. Courts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were normal or routine for the insider; (2) whether profits reaped were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Waiver

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

*HN10*[⬇] **Reviewability of Lower Court Decisions, Preservation for Review**

Waiver is the intentional relinquishment of a known right and forfeiture is a party's failure to make the timely assertion of a right.

Civil Procedure > Pleading & Practice > Motion Practice > Content & Form

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN11*[⬇] **Motion Practice, Content & Form**

It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.

Securities Law > ... > Elements of Proof > Scienter > Relevant Factors

Securities Law > ... > Civil

2022 U.S. App. LEXIS 8513, *1; 2021 FED App. 0058P (6th Cir.), **Cir.)

Liability > Fraudulent Interstate Transactions > Scienter

*HN12*[↓] **Scienter, Relevant Factors**

When any high managerial agent or member of the board of directors acts with the necessary scienter, their state of mind can be imputed to the corporation. Scienter allegations related to other executives can also be imputed.

Securities Law > Blue Sky Laws > Civil Liability > Controlling Persons

*HN13*[↓] **Civil Liability, Controlling Persons**

The Exchange Act, *15 U.S.C.S. § 78t(a)*, provides liability for every person who, directly or indirectly, controls any person liable for violation of the securities law.

**Counsel:** ARGUED: Daniel Tyre-Karp, THE ROSEN LAW FIRM, P.A., New York, New York, for Appellant.

John A. Jordak, Jr., Elizabeth Gingold Clark, ALSTON & BIRD, Atlanta, Georgia, for Appellees.

ON BRIEF: Daniel Tyre-Karp, Phillip Kim, THE ROSEN LAW FIRM, P.A., New York, New York, Paul Kent Bramlett, BRAMLETT LAW OFFICES, Nashville, Tennessee, for Appellant.

John A. Jordak, Jr., Elizabeth Gingold Clark, Courtney Quirós, ALSTON & BIRD, Atlanta, Georgia, John G. Jackson, CHAMBLISS, BAHNER & STOPHEL P.C., Chattanooga, Tennessee, for Appellees.

**Judges:** Before: CLAY, GRIFFIN, and STRANCH, Circuit Judges.

**Opinion by:** GRIFFIN

# Opinion

**[\*\*2]** GRIFFIN, Circuit Judge.

Shareholders of Astec Industries filed this putative class action, alleging that the company and its executives committed securities fraud during a recent expansion. The district court dismissed the complaint, holding that plaintiffs had not met the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiffs appeal.

Although the pleading requirements for securities-fraud cases are daunting, they are not insurmountable. **[\*2]** We conclude that plaintiffs have pleaded plausible claims against Astec's CEO and the company itself but have abandoned or forfeited their claims against the other individual defendants. Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I.

Astec manufactures industrial equipment and often sells its products as a modular plant, which allows its customers to avoid building a factory from scratch. Historically, these plants produced construction material, such as concrete or asphalt. However, in the late 2000s, the European Union's push for renewable energy created a global demand for wood-pellet biofuel, to which Astec responded by developing and selling modular plants that produced wood pellets.

Astec sold its first wood-pellet plant to Hazlehurst Wood Pellets in 2013. Hazlehurst did not purchase the plant outright, however: Astec lent it $60 million with an agreement that Hazlehurst would repay the loan when it secured traditional financing. Astec anticipated repayment within three years. Until then, Astec would not realize any revenue from the Hazlehurst sale.

**[\*\*3]** In 2015, Astec sold its second wood-pellet plant to Highland Pellets **[\*3]** for $152.5 million. Unlike the Hazlehurst deal, this was a cash transaction. But there were reservations. Highland

Pellets supplied Great Britain's largest renewable power plant, which required it to deliver a certain amount of wood pellets every year. To ensure that the plant could meet the necessary production rate, Highland added two special conditions to its purchase agreement with Astec. First, Highland required the plant to pass a "Reliability Run," during which it had to produce a set amount of high-quality pellets within a 30-day period. Second, the contract provided that, if the plant did not pass the Reliability Run by April 2018, Astec would refund the entire $152.5 million purchase price. Astec did not inform its investors of this clawback provision.

Selling the plants turned out to be the easy part. Once built, both the Hazlehurst plant and the Highland plant simply failed to perform. Neither ran efficiently with its wood-burning furnaces. This was a grave concern for the Hazlehurst plant. To attract financing, Hazlehurst needed to sell its wood pellets in the European Union. This meant that the plant had to meet "strict EU environmental standards," one of which was that **[*4]** it had to operate with wood-burning furnaces. The Hazlehurst plant's inability to burn wood efficiently thus jeopardized its ability to pay the $60 million it owed Astec.

Even when the plants installed non-Astec replacement furnaces, production issues persisted. Hazlehurst consistently ran into "feed-related issues" with its wood fuel and one or more of its three production lines was often down for maintenance. The Highland plant fared no better. It threw off "thousands of sparks per day," which caused pellets and sawdust to "spontaneously combust[.]" The Highland plant often operated at only 50% capacity, and struggled to run for more than three consecutive shifts before a problem shut it down.

As the plants struggled, Astec CEO Benjamin Brock repeatedly told investors that everything was progressing well and touted the potential of the company's wood-pellet business. He dismissed

concerns that Hazlehurst would be unable to pay its loan by saying that "there is no risk" of default and that "it's a matter of timing more than anything." Even after Astec was forced to extend the loan's term because Hazlehurst was unable to secure alternative financing, Brock justified this extension by **[*5]** merely asserting that "Hazlehurst has been a good partner." **[**4]** As for the Highland plant, Brock reported to investors that "the site looked great and the project is on schedule."

Eventually, Brock's smokescreen disintegrated. In October 2017, Astec issued a press release that described the issues occurring at the wood-pellet plants, including their struggle to burn wood and production shortfalls. On a conference call coinciding with this press release, Brock asserted that Astec had just discovered the design flaws and still had a rosy outlook on its wood-pellet business. Despite Brock's assurances that the design flaws would be corrected, the plants' performance never improved. After the Highland plant repeatedly failed the Reliability Run, Highland determined that it would be a "waste of time" to continue trying. The plant never achieved more than three consecutive days of operation—a far cry from the thirty days needed to avoid the clawback provision. In January 2018, Astec began negotiating with Highland to "relieve the tension caused by the plant's inability to meet contractual production obligations."

While these secret negotiations were happening, Brock assured investors that "on **[*6]** the wood pellet plants, we are making good progress and believe that our announced changes during 2017 are adequate to cover our commitments to our customers." Shortly thereafter, employees from Highland, Astec, and a third-party consultant inspected the Highland plant and created two reports that identified the plant's extensive problems. These reports were circulated to Astec executives, including Brock.

In March 2018, Astec filed a Form 10-K, in which it reported that it had agreed to compensate

Highland for production shortfalls and mentioned—for the first time—the possibility that Astec would have to refund the purchase price of the Highland plant. The next month, Brock toured the Highland plant and participated in a meeting about the plant's issues. Brock then reported to investors that Astec had "made good progress" on the wood-pellet plants and that he still expected the company's wood-pellet business to grow.

Despite Brock's outward confidence, he sold 60,000 shares of his Astec stock in May 2018, earning roughly $3.2 million. Less than a week later, Astec filed its quarterly 10-Q Form. This form, for the first time, publicly disclosed the full details of the Highland deal's **[*7]** clawback provision.

 **[**5]** Astec soon began cutting its losses. During a July 2018 investor telephone conference, Brock announced Astec's decision to "exit" the Highland plant. As part of Astec's deal with Highland, Astec agreed to pay a $68 million penalty and forgive $7 million in receivables. After this call, Astec's stock price dropped 20%, from $60.80 per share to $48.21 per share. A subsequent poor earnings report drove the stock price further down to $32.79. Astec later announced that it would write off $65.7 million related to the Hazlehurst plant. The company eventually sold the plant for $20 million—about a third of its expected value. With that, Astec's foray into wood-pellet plants ended.

## II.

After years of reports that Astec's wood-pellet business was thriving, its sudden collapse caused investors to conclude that they had been misled. As a consequence, they filed this securities-fraud action against Astec, Brock, and executives Malcolm Swanson and David Silvious. They brought two claims: (1) violation of *Section 10(b)* of the *Securities Exchange Act of 1934* and *Rule 10b-5* against all defendants ("the § 10(b) claims"), and (2) violation of *Section 20(a) of the Exchange Act* against Brock, Swanson, and Silvious ("the § 20(a) claims").

Defendants moved to dismiss **[*8]** plaintiffs' complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, arguing that it failed to sufficiently allege how their statements were fraudulent and/or how they acted with the state of mind necessary for a securities-fraud claim. The district court granted defendants' motion, holding that plaintiffs "fail[ed] to identify, with the level of specificity required, why the statements they believe are misleading are in fact misleading." In the lower court's view, the complaint was a "puzzle pleading" because it was "merely a long list of quotes followed by some generalized allegations of fraud[.]" The court also held that plaintiffs had failed to plead facts sufficient to raise a "strong inference" that any defendant acted with the necessary scienter. Plaintiffs now appeal.

## III.

*HN1*[⬆] We review de novo a district court's *Rule 12(b)(6)* dismissal of a complaint. *Giasson Aerospace Science, Inc. v. RCO Eng'g Inc., 872 F.3d 336, 338 (6th Cir. 2017)*. We accept the truth of plaintiffs' well-pleaded factual allegations and will affirm the district court's ruling only **[**6]** if defendants are entitled to judgment as a matter of law. *Wilmington Tr. Co. v. AEP Generating Co., 859 F.3d 365, 370 (6th Cir. 2017)*. *HN2*[⬆] "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual **[*9]** content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (internal citations omitted) (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). We must construe the complaint in the light most favorable to plaintiffs and draw all reasonable inferences in plaintiffs' favor. *Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008)*.

Plaintiffs brought *§ 10(b)* claims against Brock,

Swanson, Silvious, and Astec, and *§ 20(a)* claims against Brock, Swanson, and Silvious. We examine the sufficiency of each claim in turn.

A.

*HN3*[↑] *Section 10(b)* prohibits violating any rule or regulation prescribed by the Securities and Exchange Commission "as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. §78j(b)*. In accordance with this provision, the Commission has issued *Rule 10b-5*, which prohibits untrue statements of material fact, omissions of material fact, and any other kind of fraud in connection with the purchase or sale of a security. *17 C.F.R. § 240.10b-5*.

A securities-fraud claim under *§ 10(b)* requires (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's injury. *See La. Sch. Emps. Retirement Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010)* (quoting *Hoffman v. Comshare, Inc., 183 F.3d 542, 548 (6th Cir. 1999)*). The district court held that plaintiffs had not sufficiently pleaded either **[*10]** the misstatement-or-omission element or the scienter element. Both of these elements have heightened pleading requirements.

**[**7]** i.

*HN4*[↑] *Federal Rule of Civil Procedure 9(b)* and the PSLRA apply to the misstatement-or-omission element. *Id. Rule 9(b)* requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. To satisfy *Rule 9(b)*, "a plaintiff's complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Ernst & Young, 622 F.3d at 478* (quoting *Frank v. Dana Corp., 547 F.3d 564, 569 (6th Cir. 2008)*). The PSLRA also requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*.

*HN5*[↑] Together, *Rule 9(b)* and the PSLRA require a complaint to allege the "who, what, where, when, and why" of the fraudulent statements. *See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003)*. So, when examining allegedly fraudulent statements, we ask: Who said the statement? What is the statement? Where did they say it? When did they say it? Why is it misleading? *Cf. Ernst & Young, 622 F.3d at 478*; *15 U.S.C. § 78u-4(b)(1)*. If **[*11]** the complaint does not answer all of these questions, it fails to sufficiently plead securities fraud. *Id.* The district court determined that plaintiffs' complaint did not answer these questions because it was a "puzzle pleading." Plaintiffs challenge this conclusion, arguing that their pleading is "not merely a long list of quotes followed by some generalized allegations of fraud" and is instead:

> organized into coherent subsections that (i) explain the Complaint's broad theory of the alleged fraud; (ii) explain the materially misleading nature of the challenged statements regarding the Hazlehurst Plant and the Highland Plant; and (iii) detail the specific misstatements in chronological order with reasons why each was misleading.

Appellant's Br. 26 (footnotes and quotation omitted). Even if this structure is "imperfect," plaintiffs argue that it does not justify dismissal.

**[**8]** We agree. Although plaintiffs' complaint is not a model of clarity or conciseness, it sufficiently pleads fraudulent statements. For example, in Paragraphs 146 to 149, plaintiffs set forth what Brock (the who) said on an April 24, 2018, conference call (the when and where):

> Changing the subject to wood pellet plants, **[*12]** 2017 was an extremely

challenging year to us with regards to these plants as we took significant charges last year related to getting the two plants to be delivered, installed it and getting them up to speed on production for our customers. As an update on our progress on the wood pellet plants, we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers.
***

Well, we want to be completely finished at both places before we take an order and we feel like [at Hazlehurst] that we passed the test, we're meeting with them next week to talk through that. [At Highland], we actually have until June 19 now, we've had weather issues, we've had some mechanical issues and we've modified some equipment. It is tight at [Highland]. We have a pathway to finish, but it is tight and so we're all hands on deck on that, but I feel like with what we committed to we have the, the charge we took last year is adequate but we have to finish, so we're all hands on deck [at Highland] and that's where we stand. We're just not going to take an order unless we do and if we don't get one in time to deliver in 2019, we don't. We want to finish first. **[*13]**
***

Well, Stanley this is Ben and I think whenever we get into these, there's always something that'll pop up, but thankfully what has popped up and mechanical issues that we corrected has not been extremely major. And so the hammer mills that piece and all that we fixed, the extra bag houses we fixed, but as you start up, sometimes things happen like shafts on a drag will break and you figure out how to correct that and fix that and have a long term fix, so it's things like that. We're in a position where we need to be cranking up and running full production and going through testing and we have a lot of people on site to do that.

R. 56, PageID 998-99 (emphasis omitted). In Paragraph 151, plaintiffs then describe why they believe that these statements were misleading:

> The statements referenced . . . above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales **[**9]** and revenue to improve **[*14]** the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

R. 56, PageID 1001-02. Plaintiffs repeat this structure throughout their complaint. They clearly identify the "who," "what," "where," and "when" of each statement, Am. Compl. ¶¶ 97-103, 105-06, 108, 110-15, 117-18, 120-22, 124-27, 129-138, 140-42, 144-50, 152-57, then provide the "why" in a subsequent paragraph, Am. Compl. ¶¶ 104, 107, 109, 116, 119, 123, 128, 139, 143, 151, and 158.

For pleading purposes, plaintiffs have complied with the requirements of *Rule 9(b)* and the PSLRA. Even though the factual allegations are lengthy, the complaint's theory of liability is clear: Defendants **[*15]** painted a rosy picture of Astec's performance without disclosing the plants' problems and without providing a fair disclosure of the financial consequences of the plants' failure to meet contractual obligations. These deceits led to an artificial inflation of Astec's stock price. Under these circumstances, the district court erred by

dismissing the complaint for failure to sufficiently plead misleading statements. *See United States ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003)* ("Some complaints are windy but understandable . . . Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case.").

ii.

*HN6*[⬆] Regarding the scienter element, the PSLRA provides that a securities-fraud plaintiff "shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind" in violating the securities laws. *15 U.S.C. § 78u-4(b)(2)(A)* (emphasis added); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any **[**10]** opposing inference of nonfraudulent intent." *Tellabs, 551 U.S. at 314*. Courts must consider "plausible opposing inferences." *Id. at 323*. Complaints that fail to meet this **[*16]** standard "shall" be dismissed. *15 U.S.C. § 78u-4(b)(3)(A)*.

*HN7*[⬆] In securities-fraud cases, scienter can be established by either demonstrating a "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness." *Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1039 (6th Cir. 2016)* (quoting *Ley v. Visteon Corp., 543 F.3d 801, 809 (6th Cir. 2008)*). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* (quoting *Frank, 646 F.3d at 959*). "Recklessness requires more than negligence and is 'akin to conscious disregard.'" *Id.* (quoting *Frank, 646 F.3d at 959*). "Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags,' demonstrating an 'egregious refusal to see the obvious or to investigate the doubtful.'" *Id.* (quoting *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 686-87,*

*695, 91 Fed. Appx. 418 (6th Cir. 2004)*).

*HN8*[⬆] To decide if a plaintiff adequately pleaded a strong inference of scienter, we use a three-part test "to determine the sufficiency of a plaintiff's scienter allegations." *Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 979 (6th Cir. 2018)* (citing *Tellabs, 551 U.S. at 322-23*). "First, we must accept all factual allegations in the complaint as true." *Tellabs, 551 U.S. at 322*. Next, we review the allegations holistically "to determine 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dougherty, 905 F.3d at 979* (quoting *Tellabs, 551 U.S. at 322-23*). Finally, "we 'must take into account plausible opposing inferences' and decide whether 'a reasonable person would deem **[*17]** the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, 551 U.S. at 323-24*).

As part of that analysis, we consult a non-exhaustive list of considerations known as the *Helwig* factors. *Doshi, 823 F.3d at 1039*. Here, the relevant *Helwig* factors include "insider trading at a suspicious time or in an unusual amount;" "divergence between internal reports and external statements on the same subject;" "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;" and "disregard of the most **[**11]** current factual information before making statements." *Doshi, 823 F.3d at 1039-40* (citing *Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001)* (en banc), *abrogated on other grounds by Tellabs, 551 U.S. at 314*)).

As we have done in other cases, we will analyze scienter on a defendant-by-defendant basis. *See, e.g., City of Monroe Emps.' Re. Sys. v. Bridgestone Corp., 399 F.3d 651, 684-87 (6th Cir. 2005)*.

a.

We begin with Brock. As pleaded, he served as the main spokesperson to the investors, was intimately

aware of the plants' problems, and sold a suspicious amount of his own stock shortly before Astec began fully disclosing the magnitude and consequences of its failures in the wood-pellet business. Applying the applicable *Helwig* factors, we hold that plaintiffs have pleaded sufficient facts to support a strong inference **[*18]** that Brock acted with the necessary scienter.

Regarding Brock's misleading statements to investors, we need not go through these statements one-by-one because that would "risk[] losing the forest for the trees." *Frank, 646 F.3d at 961*. Suffice it to say that a holistic review of Brock's statements reveals a theme: relentless, unfounded optimism that was contradicted by the undisclosed facts. For example, on an October 2016 investor call, Brock was "happy to report that the [Highland] site looked great and the project [was] on schedule." But according to plaintiffs' allegations, the Highland plant was throwing off "thousands of sparks per day" at that time, was consistently shut down for maintenance, and was producing a fraction of the wood pellets it was supposed to be making. This situation cannot reasonably be described as "look[ing] great" and "on schedule." Or consider the February 2018 call where Brock assured investors that Astec was "making good progress" on the Highland plant without telling them that the company was negotiating with Highland in an effort to "relieve the tension caused by the plant's inability to meet contractual obligations." Brock also assured investors that there was "*no* risk" **[*19]** (emphasis added) of Hazlehurst defaulting on the loan even though the plant's inability to burn wood efficiently barred it from the lucrative European market.

 **[**12]** In all, a holistic review of Brock's statements establishes a strong inference that he recklessly misled Astec's investors. And, at the motion-to-dismiss stage, we need not view Brock's optimism as mere ignorance. Plaintiffs' allegations show that Brock was intimately aware of what was occurring at the plants. He talked to Hazlehurst about that plant's issues every week, joined

conference calls to discuss the Highland plant's "shortfall in production targets" "at least a few times a week," and received two inspection reports from the Highland plant that chronicled all of its issues. Brock also personally toured the Highland plant and attended an hours-long meeting on the issues it was encountering. Yet instead of sharing the full picture with investors, he brushed off concerns and predicted massive profits. Brock's contradiction of internal reports and disregard of the most current factual information supports finding a strong inference of scienter. *Doshi, 823 F.3d at 1039-40*.

Brock's stock sales are another indication of his intent. *HN9*[↑] "Unusual trading or **[*20]** trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999)*. "Courts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were 'normal or routine' for the insider; (2) whether profits reaped 'were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud'; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious." *In re Cardinal Health Inc., Sec. Litig., 426 F.Supp.2d 688, 728 (S.D. Ohio 2006)*; see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1423-25 (3d. Cir. 1997)*.

Brock's sales of his own stock strongly support a finding of sufficient scienter. Before May 1, 2018, Brock had not sold any of his Astec stock in over three years. Stock sales, especially of this magnitude, were not normal or routine for him. And the timing is extremely suspicious. These sales came shortly after Brock toured the Highland Plant, less than a week before Astec first disclosed the full details of the Highland deal's $152 million clawback provision, and a few months before Astec began exiting its wood-pellet-plant deals. These sales yielded $3.1 million—more **[*21]** than 3.5

Brian O'Connell

times Brock's annual compensation. Had he held this stock a little longer, its value would have been cut almost in half. This multi-million-dollar sale right **[\*\*13]** before a foreseeable stock-value drop raises a "suspicion that [Brock] might have had an incentive to commit fraud." *Cardinal Health, 426 F.Supp.2d at 728*. In all, this *Helwig* factor strongly favors a scienter finding as to Brock.

Given Brock's misleading statements, knowledge of the plants' issues, and extremely suspicious stock sales, we are satisfied that plaintiffs have pleaded a strong inference of "knowing and deliberate intent to manipulate, deceive, or defraud" or, at minimum, recklessness. *See Doshi, 823 F.3d at 1039-40*. Accordingly, we conclude that the district court erred in dismissing plaintiffs' *§ 10(b)* claims against Brock.

b.

The second most prominent defendant in the complaint is Malcolm Swanson, the Astec executive who oversaw the wood-pellet plants. Despite his involvement, plaintiffs are "not appealing the dismissal of claims against defendant Malcolm Swanson." Appellant's Br. 3 n.1. Because plaintiffs have abandoned this portion of the appeal, we affirm the district court's decision as to Swanson.

c.

The last individual defendant is David Silvious, Astec's chief financial officer **[\*22]** and treasurer. The district court's conclusion as to Silvious was twofold. First, it determined that "[i]n their response to the motion to dismiss, plaintiffs did not argue that any of the *Helwig* factors applied to Silvious." The court therefore concluded that "[p]laintiffs have waived their argument that Silvious acted with the required scienter." Second, the district court concluded that "[p]laintiffs have not pled facts that would demonstrate that Silvious acted with the required scienter" because "there is only one statement made by Silvious quoted in the complaint, a statement about revenue in the fourth

quarter of 2016." The district court thus issued alternative holdings as to Silvious: one based on forfeiture[1] and one based on the merits. *See Wright v. Spaulding, 939 F.3d 695, 701-02 (6th Cir. 2019)* (describing what constitutes a holding).

**[\*\*14]** On appeal, plaintiffs never acknowledge the district court's forfeiture holding. Because plaintiffs do not argue that this "alternative, independent basis" for dismissal is incorrect, "that ruling stands for the purposes of this appeal." *White Oak Prop. Dev., LLC v. Washington Twp., Ohio, 606 F.3d 842, 854 (6th Cir. 2010)*; *see also Grosswiler v. Freudenberg-Nok Sealing Techs., 642 F. App'x 596, 599 (6th Cir. 2016)* ("Because Plaintiffs have failed to address the district court's alternate basis for its decision, the merit of the issue they do raise is **[\*23]** irrelevant."). Compounding their problem, plaintiffs also fail to argue on appeal that Silvious possessed the requisite scienter. Plaintiffs do not mention Silvious in the section of their brief dedicated to their scienter allegations. Appellant's Br. 36-44. They do not argue that Silvious received internal reports that contradicted his public statements (that argument is confined to Brock and Swanson), nor do they argue that he engaged in any suspicious trading, made statements that were quickly contradicted, or disregarded the most current factual information (those arguments are confined to Brock). And references to Silvious are otherwise fleeting. Appellant's Br. 3, 49, 52. The closest they come to an argument against Silvious is when they describe the district court's decision:

> The district court found that the complaint

_____

[1] The district court used the term "waiver." Although caselaw often uses "waiver" and "forfeiture" interchangeably, there is a difference. *See United States v. Olano, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)*. *HN10*[⬆] Waiver is "the intentional relinquishment of a known right" and forfeiture is "a party's failure to make the timely assertion of a right." *Ohio State University v. Redbubble, Inc., 989 F.3d 435, 443 (6th Cir. 2021)*. Here, forfeiture is the better fit because, unlike the claims against Swanson, plaintiffs have never affirmatively relinquished their claims against Silvious. *See, e.g., Bard v. Brown Cnty., Ohio, 970 F.3d 738, 748 n.4 (6th Cir. 2020)*.

failed to plead a strong inference of scienter against Silvious, in part, because "there is only one statement made by Silvious quoted in the complaint"—despite the fact that Silvious is considered to have made every statement in Astec's quarterly and annual reports by virtue of having signed them.

Appellant's Br. 15. This sentence might have been plaintiffs' effort [*24] at attacking the district court's merits decision. *HN11*[⬆] But "it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *White Oak, 606 F.3d at 850* (quoting *United States v. Robinson, 390 F.3d 853, 886 (6th Cir. 2004)*). Because plaintiffs' argument on Silvious's state of mind is at best perfunctory, they have forfeited this issue on appeal. *Id.*

 [**15] In any event, our own review of the complaint reveals no strong inference of scienter when it comes to Silvious. True, he signed Astec's reports to regulators and investors. But the complaint does not include allegations showing that he knowingly or deliberately intended to manipulate or was reckless. *See Doshi, 823 F.3d at 1039-40*. Unlike Brock and Swanson, there are no allegations that he knew how poorly the wood-pellet plants were doing. Nor is there any circumstance, such as a suspicious stock sale, that otherwise indicates fraudulent intent. The complaint does not provide support for a claim that, in signing the reports, Silvious acted with a "knowing and deliberate intent to manipulate, deceive, or defraud," or that his signature amounts to "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Doshi, 823 F.3d at 1039*. Although he likely could have done [*25] more to verify the reports, that failure indicates negligence at most, which cannot support a securities-fraud claim. *Id.* Accordingly, the district court properly dismissed the *§ 10(b)* claim against Silvious.

d.

The final defendant is Astec itself. At this point in the case, the *§ 10(b)* claims against the company rise and fall with the claims against the individual defendants. *HN12*[⬆] That is because, when "[a]ny high managerial agent or member of the board of directors" acts with the necessary scienter, their state of mind can be imputed to the corporation. *See In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 476 (6th Cir. 2014)*. We have ruled that plaintiffs have sufficiently alleged that Brock acted with the requisite scienter. Because his state of mind can be imputed to Astec, the *§ 10(b)* claim against the company should have also survived the motion to dismiss.[2]

B.

We now turn to plaintiffs' *§ 20(a)* claims against Brock, Swanson, and Silvious. *HN13*[⬆] This section of the *Exchange Act* provides liability for "[e]very person who, directly or indirectly, controls any person liable" for violation of the securities law. *15 U.S.C. § 78t(a)*. To now, the district court and the parties have appropriately treated these claims as dependent on the viability [**16] of the *§ 10(b)* claims because there can be no liability under *§ 20(a)* without [*26] an underlying violation of securities law. *See Doshi, 823 F.3d at 1045*. We adhere to this framing and conclude that these claims survive to the same extent as their corresponding *§ 10(b)* claims. Accordingly, the *§ 20(a)* claims can continue against Brock but not Swanson or Silvious.[3]

IV.

For these reasons, we affirm the district court's judgment regarding Swanson and Silvious and

—————————

[2] Scienter allegations related to other executives can also be imputed to Astec, even if they are not sufficient to support a claim against the individual. *See Omnicare, 769 F.3d at 476*. But because the allegations against Brock are sufficient on their own, we need not consider other allegations at this time.

[3] RThe plaintiffs also challenge the district court's denial of leave to amend their complaint. Because this case will proceed on remand, the district court can consider whether further amendments are appropriate.

2022 U.S. App. LEXIS 8513, *26; 2021 FED App. 0058P (6th Cir.), **16

reverse as to Brock and Astec. We remand for proceedings consistent with this opinion.

---

**End of Document**

Brian O'Connell