UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARKO BUSIC and ADIL SHEIKH, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ORPHAZYME A/S, CARROLEE BARLOW, THOMAS BLAETTLER, MARTIN BONDE, CHRISTOPHE BOURDON, REMI DROLLER, GEORGES GEMAYEL, BO JESPER HANSEN, ANDERS HEDEGAARD, MARTIJN KLEIJWEGT, CATHERINE MOUKHEIBIR, MOLLY PAINTER, KIM STRATTON, ANDERS VADSHOLT, and STEN VERLAND,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  21 C 3640<br><br>Judge Gary Feinerman |

**MEMORANDUM OPINION AND ORDER**

Marko Busic and Adil Sheikh bring this suit against Orphazyme A/S and fourteen of its officers and directors, on behalf of themselves and a putative class of others who purchased Orphazyme stock as part of its September 29, 2020, initial public offering ("IPO") and/or from September 29, 2020, through November 4, 2021, alleging violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a); SEC Regulation S-K, 17 C.F.R. § 229; and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Doc. 23. Defendants move under Civil Rule 12(b)(6) to dismiss the operative complaint, Doc. 26, and Plaintiffs move to strike certain exhibits filed by Defendants in support of dismissal, Doc. 30. The motions are granted in part and denied in part.

## Background

In resolving Defendants' Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Orphazyme is a Danish biopharmaceutical company that develops drugs to treat neurodegenerative diseases. Doc. 23 at ¶¶ 2, 16. Defendant Kim Stratton was Orphazyme's CEO at the time of the IPO; Defendant Christophe Bourdon became CEO in March 2021; Defendant Anders Vadsholt was CFO throughout the class period; and Defendant Thomas Blaettler was Chief Medical Officer ("CMO") from November 2016 through November 2021. *Id*. at ¶¶ 17-20. Defendants Carrolee Barlow, Martin Bonde, Remi Droller, Georges Gemayel, Bo Jesper Hansen, Anders Hedegaard, Martijn Kleijwegt, Catherine Moukheibir, and Sten Verland served on Orphazyme's Board of Directors at the time of the IPO and/or during the class period, which runs from September 29, 2020, through November 4, 2021. *Id*. at ¶¶ 1, 21-29. Defendant Molly Painter served as President of Orphazyme's wholly owned U.S. subsidiary from January 2020 through September 2021. *Id*. at ¶ 30. Plaintiffs are individuals who

purchased Orphazyme common stock "pursuant and/or traceable to" the Registration Statement issued in connection with the IPO and/or during the class period. *Id*. at ¶ 15.

## A. Arimoclomol Clinical Trial

Orphazyme's sole drug candidate at all relevant times was arimoclomol. *Id*. at ¶¶ 2, 38, 98. In July 2016, the company initiated a Phase 2/3 clinical trial of the drug to treat Niemann-Pick Disease Type C ("NPC"), a rare genetic disease that impairs the body's ability to recycle cholesterol and lipids and leads to brain damage. Doc. 23 at ¶¶ 2, 35; Doc. 28-1 at 121. Symptoms of NPC include difficulty swallowing, loss of speech, and impaired cognition, motor coordination, and ambulation. Doc. 23 at ¶ 35. The clinical trial collected data for two years on fifty patients, some treated with arimoclomol and some given a placebo. *Id*. at ¶¶ 36-37. The trial employed two primary endpoints: disease severity, as measured by the 5-domain NPC Clinical Severity Scale ("NPCCSS"); and the Clinical Global Impression of Improvement Scale ("CGI-I"). *Id*. at ¶ 36. The five NPCCSS domains correspond to the NPC symptoms listed above: swallowing, ambulation, cognition, fine motor skills, and speech. *Ibid*.

According to Orphazyme's September 2020 Registration Statement, the trial showed a 63% reduction in disease progression, as measured by the NPCCSS scale, for all participants treated with arimoclomol relative to the placebo control group. Doc. 28-1 at 121-122. Although that particular result was not statistically significant at a 5% significance level, a statistically significant benefit was shown on the NPCCSS scale for two subgroups: patients four years or older, and patients receiving miglustat, an off-label therapy for NPC. Doc. 23 at ¶¶ 35-37; Doc. 28-1 at 121-123. In addition, with the agreement of the U.S. Food and Drug Administration ("FDA"), Orphazyme conducted a post-hoc analysis excluding three patients with double functional null mutations indicative of a particularly severe form of NPC. Doc. 28-1 at 123. With that exclusion, the overall NPCCSS scale showed a statistically significant benefit

of arimoclomol over placebo. *Ibid*. The CGI-I scale failed to show a statistically significant benefit. Doc. 23 at ¶ 36; Doc. 28-1 at 124.

Orphazyme reported the clinical trial's results in January 2019. Doc. 23 at ¶ 35. In November 2019, the FDA designated arimoclomol as a "breakthrough therapy" for treatment of NPC. *Id*. at ¶ 3; Doc. 28-1 at 121.

### B. FDA Communication Protocols for Breakthrough Drugs

An FDA "breakthrough therapy" designation prioritizes the agency's review of drugs developed to treat serious, life-threatening diseases. Doc. 23 at ¶ 40. The FDA "commits to working particularly closely with the drug sponsor to devise the most efficient pathway for generating additional evidence needed about safety and efficacy." *Id*. at ¶ 42. The FDA provides the sponsor with enhanced feedback and guidance, including "[m]ore frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval," "[m]ore frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers," and "intensive guidance on efficient drug development." *Id*. at ¶¶ 41, 43.

When a drug is designated a breakthrough therapy, the FDA holds an "[i]nitial comprehensive multidisciplinary breakthrough therapy meeting" to discuss the "overarching, high-level plan for drug development." *Id*. at ¶ 45; CTR. FOR DRUG EVAL. & RSCH., OFF. OF NEW DRUGS, GOOD REVIEW PRACTICE: MANAGEMENT OF BREAKTHROUGH THERAPY-DESIGNATED DRUGS AND BIOLOGICS, NO. 6025.6, at 9 (July 29, 2014) ("MAPP 6025.6"), available at https://www.fda.gov/files/about%20fda/published/Good-Review-Practice--Management-of-Breakthrough-Therapy-Designated-Drugs-and-Biologics.pdf. The meeting "can include topics such as planned clinical trials and endpoints, plans for expediting the manufacturing development strategy, and studies that potentially could be completed after approval," and

"should be used to establish a communication plan with the sponsor so interactions between [the FDA] and the sponsor related to the breakthrough therapy drug development program can be managed efficiently."  Doc. 23 at ¶ 45; MAPP 6025.6 at 9.  The FDA review team is expected to continue to meet with the drug sponsor "to address important issues at different development phases."  Doc. 23 at ¶ 47; MAPP 6025.6 at 9.

### C.    New Drug Application for Arimoclomol

In July 2020, based on the Phase 2/3 clinical trial results, Orphazyme submitted a New Drug Application ("NDA") to the FDA for priority review of arimoclomol to treat NPC.  Doc. 23 at ¶¶ 38, 57.  On September 16, 2020, the FDA designated the NDA for priority review and set a target date of March 17, 2021, for its completion.  *Id*. at ¶¶ 38, 48, 57.  The target date was later extended to June 17, 2021.  *Id*. at ¶ 48.

According to the FDA's "Review Process Desk Reference Guide" for NDAs, the FDA review team holds an internal mid-cycle meeting within 90 days of accepting an NDA for priority review.  *Id*. at ¶ 51; *see* CTR. FOR DRUG EVAL. & RSCH., CDER 21ST CENTURY REVIEW PROCESS DESK REFERENCE GUIDE: NEW DRUG APPLICATION AND BIOLOGICS LICENSE APPLICATION REVIEWS, at 28 ("CDER Review Process"), available at https://www.fda.gov/media/78941/download.  At that meeting, the review team identifies "[d]eficiencies that require significant additional work by the applicant and will be conveyed to the applicant in an appropriate action letter" as well as "[a]dditional information needed from the applicant and any feedback that can be relayed to the applicant."  Doc. 23 at ¶ 51; *see* CDER Review Process at 30.  The review team is generally expected to update the applicant on the review process within two weeks of the mid-cycle meeting.  Doc. 23 at ¶ 51.

Two months after the mid-cycle meeting, the FDA holds a late-cycle review meeting, which is "intended to share information, identify deficiencies[,] … and plan the rest of the

review." *Id*. at ¶ 53; *see* CDER Review Process at 40. In advance of the late-cycle meeting, the FDA review team sends the applicant a preliminary notice of any issues or deficiencies with the NDA. Doc. 23 at ¶ 53; *see* CDER Review Process at 38.

### D. Orphazyme's Registration Statement and IPO

On September 24, 2020, Orphazyme received a deficiency letter from the FDA—which Defendants refer to as a "filing communication"—summarizing six potential review issues. Doc. 23 at ¶¶ 49, 57.

In conjunction with its IPO on September 29, 2020, and pursuant to its Registration Statement, Orphazyme sold 3,966,146 shares of stock at $11 per share. *Id*. at ¶ 57. The Registration Statement described the FDA's deficiency letter as follows:

> On September 24, 2020, we received a filing communication from the FDA in connection with our NDA for arimoclomol for the treatment of NPC in which the FDA summarized six potential review issues, four of which we have previously discussed with the FDA, including the FDA's continuing evaluation of the integrity of data from our Phase 2/3 trial for NPC; the effect of the high degree of concomitant miglustat use in our Phase 2/3 trial for NPC on its ability to determine the safety and efficacy of arimoclomol, which could have potential implications for labeling/recommended dosing and post-marketing studies; the proposed primary hypothetical treatment effect used in our Phase 2/3 trial for NPC to estimate the treatment benefit effect; the meaningfulness of one metric utilized to evaluate patient progress in our Phase 2/3 trial of NPC; the timing of submission of the QTc and other study reports to the FDA, including in light of evidence suggesting a potential QT safety signal; and differences among the formulations of arimoclomol used in our Phase 2/3 trial of NPC as compared to the formulation of arimoclomol to be marketed. The FDA has requested that we submit reports from the QTc clinical trial by October 1, 2020 and that, given the priority review timeline and both nonclinical and clinical evidence suggesting a potential QT safety signal, submission of these reports after that date may not allow the FDA sufficient time to review. In a preclinical study, we observed a potential QT signal in dogs at a level of arimoclomol exposure that is 28 times higher than the level of exposure in humans in our Phase 2/3 trial in NPC. To date, we are not aware of any clinical evidence of a potential QT signal related to arimoclomol. We do not anticipate being able to submit the reports by October 1, 2020, which may negatively impact our development timeline.

> The filing communication constitutes preliminary notice from the FDA of potential review issues as part of its ordinary course review of our NDA and is not necessarily indicative of deficiencies that may be identified during the review. We intend to discuss the filing communication with the FDA. The receipt of the filing communication does not impact the FDA's acceptance of the NDA for arimoclomol, the target PDUFA date or the priority review determination. However, we cannot assure you that such issues will not result in a delay of any potential approval of arimoclomol for the treatment of NPC by the FDA or a determination by the FDA not to approve the product candidate for marketing in the United States.

*Ibid*. The Registration Statement's "Risks Related to Development of Our Product Candidates,"

Doc. 28-1 at 25, identified the following risk:

> Because we are developing arimoclomol for the treatment of diseases in which there is little clinical experience, the FDA or other regulatory authorities may not consider the endpoints of our clinical trials to predict or provide clinically meaningful results.

> There are currently either no or limited approved therapies in the orphan disease indications we are targeting and there may be no therapies approved to treat other diseases that we will target in the future. As a result, the design and conduct of clinical trials of arimoclomol or any future product candidate may take longer, be more costly or be less effective as a result of the novelty of development in these diseases. In some cases, we may use endpoints or methodologies that regulatory authorities may not consider to be clinically meaningful and that we may not continue to use in clinical trials or that we may determine after the initiation of the trial to no longer be an appropriate endpoint or methodology. Any such regulatory authority may require evaluation of additional or different clinical endpoints in our clinical trials or ultimately determine that these clinical endpoints do not support marketing approval. In addition, if we are required to use additional or different clinical endpoints by regulatory authorities, arimoclomol may not achieve or meet such clinical endpoints in our clinical trials. Even if a regulatory authority finds our clinical trial success criteria to be sufficiently validated and clinically meaningful, we may not achieve the pre-specified endpoint to a degree of statistical significance in any pivotal or other clinical trials we may conduct for our product candidate. Further, even if we do achieve the pre-specified criteria, our trials may produce results that are unpredictable or inconsistent with the results of other efficacy endpoints in the trial. Regulatory authorities also could give overriding weight to other efficacy endpoints over a primary endpoint even if we achieve statistically significant results on that primary endpoint, if we do not do so on our secondary efficacy endpoints. Regulatory authorities also weigh the benefits of a product against its risks and may view the efficacy results in the context of safety as not being supportive of approval.

Doc. 23 at ¶ 59.

The Registration Statement included details concerning the Phase 2/3 clinical trial. It stated, "[t]hus far, we have only conducted relatively small Phase 2/3 and Phase 2 clinical trials, only one of which was designed to measure efficacy," and it cautioned that "[s]uch clinical trials may not lead to pharmaceutical products that can be effectively commercialized." Doc. 28-1 at 27. The Registration Statement reported that "[s]tatistical significance [was] not reached when including [all] individuals … in [the] arimoclomol treatment group," but that it had been reached in a "post-hoc analysis … conducted to exclude three patients with double functional null mutations" and in "[t]wo preplanned subgroup analyses" of "patients aged 4 years [or older]" and "patients receiving miglustat." *Id*. at 122-123. The Registration Statement added that the CGI-I metric did not "show an overall effect on this endpoint and therefore was not statistically significant." *Id*. at 124.

### E. Orphazyme's March-April 2021 Statements

On March 2, 2021, Orphazyme filed with the SEC its Annual Report for the Fiscal Year 2020 on Form 20-F. Doc. 23 at ¶ 69. The 2020 Annual Report included the above-quoted statements from the Registration Statement. *Ibid*.

On March 3, 2021, Vadsholt—Orphazyme's CFO—participated in the Cowen Healthcare Conference. *Id*. at ¶ 71. According to analyst reports, Vadsholt stated that Orphazyme was "in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements." *Ibid*. As reflected in numerous reports from March through June 2021, analysts understood Vadsholt's statement to mean that approval for arimoclomol was imminent. *Ibid*.

On April 29, 2021, Vadsholt and Bourdon—Orphazyme's CEO—attended the B. Riley Neurosciences Conference, where Bourdon told investors that Orphazyme was "NPC launch

ready," that the company was "absolutely launched already in the US," and that "with NPC alone, Orphazyme can make a difference for patient[s] and generate substantial, you know value for our shareholders and investors." *Id*. at ¶ 74. Bourdon added that the clinical trial was "able to show some meaningful treatment difference for patients" on the NPCCSS scale. *Id*. at ¶ 76.

### F. May 2021 FDA Communication

According to a confidential witness, the FDA in May 2021 informed Orphazyme's U.S. headquarters in Chicago that the company would have to use a video fluoroscope exam—which allows the examiner to ascertain the patient's ability to swallow effectively and safely—to measure the swallow domain of the NPCCSS scale. *Id*. at ¶ 95. According to the confidential witness, the FDA told the company that it would need to "demonstrate a correlation between the swallowing domain and the fluoroscopic assessment." *Ibid*.

The confidential witness worked as a Director of Field Medical Affairs at Orphazyme from July 2020 through July 2021. *Id*. at ¶ 94. He led the company's field medical affairs group, which presented information about the clinical trial to healthcare providers and insurers, and also was responsible for leading a team of medical science liaisons in the United States. *Ibid*. He reported to the head of U.S. Medical Affairs, who in turn reported to Painter (the President of Orphazyme's wholly owned U.S. subsidiary). *Ibid*. "[H]igher level managers" in the United States told the confidential witness that management at Orphazyme's Copenhagen headquarters "had previous knowledge of the FDA's serious criticisms and concerns even before that negative feedback was shared with" the Chicago office. *Id*. at ¶ 97.

### G. June 2021 Complete Response Letter

On June 17, 2021, Orphazyme received a Complete Response Letter ("CRL") from the FDA upon completion of its review of the NDA. *Id*. at ¶¶ 78, 112. A CRL "describes all the

specific deficiencies in the NDA and identifies all the corrective actions that a sponsor can take to rectify its mistakes." *Id*. at ¶ 7.

On June 18, 2021, Orphazyme issued a press release reporting on the CRL. *Id*. at ¶ 78. The press release stated that the FDA

> issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain. Further, the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single phase 2/3 clinical trial to support the benefit-risk assessment of the NDA.

*Ibid*. The press release included this statement by Hansen, the Deputy Chairman of Orphazyme's Board of Directors:

> As representative for Orphazyme's shareholders and as a shareholder myself, I am extremely disappointed. I strongly believe there is a path forward for Orphazyme based on our pursuit of regulatory approval from the European Medicines Agency and continued dialogue with the FDA. Meeting these milestones in NPC will take great sacrifice from everyone in the organization, while we as a Board assist the management team in protecting as much value as possible.

*Id*. at ¶¶ 22, 78.

The same day, Bourdon, Vadsholt, and Blaettler—the company's CMO—held a conference call with analysts. *Id*. at ¶ 80. Bourdon repeated the press release's description of the CRL. *Ibid*. An analyst asked "whether the FDA actually thinks that they need a new confirmatory clinical trial" or whether there was "some sort of way to look at maybe existing data or confirmatory preclinical work or any additional biopsy work or something like that, that could be supportive for resubmission." *Id*. at ¶ 82. Bourdon responded that, "on the additional evidence beyond clinical, there could be some kind of also like, for example, pharmacodynamic data. But at this stage, it's very important for us to ensure that we find the most constructive path forward with the FDA. And as soon as we have new information here, we're going to come

back and revert and update you." *Ibid*. After the analyst asked why the FDA was "potentially even highly focused on" the swallow domain given that "it was primarily on the cognitive domain that you only saw maybe at best a numerical difference compared to placebo," and "how did your data look for [the swallow] domain alone?", this exchange ensued:

> Blaettler: "[W]e had good effect on the swallow domain. It was 1 of 3 domains that mostly carried the effect."
>
> Analyst: "Okay. So that should be supportive for your case if they focus more highly on the swallow domain, basically, so meaning that you have a p-value of less than 0.05, I guess."
>
> Blaettler: "I think what is still important to emphasize here, it is a composite outcome measure, where all 5 domain[s] should be considered in totality. But certainly, the swallow domain is one of the strong domains for arimoclomol and is associated with survival."

*Ibid*.

Bourdon and Vadsholt held a second June 18 conference call. *Id*. at ¶ 86. Bourdon again repeated the press release's description of the CRL. *Ibid*. An analyst from Guggenheim Securities asked whether the company would be "willing" to "run a study," whether it was necessary to collect the required data, and what the "ballpark time frame" might be for a study. *Ibid*. Bourdon responded: "So we are, at the moment, reassessing the kind of data, not only like clinical data, but they could be also like pharmacodynamic data. So we are assessing this as we speak and then we're going to revert when we have more clarity on the path forward." *Ibid*.

On June 18, Orphazyme's stock price declined nearly 50%, from $14.56 on June 17 to a closing price of $7.33 on June 18. *Id*. at ¶ 107. On the next trading day, June 21, the company's stock price declined further, closing at $6.52. *Ibid*.

On June 21, analysts from Guggenheim Securities published a report expressing "surprise" at the CRL given arimoclomol's breakthrough therapy designation and Orphazyme's statements during the class period regarding "labeling talks" with the FDA, which had led

analysts to believe that the NDA's approval was imminent. *Id*. at ¶ 108. The report downgraded Orphazyme to a "Sell" recommendation with a price target of $1, and it observed that "it might make sense to wind down the company." *Ibid*. On June 28, the company announced that it would reduce its workforce by two thirds and initiate a "rigorous cost saving program." *Id*. at ¶ 110.

### H.     August 2021 Financial Results Call

On August 31, 2021, Orphazyme held a conference call to announce financial results for the first half of 2021. *Id*. at ¶ 88. Bourdon stated that "arimoclomol has demonstrated statistically significant and clinically meaningful effects on the disease progression in NPC, it has shown durable response and has demonstrated a good safety profile up to 36 months in the open-label extension study." *Ibid*.

### I.     October 2021 Type A Meeting

On October 13, 2021, the FDA held a Type A meeting with Orphazyme to discuss a path forward for the NDA. *Id*. at ¶¶ 90, 112. The company announced the results of the meeting in a press release issued on October 31, a Sunday. *Id*. at ¶ 90. The press release began with two bullet points stating, "[p]rogress made in understanding potential resolution of topics outlined in Complete Response Letter, including need for additional data to support NDA" and "FDA recommends the company provides supplemental information and analyses, and the FDA offers to have further interactions to identify a path to resubmission for arimoclomol in NPC." *Ibid*.; Doc. 28-13 at 1. The press release continued:

> The Type A meeting resulted in the following take-aways:
>
> - The FDA recommended that the Company submit additional data, information, and analyses to address certain topics in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission.

- The FDA concurred with the Company's proposal to remove the cognition domain from the NPCCSS endpoint, with the result that the primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, subject to the submission of additional requested information which the Company intends to provide. To bolster the confirmatory evidence already submitted, the FDA affirmed that it would require additional in vivo or pharmacodynamic (PD)/pharmacokinetic (PK) data; the Company is considering the optimal path forward to address the FDA's requests.

Doc. 23 at ¶ 90. The press release added the following statement from Bourdon:

> We are pleased to have gained a greater understanding from the FDA on the information that could address topics in the CRL. This is good progress. We are encouraged by the FDA's request to submit additional information and the invitation to further engage to discuss our approach and potential path forward. While we have not yet established a path to resubmission, our team will now work on putting a plan in place to discuss with the FDA during our next interactions and we will share more details about our strategy as and when appropriate. … We firmly believe in the establishment of a positive benefit-risk balance for arimoclomol and will continue to support the NPC community and our early access programs.

*Ibid*. The next day—Monday, November 1—Orphazyme's stock price increased by 7.5%, from its closing price of $3.89 per share on Friday, October 30, to close on November 1 at $4.18. *Id*. at ¶ 91.

## J. November 2021 Prospectus Supplement

On November 4, 2021, Orphazyme released a Prospectus Supplement to enable it to issue and sell up to $50 million of shares, which the company intended to use to seek regulatory approval of arimoclomol. *Id*. at ¶¶ 93, 112. The Supplement included previously undisclosed details about the June 2021 CRL and the October 2021 Type A meeting. *Id*. at ¶ 112. As to the CRL, the Supplement stated that the FDA

> issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain, **in the context of the FDA's preferred and recommended statistical approach**. Further, the FDA noted in the CRL that additional data is needed to supplement confirmatory evidence beyond the single Phase 2/3

13

trial for NPC **to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS** to support the benefit-risk assessment of the NDA.

*Ibid*. (emphasis added).  The emphasized text did not appear in Orphazyme's June 18, 2021, press release concerning the CRL.  As to the Type A meeting, the Supplement stated that the "Type A meeting resulted in the following takeaways":

> **Although the FDA stated that the additional rationale and reanalysis we presented to the FDA at this meeting were insufficient to address the deficiencies outlined in the CRL**, the FDA recommended that we submit additional data, information and analyses in order to address the deficiencies noted in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission of the NDA.  With regard to the confirmatory evidence, the FDA recommended that we submit additional information, such as in vivo or PD [pharmacodynamic] biomarker data as well as PK [pharmacokinetic] data, **that demonstrates arimoclomol target engagement and/or modulation of pathological processes relevant to NPC and assess the relationship between arimoclomol exposure and PD biomarker response.**  The FDA concurred with our proposal to remove the cognition domain from the NPCCSS endpoint, with the result that the primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, **subject to the submission of additional requested information, including performance-based validity evidence for selected domains inclusive of ambulation, speech and fine motor skills.  The FDA did not agree with our proposal to rescore the swallow domain because, in the FDA's view, our submission lacked previously requested evidence, protocols and supporting materials to establish how the scores were initially assigned, and the FDA has requested additional information for consideration, such as documentation related to clarity and standardization in collection of patient experience data.  The FDA has also requested additional information to discuss our proposal to use a while-on-treatment estimand of the log transformed ratio to address the timing of both the treatment comparison and potential intercurrent events.**

*Ibid*. (emphasis added).  The emphasized text did not appear in Orphazyme's October 31, 2021 press release concerning the Type A meeting.  The Supplement stated further that the company was "considering the optimal path forward, which could entail a material extension of the time and cost required for resubmission of the NDA."  *Ibid*.

On November 5, Orphazyme's stock price declined by over 4% from its November 4 closing price of $4.24. *Id*. at ¶ 113. By November 10, the stock had declined to $3.94. *Ibid*.

## Discussion

### I.    Section 11 Claim

Section 11 of the 1933 Act makes it unlawful for a registration statement to "contain[] an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "[E]very person who signed the registration statement," as well as "every person who was a director of … the issuer at the time of the [statement's] filing," is liable for statements that violate Section 11. *Id*. § 77k(a)(1)-(2). The parties dispute whether Plaintiffs' Section 11 claim is subject to the heightened pleading standards of Rule 9(b) or the ordinary pleading standards of Rule 8(a). Doc. 27 at 23; Doc. 31 at 21-23; Doc. 37 at 10 n.1. There is no need to resolve the dispute, as the Section 11 claim fails even under the more lenient Rule 8(a) standard.

Defendants' Rule 12(b)(6) motion attaches the entire Registration Statement as an exhibit. Doc. 28-1. Plaintiffs move to strike that exhibit, arguing that "the entire Registration Statement is [not] subject to judicial notice or incorporated by reference into" the complaint simply because the complaint "challenge[s] two statements in the Registration Statement as materially misleading." Doc. 33 at 3. Plaintiffs are incorrect. In resolving Defendant's Rule 12(b)(6) motion, the court may consider the Registration Statement because it is "referenced in the complaint and central to the plaintiff's claim." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2021). Moreover, as Plaintiffs concede, "judicial notice may generally be granted for publicly available SEC forms like" the Registration Statement. Doc. 33 at 4; *see Patten v. N. Tr. Co*., 703 F. Supp. 2d 799, 803 n.2 (N.D. Ill. 2010) ("The court takes judicial notice of matters of public record, such as stock prices and SEC filings."). That said, Plaintiffs' submission that "it is

inappropriate to take judicial notice [of the Registration Statement] for the truth of [its] contents," Doc. 33 at 4, is correct. *See Hennessy v. Penril Datacomm Networks, Inc*., 69 F.3d 1344, 1355 (7th Cir. 1995) (holding that the court could not use an SEC filing to determine the truth of a fact asserted in the filing); *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court cannot take judicial notice of disputed facts contained in … public records."). Accordingly, while the court considers the Registration Statement for the purpose of determining its content, the court does not assume the truth of that content.

As noted, the Registration Statement described "six potential review issues" flagged by the FDA in its September 24, 2020, deficiency letter, one being "the meaningfulness of one metric utilized to evaluate patient progress in our Phase 2/3 trial of NPC." Doc. 23 at ¶ 57. Plaintiffs contend that this description was materially misleading because the Statement "did not disclose that the FDA criticized the lack of statistical significance for both [the NPCCSS and CGI-I] metrics, condemned the clinical trial's results as 'weak and contradictory,' and required the Defendants to conduct a new study to demonstrate 'performance-based validity evidence.'" Doc. 31 at 23. Plaintiffs' argument fails because they do not allege any facts suggesting that the FDA—in the deficiency letter or as of the IPO on September 29, 2020—had communicated those matters to the company. Rather, the FDA conveyed those matters in the June 2021 CRL and at the October 2021 Type A meeting, months after the IPO. Doc. 23 at ¶ 112; Doc. 31 at 23.

"To be actionable, a statement must be false or misleading at the time it was made; how things 'turn out *ex post* do not matter to liability.'" *City of New Orleans Emps.' Ret. Sys. v. PrivateBancorp, Inc*., 2011 WL 5374095, at *9 (N.D. Ill. Nov. 3, 2011) (quoting *Eckstein v. Balcor Film Invs*., 58 F.3d 1162, 1169 (7th Cir. 1995)); *see also Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 810 (7th Cir. 2001) (rejecting the argument that the defendant's failure to disclose a

March 17 FDA letter in its March 9 SEC filing violated Rule 10b-5, noting the "fundamental problem" that, "[u]nless [the defendant] had a time machine, it could not have described on March 9 a letter that had yet to be written"); *Hoey v. Insmed Inc.*, 2018 WL 902266, at *25 (D.N.J. Feb. 15, 2018) ("Plaintiff … fails to adequately allege that [the defendant] was aware of the [regulatory agency's] concerns, before making representations which Plaintiff challenges under the law."); *id*. at *18 ("This statement suffers from the same flaw in Plaintiff's previous arguments; in demonstrating falsity, Plaintiff references concerns which were raised after the fact."). Without alleging facts suggesting that the FDA had determined that the clinical trial was fatally flawed and had communicated that determination to the company by late September 2020, Plaintiffs' Section 11 claim cannot proceed. *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 170 (S.D.N.Y. 2015) (dismissing a Section 11 claim that was based on "sheer speculation unsupported by factual allegations") (internal quotation marks omitted), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

Plaintiffs retort that the FDA must have raised its "views concerning the trial's 'weak and contradictory' results and lack of statistical significance" at the initial breakthrough therapy meeting and at other pre-NDA meetings for breakthrough-designated drugs, Doc. 31 at 25, given that those meetings typically discuss "planned or completed clinical trials and their endpoints," "important issues at different development phases," and "the drug's development plan and … collection of appropriate data needed to support drug approval," Doc. 23 at ¶¶ 41, 45, 47. But Plaintiffs' allegations do not suggest that the FDA in fact viewed the trial's results as "weak and contradictory" or as lacking statistical significance as of late September 2020. As noted, the FDA expressed its view that the clinical trial results were "weak and contradictory" and "lack[ed] … statistical evidence on the 5-domain NPCCSS" in the June 2021 CRL. *Id*. at ¶ 112.

Indeed, the fact that the FDA designated arimoclomol as a "breakthrough therapy" in November 2019 and approved the NDA for priority review in September 2020—each of which occurred *after* Orphazyme reported its clinical trial results in January 2019—strongly suggests that, as of late September 2020, the FDA had not decided that the trial results doomed or severely damaged the NDA's chances for approval. *Id.* at ¶¶ 3, 35, 38, 48; Doc. 28-1 at 121.

Plaintiffs' contention that the Registration Statement was misleading for failing to disclose the FDA's comment that the clinical trial results "lack[ed] … statistical evidence on the 5-domain NPCCSS," Doc. 23 at ¶ 112, fails for an independent reason. The Statement described in detail the trial design and results, and it specifically noted that the trial did not attain statistical significance on the NPCCSS scale for the entire population of patients treated with arimoclomol; rather, the Statement made clear that statistical significance was attained only for subgroups that excluded patients with double functional null mutations, included only patients aged four years old or older, or included only patients receiving miglustat. Doc. 28-1 at 121-123. That disclosure clearly conveyed that the Phase 2/3 trial did not achieve statistical significance on the unmodified NPCCSS scale. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (holding that "no reasonable investor could have understood the [statement] to mean anything other than the positive subgroup results," where a press release described statistically significant results in a subgroup as "encouraging preliminary findings," but also "disclosed that the overall study population did not attain statistically significant results based on the primary endpoints") (internal quotation marks omitted).

Plaintiffs next argue that the Registration Statement was misleading because its "description of the [September 2020] deficiency letter was vague to the point of being

meaningless." Doc. 31 at 24. That argument has no merit. The Statement specified that the "six

potential review issues" flagged by the FDA

> include[ed] the FDA's continuing evaluation of the integrity of data from our
> Phase 2/3 trial for NPC; the effect of the high degree of concomitant miglustat
> use in our Phase 2/3 trial for NPC on its ability to determine the safety and
> efficacy of arimoclomol, which could have potential implications for
> labeling/recommended dosing and post-marketing studies; the proposed
> primary hypothetical treatment effect used in our Phase 2/3 trial for NPC to
> estimate the treatment benefit effect; the meaningfulness of one metric utilized
> to evaluate patient progress in our Phase 2/3 trial of NPC; the timing of
> submission of the QTc and other study reports to the FDA, including in light
> of evidence suggesting a potential QT safety signal; and differences among
> the formulations of arimoclomol used in our Phase 2/3 trial of NPC as
> compared to the formulation of arimoclomol to be marketed.

Doc. 23 at ¶ 57. In addition, the Statement disclosed that a preclinical study had "suggest[ed] a

potential QT safety signal," that the FDA had requested reports from a new QTc study to be

submitted by October 2020, and that the company "d[id] not anticipate being able to submit the

reports" by then. *Ibid*. Those detailed descriptions of the deficiency letter are, contrary to

Plaintiffs' suggestion, more than "highly generalized" statements about problems associated with

the drug's development. *In re BioMarin Pharm. Inc. Sec. Litig*., 2022 WL 164299, at *8 (N.D.

Cal. Jan. 6, 2022).

Last, Plaintiffs contend that the Registration Statement's disclosures "concerning

potential disagreements with the FDA about 'endpoints,' 'methodologies[,]' and 'meaningful

results'" were misleading because Orphazyme "kn[e]w[] that such risks ha[d] materialized or

ha[d] a high risk of occurring" following its receipt of the deficiency letter. Doc. 31 at 24. In

support, Plaintiffs cite the following passages from the Statement:

- Because we are developing arimoclomol for the treatment of diseases in
  which there is little clinical experience, the FDA or other regulatory
  authorities may not consider the endpoints of our clinical trials to predict
  or provide clinically meaningful results.

19

- There are currently either no or limited approved therapies in the orphan disease indications we are targeting … . As a result … we may use endpoints or methodologies that regulatory authorities may not consider to be clinically meaningful … . Any such regulatory authority may require evaluation of additional or different clinical endpoints in our clinical trials or ultimately determine that these clinical endpoints do not support marketing approval. In addition, if we are required to use additional or different clinical endpoints by regulatory authorities, arimoclomol may not achieve or meet such clinical endpoints in our clinical trials. Even if a regulatory authority finds our clinical trial success criteria to be sufficiently validated and clinically meaningful, we may not achieve the pre-specified endpoint to a degree of statistical significance in any pivotal or other clinical trials we may conduct for our product candidate. Further, even if we do achieve the pre-specified criteria, our trials may produce results that are unpredictable or inconsistent with the results of other efficacy endpoints in the trial.

Doc. 23 at ¶ 59; Doc. 31 at 24. As explained above, Plaintiffs do not allege facts suggesting that the FDA had determined, as of late September 2020, that the "endpoints of [Orphazyme's] clinical trials [were insufficient to] predict or provide clinically meaningful results" or that it would require the company to "evaluat[e] … additional or different clinical endpoints in [its] clinical trials." Doc. 23 at ¶ 59. To the contrary, the FDA's designation of arimoclomol as a breakthrough therapy and acceptance of its NDA for priority review *after* Orphazyme reported the Phase 2/3 clinical trial results suggest that the agency was optimistic about arimoclomol's chances of approval. There is thus no reason to believe, based on the complaint's allegations, that Orphazyme knew by late September 2020 that the risk of the FDA finding their endpoints insufficient "ha[d] materialized or ha[d] a high risk of occurring." Doc. 31 at 24.

Accordingly, Plaintiffs' Section 11 claim is dismissed.

## II. Section 15 Claims

Section 15 of the 1933 Act extends liability to "[e]very person who, by or through stock ownership, agency, or otherwise, … controls any person liable" under Section 11. 15 U.S.C.

§ 77o(a).  Because the complaint does not allege a viable Section 11 claim, Plaintiffs' Section 15

claims are dismissed as well.

## III.    Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the 1934 Act makes it

> unlawful for any person, directly or indirectly, by the use of any means or
> instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange … [t]o use or employ, in connection with the
> purchase or sale of any security … any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the Commission
> may prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j.  Pursuant to Section 10(b), the SEC promulgated Rule 10b-5, which makes it

unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light of
> the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Rule 10b-5 prohibits only conduct that Section 10(b) itself makes

unlawful.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  "In

a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or

omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation."  *Ibid*.

Plaintiffs' Section 10(b) and Rule 10b-5 claims are subject to the heightened pleading

standards of Rule 9(b), which requires pleading the "circumstances constituting fraud" with

particularity. Fed. R. Civ. P. 9(b). This means that Plaintiffs "must describe the who, what, when, where, and how of the fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted). "This requirement includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (internal quotation marks omitted). In addition, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).

In seeking dismissal of Plaintiffs' Section 10(b) and Rule 10b-5 claims, Defendants focus on the material misrepresentation and scienter elements, which are considered in turn.

## A. Material Misrepresentation

To satisfy the material misrepresentation element, a plaintiff must allege that the defendant made a statement that was "*misleading* as to a *material* fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). Although omissions can be misleading, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), and "[d]isclosure of … information is not required … simply because it may be relevant or of interest to a reasonable investor," *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Instead, an omission is actionable only if disclosure of the omitted information was "necessary 'to make … statements made, in the light of the

circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)) (ellipsis in original). Stated otherwise, "th[e] materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id*. at 38 (quoting *Basic*, 485 U.S. at 231-32) (internal quotation marks omitted).

### 1. Registration Statement and 2020 Annual Report

Plaintiffs submit that the Registration Statement violates Section 10(b) for the same reasons that it violated Section 11 of the 1933 Act, and they add that the 2020 Annual Report "repeated the same misleading statements." Doc. 31 at 29-30. For the reasons discussed in dismissing Plaintiffs' Section 11 claims, the company's statements in the Registration Statement were not misleading.

Plaintiffs also contend that the 2020 Annual Report, filed in March 2021, was misleading because it omitted information from "a mid-cycle communication from the FDA that identified deficiencies that required 'significant additional work.'" *Id*. at 30. From the facts that the "review team at the FDA holds an internal mid-cycle meeting within 90 days after an NDA is accepted" and that "generally, within 2 weeks of the mid-cycle meeting, the … review team will call the sponsor to provide an update on the review status," Plaintiffs surmise that Orphazyme received that mid-cycle communication "before some of the most misleading statements were made … in the summer and fall of 2021." Doc. 23 at ¶¶ 51-52 (alterations and internal quotation marks omitted). Likewise, from the fact that the FDA review team is expected to identify "deficiencies that require significant additional work by the applicant" at the mid-cycle review meeting, Plaintiffs infer that the mid-cycle communication "identified deficiencies that required

'significant additional work.'" *Id*. at ¶ 51 (quoting CDER Review Process at 30). Defendants respond that the company had no duty to report interim FDA feedback like the mid-cycle communication because it is not "material." Doc. 37 at 15.

Defendants are correct. The substantial weight of authority "reject[s] claims of material omissions where pharmaceutical companies d[o] not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (collecting cases); *see Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *12 (S.D. Ind. Jan. 4, 2016) ("[N]umerous courts have concluded that a defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology.") (collecting cases); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *14 (S.D.N.Y. Sept. 19, 2012) ("[Where] defendants never guaranteed FDA approval, defendants had no obligation to disclose the purported flaws in the trial."); *In re Genzyme Corp.*, 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012) ("Because the [FDA's] observations do not represent a final agency determination, they are necessarily interim statements, subject to revision. … It simply cannot be that every critical comment by a regulatory agency … has to be seen as material for securities law reporting purposes, especially in an industry … where there is constant and close supervision by the FDA.") (internal quotation marks omitted), *aff'd sub nom. In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014); *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977, at *7 (D. Colo. Oct. 20, 2005) (holding that the "defendants' positive statements about the clinical trial results were [not] misleading," even though "the defendants did not disclose that the FDA had voiced concerns to [them] … about the subgroup analysis," because "[t]he fact that the FDA staff members raised questions did not impose a duty upon the defendants to revise their opinions about the drug's

efficacy or to report to the public the substance of their conversations with the FDA"); *In re Alkermes Sec. Litig.*, 2005 WL 2848341, at *16 (D. Mass. Oct. 6, 2005) ("Defendants had no duty to disclose that the FDA had requested additional studies because they had never guaranteed FDA approval."); *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) (holding that the defendant was under no obligation to disclose an FDA inspection because "the agency had not yet decided to sanction [the defendant]"), *aff'd sub nom. Gallagher*, 269 F.3d 806; *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 37 (D. Mass. 1997) (holding that the defendants "had no duty to disclose" the FDA's "concerns about the efficacy of the drug," as they represented "ongoing discussions with FDA during the review process") (alteration and internal quotation marks omitted); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) ("Defendants, as a general proposition, had no duty to report its ongoing discussions with FDA during the review process.") (internal quotation marks omitted). *But see Khoja*, 899 F.3d at 1010 ("[O]nce [the defendant] chose to tout the apparently positive 25 percent interim results, [it] had the obligation also to disclose that [the FDA had told it that] they were likely unreliable."). Rather, "the law with respect to this issue is clear: a biopharmaceutical corporation need not share a regulatory agency's response or criticism to a trial and its results if it does not constitute a final determination." *Hoey*, 2018 WL 902266, at *14 (collecting cases). The rationale for the principle that "interim FDA feedback is not material" is that such feedback "does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications." *Sanofi*, 87 F. Supp. 3d at 542.

Accordingly, even if Orphazyme, before it issued the 2020 Annual Report, had received a "mid-cycle communication from the FDA that identified deficiencies that required 'significant

additional work,'" Doc. 31 at 30, it had no duty to disclose that interim FDA feedback, and its failure to do so was not an actionable omission. *See Sanofi*, 87 F. Supp. 3d at 541-42.

### 2. March 2021 Cowen Healthcare Conference

Next, Plaintiffs challenge Vadsholt's March 3, 2021, statement at the Cowen Healthcare Conference that the company was "in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements." Doc. 23 at ¶ 71; Doc. 31 at 30. Plaintiffs submit that Vadsholt "misled investors in making this statement when he omitted to disclose the specifics of the [FDA's September 2020 deficiency letter] or the deficiencies identified in the mid-cycle communication before this statement was made." Doc. 31 at 30.

As discussed above, the company's Registration Statement adequately described the deficiency letter, and the company had no independent duty to disclose the mid-cycle communication. To the extent that Plaintiffs contend that Vadsholt's statement itself is misleading, that argument fails. As an initial matter, Plaintiffs do not allege that the information Vadsholt conveyed—that the company was "in the final stages of labeling talks with FDA" and did "not expect burdensome liver/renal monitoring requirements"—was untrue. It follows that the statement cannot be an actionable misrepresentation. *See Anderson*, 140 F. Supp. 2d at 909 ("Accurate statements of historical fact … are not actionable."); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) ("[A]s all of these statements comment on the evolving status of the Company's [drug] application, they are not actionable to the extent that they merely recite historical fact."); *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009) (holding that the defendant's "statement of expectation about the FDA's timing … merely referred to the historical fact— … not alleged to be false—that the FDA gave [the defendant] a [certain] date for its response to the NDA").

26

Moreover, "non-specific puffery"—including statements like Vadsholt's that "d[o] not make any concrete assertion [but] express[] only vague optimism"—"is not actionable under Rule 10b-5." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021); *see also Gallagher*, 269 F.3d at 811 (similar); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (noting that "predictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b-5," and holding that "indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact"). Of particular importance here, "statements [that] place a positive spin on developments in the [FDA approval] process … constitute inactionable puffery and corporate optimism." *EDAP*, 2015 WL 5326166, at *9-10 (holding that the company's statements that "the process was 'on track' and making continued 'progress,'" that it was "moving through the approval process in a timely manner," and that it was excited about "'great news' and having 'a much clearer path toward FDA approval'" were inactionable puffery); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (same for the defendant's statement that it "was 'proud' to be 'on track to have these [pharmaceutical] products reach the market in 2016'"); *Hoey*, 2018 WL 902266, at *18 (holding that a CEO's statement that "two and a half years ago when I had the privilege to talk to the board and to look at the opportunity … , I saw an approvable drug, bottom line" was a "paradigm of corporate puffery, and, therefore, … cannot serve as the basis for § 10(b) liability"). Vadsholt's statement that Orphazyme was "in the final stages of labeling talks with FDA and does not expect burdensome liver/renal monitoring requirements"—which does not promise that arimoclomol would be approved at the end of the "labeling talks"—promises far less than what ordinarily

qualifies as inactionable puffery.  It follows that Vadsholt's statement cannot support a Section 10(b) claim.

In any event, Plaintiffs' allegations provide no basis to believe that, as of March 2021, the company knew that its NDA would not attain timely approval.  Plaintiffs' allegation that the FDA's mid-cycle communication "identified deficiencies that required 'significant additional work,'" Doc. 31 at 30, rests entirely on FDA guidelines describing the purpose of the mid-cycle communication meeting rather than on any case-specific fact suggesting that the mid-cycle communication Orphazyme received in fact stated that "significant additional work" was required for approval, *id*. at 25-26.  Such speculation does not satisfy Rule 8(a), much less Rule 9(b).  *See Harris*, 135 F. Supp. 3d at 170 ("[T]he Amended Complaint fails to allege a misstatement or omission because the allegation … is sheer speculation unsupported by factual allegations.") (internal quotation marks omitted); *Bay Indus., Inc. v. Tru-Arx Mfg., LLC*, 2006 WL 3469599, at *2 (E.D. Wis. Nov. 29, 2006) ([P]laintiff's speculation … is not an adequate substitute for meeting the pleading requirements of Rule 8, liberal though they may be.").

Accordingly, Vadsholt's statements at the Cowen Healthcare Conference do not qualify as material misrepresentations.

### 3.     April 2021 B. Riley Neurosciences Conference

Plaintiffs allege that Bourdon made the following statements at the April 2021 B. Riley Neurosciences Conference and that those statements were materially misleading:

- Orphazyme is "NPC launch ready";

- Orphazyme was "absolutely launched already in the US"; and

- "[W]ith NPC alone, Orphazyme can make a difference for patient[s] and generate substantial, you know value for our shareholders and investors."

Doc. 23 at ¶ 74 (second alteration in original); Doc. 31 at 31-32.

At the threshold, the parties dispute whether Bourdon said that Orphazyme was "absolutely *launched already* in the US" (Plaintiffs' position) or "absolutely *launch-ready* in the U.S." (Defendants' position). Doc. 27 at 28; Doc. 31 at 31. Arimoclomol indisputably had not been "launched already" as of April 2021 because it had yet to gain FDA approval. Doc. 23 at ¶ 78. The court takes judicial notice of the publicly available recording from the conference, the accuracy of which Plaintiffs do not dispute and on which both sides base their transcriptions. *See Pugh v. Trib. Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) "[The court] may take judicial notice of documents in the public record … ."). It is beyond any reasonable dispute from the recording that Bourdon stated that Orphazyme was "launch-ready in the U.S." *Orphazyme Company Presentation*, B. Riley Securities Neuroscience Conference at 4:55–5:12, *available at* https://bit.ly/3JdFTrO.

Plaintiffs nonetheless contend that Bourdon's statements were materially misleading because they "contain[ed] an embedded misrepresentation … that the Company provided evidence of efficacy without which arimoclomol could neither be approved nor launched" while "omit[ting] the FDA's negative feedback" that "criticized the trial's lack of statistical significance in meetings, [the deficiency letter,] and other communications." Doc. 31 at 32. As an initial matter, it is doubtful that Bourdon's statements conveyed any such "embedded misrepresentation." Bourdon made his statements in the context of discussing Orphazyme's organizational and logistical preparedness to roll out arimoclomol. For instance, he explained the steps the company had taken that made him "feel like we are getting close to be launch[] ready," including enrolling "more than 90 … patients … in the early access program," having a "team on the ground, despite COVID, … engag[ing] with key providers, with key centers, … [to] articulate the potential benefit of arimoclomol," "set[ting] up the prelaunch and launch

strategy," and putting "in place all the backbone infrastructure … to ensure that we're going to do the right thing in the right way from supplying the product, interacting with providers and invoicing sales." Doc. 32-1 at 4. In addition, Bourdon acknowledged that success was conditioned on obtaining FDA approval: his statement that the company was "launch-ready in the U.S." was preceded immediately by the statement that the launch was "of course, pending FDA approval"; he stated that "the company now will be … pending FDA approval serving patients hopefully with NPC in the US and in coming months"; and he noted that the company was "watching very carefully … [the] FDA['s] decision [on the NDA]." *Id*. at 3-5. Given that context, Bourdon's statements that the company was "launch-ready" and "can make a difference for patient[s]" plainly referred to the company's organizational and logistical preparedness and did not misleadingly imply anything about the strength of the company's clinical trial data.

In any event, even if Bourdon's statements implied that the company had provided the FDA with clinical trial evidence sufficient for approval, they were not misleading for omitting the FDA's criticism of the Phase 2/3 trial results. As discussed above, the company adequately described the deficiency letter in its Registration Statement and had no independent duty to disclose the FDA's mid-cycle communication. And to the extent Plaintiffs suggest that Bourdon should have disclosed the criticisms expressed by the FDA in the June 2021 CRL—which stated that "additional data is needed to supplement confirmatory evidence beyond the single Phase 2/3 trial for NPC to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS," Doc. 23 at ¶ 112—he could not have described a CRL the company had yet to receive. *See Gallagher*, 269 F.3d at 810; *Hoey*, 2018 WL 902266, at *25.

Nor were Bourdan's statements false or misleading on their face. Plaintiffs do not allege that the company was not "launch-ready" in the sense of having initiated relationships with patients, providers, and institutions who could use or prescribe arimoclomol and having set up the infrastructure to supply the drug and process payments for it. And Bourdon's statement that "we feel absolutely convinced that … , with NPC alone, Orphazyme can make a difference for patient[s] and generate substantial … value for our shareholders and investors" expresses his vaguely optimistic opinion that arimoclomol would succeed—an opinion that, combined with his repeated mentions that the company was still awaiting FDA approval, Doc. 32-1 at 9, is inactionable puffery. *See Zebra Techs.*, 8 F.4th at 595; *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) ("Courts have held immaterial as a matter of law loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.") (internal quotation marks omitted); *Vallabhaneni*, 2016 WL 51260, at *16 (holding that the statement, "We are ready to launch. … [B]oth Merck and Endocyte have their teams in place and have been preparing for the potential arrival [of not-yet-approved drugs]," could "rightly be considered 'puffery' and [thus] not actionable as a matter of law").

Accordingly, Bourdon's statements at the B. Riley Neurosciences Conference do not qualify as material misrepresentations.

### 4. Statements Regarding the June 2021 CRL

Plaintiffs also allege that the company's June 18, 2021, press release regarding the FDA's CRL, as well as statements by Bourdon and Blaettler to analysts during conference calls that day, misled investors by omitting the FDA's severe criticisms of the Phase 2/3 clinical trial results and preference that the company conduct a new trial. Doc. 31 at 33.

As to the press release, Plaintiffs submit that, although "the Company announced that it had received a CRL, [it] hid that the CRL also condemned the original trial's results as 'weak and contradictory' among a litany of other serious problems." *Ibid*. As noted, the press release stated that the FDA

> issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain. Further, the FDA noted in the CRL that additional data are needed to bolster confirmatory evidence beyond the single phase 2/3 clinical trial to support the benefit-risk assessment of the NDA.

Doc. 23 at ¶ 78. The press release did not include the following bolded clauses from the company's Prospectus Supplement, issued several months later, which stated that the FDA

> issued the CRL based on needing additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain, **in the context of the FDA's preferred and recommended statistical approach**. Further, the FDA noted in the CRL that additional data is needed to supplement confirmatory evidence beyond the single Phase 2/3 trial for NPC **to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS** to support the benefit-risk assessment of the NDA.

*Id*. at ¶ 112 (emphasis added). While necessarily conceding that the press release did not include the bolded text, Defendants contend that the company "had no duty to disclose [in the press release] further details about the CRL" given that it was "indisputably part of an ongoing dialogue with the FDA." Doc. 27 at 31.

True enough, as discussed above, the general rule holds that biopharmaceutical companies are not obligated to disclose interim FDA feedback "if it does not constitute a final determination." *Hoey*, 2018 WL 902266, at *14. Moreover, a CRL does not foreclose the possibility of FDA approval if the applicant allays the FDA's concerns. *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1683 (2019) (Thomas, J., concurring) ("[C]omplete

response letters merely 'infor[m] sponsors of changes that must be made before an application can be approved, with no implication as to the ultimate approvability of the application.'") (alteration in original; emphasis removed) (quoting 73 Fed. Reg. 39588 (2008)).  Still, a CRL is the FDA's final determination that it "will not approve the application … in its present form," and "[a]fter receiving a [CRL], the applicant must" either "[r]esubmit the application …, addressing all deficiencies identified in the complete response letter," withdraw the application, or request a hearing.  21 C.F.R. § 314.110(a)-(b).  A CRL therefore is more significant than mere interim feedback; rather, it falls much closer to the "final determination" end of the spectrum of FDA action.  Accordingly, the company had an obligation to disclose the details omitted from its press release if "there [wa]s a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231-32) (internal quotation marks omitted); *see also Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (holding that the defendant's disclosure that the FDA had allowed it to resubmit an NDA based on a reanalysis of previously submitted data, without disclosing that the FDA had cautioned that "it would be 'unusual' for such reanalysis to provide sufficient evidence for approval," was a material misrepresentation); *In re Transkaryotic Therapies, Inc. Sec. Litig*., 319 F. Supp. 2d 152, 160 & n.9 (D. Mass. 2004) (rejecting the defendant's argument that it "had no duty to disclose the [FDA's] methodological criticisms" communicated in a CRL, reasoning that the CRL did not resemble mere "'random or sporadic' questions posed by the FDA to a pharmaceutical company during the review process") (quoting *Medimmune*, 873 F. Supp. at 966); *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251, at *8-9 (N.D. Cal. Aug. 5, 2004) (denying the defendant's motion to dismiss Section 10(b) claims

based in part on the fact that the defendant "misleadingly failed to reveal the depth of the FDA's concerns" conveyed in a letter requiring further information prior to approval).

Plaintiffs adequately allege that at least some of Orphazyme's omissions from the June 18, 2021, press release are actionable. Although the company disclosed that the FDA had requested "additional data … to supplement confirmatory evidence beyond the single Phase 2/3 trial for NPC," its failure to disclose that the FDA viewed the Phase 2/3 clinical trial results as "weak and contradictory" and the company's analysis as employing a "problematic hypothetical estimand" concealed the severity of the agency's concerns. Doc. 23 at ¶¶ 78, 112. Similarly, although Orphazyme had disclosed in its Registration Statement that the trial failed to achieve statistical significance on the NPCCSS scale for the original patient population, the fact that the FDA viewed the "lack of statistical evidence on the 5-domain NPCCSS" as an obstacle to approval could have been "viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231-32) (internal quotation marks omitted).

The other sections of the press release cannot ground a Section 10(b) claim. Plaintiffs contend that the press release's failure to include the clause, "in the context of the FDA's preferred and recommended statistical approach," renders misleading its statement that the FDA requested "additional qualitative and quantitative evidence to further substantiate the validity and interpretation of the 5-domain NPC Clinical Severity Scale (NPCCSS) and, in particular, the swallow domain." Doc. 23 at ¶ 78. The fact that the FDA sought additional evidence to "substantiate the validity and interpretation" of the NPCCSS data, however, necessarily implies that the company's analysis did not conform to a "statistical approach" acceptable to the agency.

It follows that the press release's failure to include the clause, "in the context of the FDA's preferred and recommended statistical approach," was not misleading.

Plaintiffs also challenge a statement in the press release by Hansen that he "strongly believe[s] there is a path forward for Orphazyme." *Ibid*. Plaintiffs submit that it was misleading to "insist[] that there was a 'path forward' to seek regulatory approval for arimoclomol even though … the FDA had communicated the complete opposite view." Doc. 31 at 33-34. But the CRL conveyed that there was a path forward to seek regulatory approval so long as the company submitted "additional qualitative and quantitative evidence." Doc. 23 at ¶¶ 78, 112. And Hansen made clear in the sentences flanking his "path forward" statement that approval was not assured and would take significant work—specifically, he acknowledged being "extremely disappointed" by the CRL, and he conceded that the path forward depended on "continued dialogue with the FDA" and would require "great sacrifice from everyone in the organization.". *Id*. at ¶ 78. Accordingly, Hansen's statement in the press release was not misleading.

Moving on to the conference calls, Plaintiffs contend that Blaettler's statements "tout[ing] the effectiveness of the swallow domain" when "the FDA had communicated the complete opposite view" were misleading. Doc. 31 at 33-34. Specifically, in response to an analyst's question about why the FDA was focused on the swallow domain and how the pertinent data looked, Blaettler stated, "[W]e had good effect on the swallow domain. It was 1 of 3 domains that mostly carried the effect." Doc. 23 at ¶ 82. When the analyst then asked whether it "should be supportive for your case if they focus more highly on the swallow domain, basically, so meaning that you have a p-value of less than 0.05 [statistical significance]," Blaettler replied that "it is a composite outcome measure, where all 5 domain[s] should be

considered in totality," and then stated, "But certainly, the swallow domain is one of the strong domains for arimoclomol and is associated with survival." *Ibid*.

Citing the confidential witness, Plaintiffs allege that the FDA by May 2021 had informed the company that it would need to conduct a fluoroscope exam to measure the swallow domain and demonstrate a correlation between that assessment and the Phase 2/3 trial data. *Id*. at ¶ 95. In addition, the November 2021 Prospectus Supplement disclosed that, at the Type A meeting in October 2021, the FDA had rejected the company's "proposal to rescore the swallow domain because, in the FDA's view, our submission lacked previously requested evidence, protocols and supporting materials to establish how the scores were initially assigned." *Id*. at ¶ 112. The Supplement's reference to "previously requested evidence" suggests that the FDA had requested additional evidence and clarification regarding the swallow domain before issuing the CRL. In light of these allegations, it is reasonable to infer that, by the time it received the CRL, the company knew that the FDA believed there were major issues with the reliability of the swallow domain results—issues that could be cured only by gathering additional data.

Given that knowledge, it was arguably misleading for Blaettler to characterize the clinical trial data as demonstrating a "good effect" on the swallow domain and to describe the swallow domain as "1 of 3 domains that mostly carried the effect"—statements that strongly implied that the swallow domain data supported approval. *Id*. at ¶ 82. Blaettler's statement that "the swallow domain is one of the strong domains for arimoclomol" exacerbated matters, particularly because it was offered in response to an analyst's question about whether it "should be supportive for your case if [the FDA] focus[es] more highly on the swallow domain." *Ibid*. Accordingly, Plaintiffs sufficiently allege that Blaettler's statements on the conference call regarding the swallow domain were misleading.

36

Defendants argue that the confidential witness's account should not be credited because Plaintiffs do not adequately describe how he had access to the information he provided. Doc. 27 at 33. Granted, "allegations from 'confidential witnesses' must be 'discounted,'" as they may "have axes to grind," may be "lying," or may not "even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). That said, a court *may* credit allegations attributed to confidential witnesses when "their stories c[an] be tested," such as when they "corroborate or disambiguate evidence from disclosed sources." *Ibid.*; *see also Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) (*Makor I*) ("[Plaintiffs] must … describe their sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged, or in the alternative provide other evidence to support their allegations.") (internal citation and quotation marks omitted), *vacated and remanded on other grounds*, 551 U.S. 308 (2007).

That is precisely the case here. The confidential witness's account corroborates the Prospectus Supplement's implication that, even before the FDA issued the CRL, the company was aware that the agency had serious concerns about the integrity of the swallow domain data and would require additional evidence. Doc. 23 at ¶ 112. The complaint also explains how the confidential witness would be in a position to know that the FDA had asked the company to validate the swallow domain data with a fluoroscopic exam—specifically, the witness reported to the head of U.S. Medical Affairs and led both the company's field medical affairs group, which presented information to healthcare providers and insurers about the clinical trial, and a team of medical science liaisons in the United States. *Id*. at ¶ 94. Given the witness's upper-level position within a team that dealt extensively with the clinical trial results, it is "probab[le] that a person in the position occupied by the source would possess the information alleged." *Makor I*,

437 F.3d at 596.  It follows that Plaintiffs adequately plead facts allowing the court to credit the witness's account.

Last, Plaintiffs allege that Bourdon's responses to analysts on the two conference calls "exacerbated the misleading [press release] by evading pointed and probing analyst questions about the FDA's concerns."  Doc. 31 at 16.  First, in response to the question "whether the FDA actually thinks that they need a new confirmatory clinical trial" or whether there was "some sort of way to look at maybe existing data or confirmatory preclinical work or any additional biopsy work or something like that, that could be supportive for resubmission," Bourdon responded that, "on the additional evidence beyond clinical, there could be some kind of also like, for example, pharmacodynamic data."  Doc. 23 at ¶ 82.  Second, in response to the question, "[i]f [the company] would have to run a study, would [the company] be willing to do that? And what could be the time line?," Bourdon responded, "So we are, at the moment, reassessing the kind of data, not only like clinical data, but they could be also like pharmacodynamic data."  *Id*. at ¶ 86.

In both exchanges, Bourdon implied that the FDA could approve a resubmitted NDA without the company first conducting a new clinical trial.  That is arguably misleading in light of Plaintiffs' allegation that the FDA had told the company by May 2021 that it would have to conduct a fluoroscopic exam to validate the swallow domain data—especially when coupled with the CRL's emphasis on the need for "additional qualitative and quantitative evidence to further substantiate the validity and interpretation of … in particular, the swallow domain."  *Id*. at ¶¶ 95, 112.  Accordingly, Plaintiffs sufficiently allege that Bourdon's statements regarding the lack of necessity for a new clinical trial were misleading.

### 5. August 2021 Financial Results Call

Next, Plaintiffs challenge Bourdon's statement, on the August 31, 2021, financial results call, that "arimoclomol has demonstrated statistically significant and clinically meaningful effects on the disease progression in NPC, it has shown durable response and has demonstrated a good safety profile up to 36 months in the open-label extension study." *Id*. at ¶ 88. Plaintiffs contend that the statement "continued to falsely claim that the trial demonstrated statistical significance" when in fact "the FDA had communicated the complete opposite view." Doc. 31 at 33-34. Defendants respond that, in "context, … Bourdon's very next statement made clear that he was relying on" a recently published journal article that had "found that arimoclomol *had* achieved statistical significance in treating NPC as measured by NPCCSS." Doc. 27 at 36. Defendants attach as exhibits the journal article and the transcript of the call, Docs. 28-11, 28-12, and Plaintiffs move to strike the article, Doc. 30; Doc. 33 at 7-8. In support, Plaintiffs argue that Defendants "cannot be allowed" to "rely on [the article] to claim that … Bourdon should be excused for withholding the FDA's condemnation of the clinical trial results for a lack of statistical significance." Doc. 33 at 7.

As a general rule, a defendant on a Rule 12(b)(6) motion cannot introduce evidence to contradict the plaintiffs' well-pleaded factual allegations. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). But Defendants' argument does not depend on whether arimoclomol *in fact* had achieved statistical significance on the NPCCSS scale. Plaintiffs' theory of misrepresentation is that Bourdon's statement misleadingly implied that the *FDA* considered the company's clinical trial data to be statistically significant, when the CRL in fact criticized the data's lack of statistical significance. Doc. 31 at 33-34. Defendants respond

by arguing that it was clear from the context of Bourdon's statement that he was referring to the article's—not the FDA's—evaluation of statistical significance. Doc. 27 at 36. Thus, the critical question is whether Bourdon's statement misleadingly implied that the FDA considered the arimoclomol clinical trial results statistically significant. The answer to that question is no, and in so concluding, the court appropriately considers the call transcript because it is a "document[] that [is] critical to the complaint and referred to in it." *Phillips*, 714 F.3d at 1020.

Viewing Bourdon's statement in context makes clear he was not referring to the FDA's view of the clinical trial data's statistical significance. The CRL criticized the clinical trial data submitted to support the NDA, the results of which Orphazyme first reported in January 2019. Doc. 23 at ¶¶ 35, 112. On the call, Bourdon's statement that arimoclomol "has demonstrated statistically significant and clinically meaningful effects" was followed immediately by this explanation: "On August 21, of this year [2021], the results of our pivotal 002 study were published in the journal of Inherited Metabolic Disease. We're very pleased with this publication, it provides validation of our program through a robust peer-reviewed scientific process." Doc. 28-12 at 5. Given that the company had released the original Phase 2/3 clinical trial results in January 2019—which it disclosed in the Registration Statement, which in turn noted the lack of statistical significance on the NPCCSS scale for the entire study population, Doc. 28-1 at 121-123—and given that the FDA had issued the CRL in June 2021, Doc. 23 at ¶ 78, Bourdon's statement that the statistically significant results had been published in an August 2021 journal article made clear to any reasonable investor that he was describing results different from those supporting the original NDA and was not suggesting that the FDA was satisfied by those results. It follows that Bourdon's statement regarding the statistical significance of the August 2021 "pivotal 002 study" results did not misleadingly imply that the

FDA considered the data submitted to support the original NDA to be statistically significant. Accordingly, Bourdon's statement on the August 2021 earnings call does not qualify as a material misrepresentation.

### 6. Statements Regarding the October 2021 Type A Meeting

Last, Plaintiffs contend that the company's October 31, 2021, press release, which reported on its October 13 Type A meeting with the FDA, "falsely told investors that 'good progress' had been made in resolving the issues identified in the CRL." Doc. 31 at 34. Defendants respond that the press release "accurately disclosed the relevant details of the Type A meeting" and that Bourdon's "good progress" statement—which the press release quoted—is an "inactionable statement of corporate optimism." Doc. 37 at 21.

In the context of the press release as a whole, Bourdon's "good progress" statement was not misleading. The press release repeatedly emphasized that the FDA had asked for additional data to support a resubmitted NDA, stating that "[t]he FDA recommended that the Company submit additional data, information, and analyses to address certain topics in the CRL and engage in further interactions with the FDA to identify a pathway to resubmission," observing that the "primary endpoint is permitted to be recalculated using the 4-domain NPCCSS, subject to the submission of additional requested information which the Company intends to provide," and noting that "the FDA … would require additional in vivo or pharmacodynamic (PD)/pharmacokinetic (PK) data." Doc. 23 at ¶ 90. The press release then quoted Bourdon as saying: "We are pleased to have gained a greater understanding from the FDA on the information that could address topics in the CRL. This is good progress." *Ibid*.

It is thus clear from the press release that the "good progress" statement suggested only that the company had identified information that the FDA would require as part of a resubmitted

NDA.  Indeed, the press release further quoted Bourdon as saying that he was "encouraged by the FDA's request to submit additional information and the invitation to further engage to discuss our approach and potential path forward" and that the company had "not yet established a path to resubmission," thus making clear that the company had not yet "resolv[ed] the issues identified in the CRL," but rather had only identified the types of additional data it would need to collect.  Accordingly, Bourdon's "good progress" statement was not a material misrepresentation.

*   *   *

In sum, Plaintiffs adequately plead that the following statements are actionable, material misrepresentations or omissions:

- The June 2021 press release's omission of the FDA's statement that additional data was needed "to address the weak and contradictory evidence, problematic hypothetical estimand and lack of statistical evidence on the 5-domain NPCCSS," *id*. at ¶ 112;

- Blaettler's June 2021 statements that there was a "good effect" on the swallow domain, that it was "1 of 3 domains that mostly carried the effect," and that "the swallow domain is one of the strong domains for arimoclomol," *id*. at ¶ 82; and

- Bourdon's June 2021 statements that, "on the additional evidence beyond clinical, there could be some kind of also like, for example, pharmacodynamic data," and that the company was "reassessing the kind of data, not only like clinical data, but they could be also like pharmacodynamic data," *id*. at ¶¶ 82, 86.

**B.    Scienter**

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud."  *Matrixx*, 563 U.S. at 48 (internal quotation marks omitted).  As shown above, the only actionable misrepresentations or omissions were made by Orphazyme, Bourdon, and Blaettler.  Thus, the court need only determine whether these three defendants acted with scienter.

Scienter is "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756; *see also Costello v. Grundon*, 651 F.3d 614, 634 (7th Cir. 2011) (defining "scienter" as "intent to deceive or reckless disregard for the truth"). The PSLRA requires a plaintiff to allege "with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Although "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Makor III*"), any evaluation of corporate scienter "must focus on the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making … ) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment," *Pugh*, 521 F.3d at 697 (internal quotation marks omitted). As the Supreme Court has instructed, the scienter inquiry asks

> whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. …
>
> …
>
> … To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." … A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007) (*Makor II*) (internal citations omitted).

The complaint alleges that Bourdon and Blaettler "knowingly or recklessly … made various untrue statements of material facts and omitted to state material facts … [to] (i) deceive the investing public, including Plaintiffs and other Class members … ; (ii) artificially inflate and maintain the market price of Orphazyme's ADS; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Orphazyme ADS at artificially inflated prices." Doc. 23 at ¶ 141. Defendants argue that the complaint "does not explain why [they] would have made misleading statements throughout 2021 about the prospects for FDA approval if they 'knew the FDA would eventually figure out that [arimoclomol] could not be approved,'" adding that "[t]he far more compelling inference is that [the company] honestly believed in arimoclomol's potential to treat NPC and expected it could achieve approval through ongoing dialogue with the FDA." Doc. 27 at 38. The court's task is to compare the plausibility of those competing inferences based on the complaint's factual allegations.

Several of the complaint's allegations, considered together, raise a cogent and compelling inference of scienter. As to Bourdon's statements suggesting that a new clinical trial might not be necessary, Plaintiffs allege that the FDA had informed the company that it had to conduct a fluoroscope exam to measure the swallow domain and demonstrate a correlation between that assessment and the Phase 2/3 clinical trial data. Doc. 23 at ¶ 95. As Defendants correctly note, Plaintiffs do not allege that the confidential witness "ever interacted with any Individual Defendant." Doc. 27 at 40. Nonetheless, it is unlikely that Bourdon would have been unaware of the FDA's request that the company conduct a fluoroscopic exam. Plaintiffs allege that arimoclomol was Orphazyme's sole drug candidate, Doc. 23 at ¶ 2, and it reasonably follows that the company's CEO would have been aware of a major issue preventing FDA approval of the drug. *See Makor III*, 513 F.3d at 711 (holding that it is "exceedingly unlikely" that the

44

company's CEO was "unaware of the problems of his company's two major products"); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) (noting that "the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item," and holding that allegations of misrepresentations that concerned "an important product" supported "a very strong inference that the senior executives who gave those apparently prepared remarks touting the product would have paid at least some attention to the product's status") (internal quotation marks omitted); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("[A]llegations regarding management's role in a company … may conceivably satisfy the PSLRA standard … where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."); *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *7 (N.D. Ill. Apr. 26, 2021) ("[I]t seems unlikely, given the importance of the 2Ku product to Gogo's fortunes … that Gogo and members of 'senior management' such as the individual defendants were unaware of the magnitude of the problem."). That Bourdon appeared to be attempting to evade analysts' questions about whether a new clinical trial was necessary further strengthens the inference that he knew—and intentionally failed to disclose—that FDA approval was contingent on the company conducting a new clinical trial. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011) (holding that the defendant company's "directly nonresponsive" answer to an analyst's "question about the submission of new data" supported a "strong inference of scienter"); *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002) ("[D]efendants' evasive responses further support a strong inference of scienter.").

As to Blaettler's statements assuring analysts about the strength of the swallow domain data despite the FDA's concerns, Plaintiffs' allegations provide ample reason to believe that he was aware of the FDA's concerns at that time. Blaettler was Orphazyme's CMO from November 2016 through November 2021, and, as noted, arimoclomol was the company's sole drug candidate. Doc. 23 at ¶¶ 2, 20. It is therefore unlikely that Blaettler was unaware of the FDA's May 2021 request that the company validate the swallow domain data by performing a fluoroscopic exam. *See Makor III*, 513 F.3d at 711; *Carbonite, Inc*., 22 F.4th at 9. In addition, the fact that Blaettler conducted the June 18 call with Bourdon and answered questions about the clinical trial data further suggests that he was knowledgeable about and paying close attention to the data and its reception by the FDA. *See In re Delcath Sys., Inc. Sec. Litig*., 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (finding an inference of scienter in part because the CEO's "public statements evinced a familiarity with the data in the trials"). Moreover, management at Orphazyme's Copenhagen headquarters knew before the FDA's May 2021 communication to the Chicago office about the FDA's "serious criticisms and concerns" about the swallow domain, Doc. 23 at ¶ 97, and it is unlikely that Blaettler, as the CMO, would not have been informed of those concerns. Blaettler's knowledge that the FDA had serious concerns with the swallow domain data's validity thus supports a strong inference of scienter as to his assurances that the data supported approval on resubmission of the NDA. *See Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 707-09 (9th Cir. 2016) (holding that the plaintiff sufficiently alleged a strong inference of scienter, in part because the defendant "affirmatively represented" that certain animal studies "supported [the defendant's] case for approval" of its drug, when in fact the defendant "knew that the animal studies were *the* sticking point with the FDA").

As to the June 2021 press release, it is unlikely, and Defendants do not even argue, that the company released the statement without knowing the full content of the CRL, including the more severe criticism that the press release failed to disclose. *See Makor III*, 513 F.3d at 710 ("Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."). Because arimoclomol was Orphazyme's sole drug candidate, it is unlikely that the company officials approving the press release were unaware of the complete text of the CRL. *See id*. at 711. That the press release failed to mention the most severe feedback from the CRL, while disclosing its less damaging aspects, further suggests that the omission was knowing and intentional. *See Zak v. Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 610 (4th Cir. 2015) (holding that "the defendants' failure to disclose in the … press release that the FDA briefing document contained a recommendation against approval of [their drug candidate]," while disclosing only the document's receipt and the fact that "'several lines of inquiry' had emerged, including that the efficacy trials 'may not adequately establish a durable treatment effect' … supports the inference that [the company] intentionally or recklessly misled investors"); *Intercept Pharms., Inc. Sec. Litig*., 2015 WL 915271, at *7 (S.D.N.Y. Mar. 4, 2015) (finding a sufficient inference of scienter where the defendant "chose … only to report the positive development, engaging in the sort of selective disclosure that creates a real possibility of misleading investors").

Defendants contend that Plaintiffs' "scienter theory does not make a whole lot of sense" because the company "would not have staked its existence on arimoclomol and invested all its resources into the drug if it knew, but concealed, that the FDA would not approve it." Doc. 27 at

38 (internal quotation marks omitted); Doc. 37 at 22.  To the contrary, Plaintiffs allege that

Defendants "made a deliberate choice … to submit to the FDA weak and contradictory clinical

data that they knew lacked statistical evidence, and chose to omit this information from investors

in order to pull off a vital capital raise."  Doc. 23 at ¶ 99.  It is highly plausible that Defendants

attempted to conceal arimoclomol's approval issues in the hope that they could raise additional

funding to correct those issues and gain FDA approval on a resubmitted NDA.  *See Makor III*,

513 F.3d at 710 (rejecting the defendants' argument that they "could have had no motive to paint

the prospects for the [products] in rosy hues because within months they acknowledged their

mistakes and disclosed the true situation of the two products," and explaining that "[t]he fact that

a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not

inconsistent with its having been a considered, though because of the risk a reckless, gamble.  It

is like embezzling in the hope that winning at the track will enable the embezzled funds to be

replaced before they are discovered to be missing") (internal citation omitted).

By the same token, Defendants' argument that Plaintiffs "do[] not allege any motive for

fraud or explain how any Defendant benefited, or could hope to benefit, from it" because "all

Individual Defendants held their shares throughout the Class Period, and some of their spouses

even *increased* their holdings," Doc. 27 at 39, fails to persuade.  Plaintiffs are correct that, at the

pleading stage, the court cannot consider an Orphazyme press release submitted by Defendants

describing stock purchases by Vadsholt's family members.  Doc. 33 at 8-9; *see Jackson v. Curry*,

888 F.3d 259, 263 (7th Cir. 2018) ("Generally, a district court cannot consider evidence outside

the pleadings to decide a motion to dismiss without converting it into a motion for summary

judgment.").  But even if Defendants held their shares throughout the Class Period, they could

still have hoped to benefit from an increase in the stock price if a resubmitted NDA were

ultimately approved. *See Makor III*, 513 F.3d at 710 (rejecting the defendants' argument that there was no scienter "because there is no indication that [the CEO] or anyone else who may have been in on the fraud profited from it financially," and explaining that the CEO "may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might exceed the costs").

The court has carefully weighed the competing inferences of scienter. The inference that Bourdon and Blaettler acted with mere carelessness is not more plausible or compelling than the inference that they acted recklessly or intentionally; rather, the inference that they acted with scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Makor II*, 551 U.S. at 324. It follows that Plaintiffs adequately plead Bourdon's and Blaettler's, and therefore Orphazyme's, state of mind for purposes of the Section 10(b) and Rule 10b-5 claims.

## IV.    Section 20(a) Claims

Section 20(a) of the 1934 Act extends liability to "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b). 15 U.S.C. § 78t(a). Defendants' only argument for dismissing the Section 20(a) claims is that the complaint does not state any Section 10(b) claims. Doc. 27 at 42. Because Plaintiffs have viable Section 10(b) claims against Orphazyme, the Section 20(a) claims may proceed against the company officials named as control persons: Bourdon, Blaettler, Vadsholt, Stratton, and Painter. Doc. 23 at ¶¶ 151-154.

## V.    Regulation S-K Claims

Last, Plaintiffs allege that Defendants' misleading statements in the Registration Statement, as well as their failure to disclose the "serious extent and nature of the FDA's negative feedback" expressed in the mid-cycle communication, in the CRL, and at the October 2021 Type A meeting, violated Regulation S-K. Doc. 31 at 11, 27-29. Defendants' only

argument for dismissal is that "Plaintiffs' claim that the Registration Statement omitted any known risks in violation of Items 303 or [105] of Regulation S-K … fails for the same reasons" that Plaintiffs' Section 11 and Section 10(b) claims fail.  Doc. 27 at 28 n.11; Doc. 37 at 16 n.12.

Item 303 of Regulation S-K requires the disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  Item 105 requires the disclosure of "the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  To the extent that Plaintiffs' Regulation S-K claims are based on Defendants' failure to disclose in the Registration Statement more details about the FDA's deficiency letter and to disclose the FDA's mid-cycle communication feedback, the claims are dismissed because Plaintiffs do not sufficiently allege that those failures were actionable omissions or misrepresentations.  However, Plaintiffs' Regulation S-K claims may proceed with respect to the Section 10(b) claims that they have adequately pleaded—that is, the June 2021 press release's omission of the most severe feedback in the CRL, Bourdon's June 2021 failure to disclose that the FDA had requested a new clinical trial, and Blaettler's June 2021 statements regarding the strength of the swallow domain data.

In addition, Plaintiffs' Regulation S-K claim may proceed as to Orphazyme's failure to disclose the "serious extent and nature of the FDA's negative feedback at [the October 2021 Type A] meeting."  Doc. 31 at 11.  Although Plaintiffs do not sufficiently allege under Section 10(b) that Bourdon's "good progress" statement was a material misrepresentation, *id*. at 34, Defendants offer no argument against Plaintiffs' contention that the company's failure to disclose more details about the Type A meeting violated Regulation S-K, *id*. at 11, 28-29.  Accordingly, Plaintiffs' Regulation S-K claim may proceed as to that alleged failure.  *See G & S*

*Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.").

### Conclusion

Defendants' motion to dismiss is granted in part and denied in part, as is Plaintiffs' motion to strike. To the extent set forth above, Defendants' motion is denied as to Plaintiffs' claims against Orphazyme, Bourdon, Blaettler, Vadsholt, Stratton, and Painter under Regulation S-K, Rule 10b-5, and Sections 10(b) and 20(a) of the 1934 Act. Defendants' motion otherwise is granted. Although Plaintiffs may be unable to satisfactorily replead the dismissed claims, the court will err on the side of caution and dismiss those claims without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). Plaintiffs have until September 8, 2022, to amend. If Plaintiffs do not amend, the dismissal will convert automatically to a dismissal with prejudice, and Orphazyme, Bourdon, Blaettler, Vadsholt, Stratton, and Painter shall answer the surviving portions of the operative complaint by September 22, 2022. If Plaintiffs amend, Defendants shall file a responsive pleading by October 6, 2022.

August 11, 2022

_____
United States District Judge

51